1  PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY

2  Name SUNDBERG,        ROGER          D.
          (Last)           (First)        (Initial)

3  Prisoner Number ___D79282___                           FILED

4  Institutional Address P.O. Box 689,  BW-116L            MAY 2 9 2008

5          Soledad, CA   93960-0689              RICHARD W. WIEKING
                                                 CLERK, U.S. DISTRICT COURT
6  ═══════════════════════════════════════      NORTHERN DISTRICT OF CALIFORNIA

7              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA

8  ROGER D. SUNDBERG                         )
   ─────────────────────────────            )
9  (Enter the full name of plaintiff in this action.)  )
                                            )
                vs.                         )   Case No. _____ SI
10                                          )   (To be provided by the clerk of court)
   B. CURRY Warden of CTF;                  )
11 ─────────────────────────────            )   PETITION FOR A WRIT
                                            )   OF HABEAS CORPUS
   Board of Parole Hearings;                )
12 ─────────────────────────────            )
                                            )
   A. Schwarzenegger, Governor              )
13 ─────────────────────────────            )
                                            )
14 ─────────────────────────────            )   (PR)
   (Enter the full name of respondent(s) or jailor in this action)  )
                                            )
15 ═══════════════════════════════════════

16              Read Comments Carefully Before Filling In

17 When and Where to File

18        You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located. If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution

28 where you are confined. Habeas L.R. 2254-3(b).

1   <u>Who to Name as Respondent</u>

2        You must name the person in whose actual custody you are. This usually means the Warden or

3   jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4   you are imprisoned or by whom you were convicted and sentenced. These are not proper

5   respondents.

6        If you are not presently in custody pursuant to the state judgment against which you seek relief

7   but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8   custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9   was entered.

10  <u>A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE</u>

11       1.  What sentence are you challenging in this petition?

12            (a)   Name and location of court that imposed sentence (for example; Alameda

13                  County Superior Court, Oakland):

14  Los Angeles County Superior Court,   Norwalk
    _____

15            Court                                Location

16            (b)   Case number, if known ___A474007_____

17            (c)   Date and terms of sentence _2/24/88, 17 years to life_

18            (d)   Are you now in custody serving this term? (Custody means being in jail, on

19                  parole or probation, etc.)          Yes _X__  No _____

20            Where?

21            Name of Institution: Correctional Training Facility

22            Address: _____P.O. Box 689, Soledad, CA  93960_____

23       2.  For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  P.C. 187, P.C. 12022.5
    _____

27  (2nd degree murder with use of a firearm)
    _____

28  _____

PET. FOR WRIT OF HAB. CORPUS          - 2 -

3. Did you have any of the following?

    Arraignment:                        Yes __X__     No _____

    Preliminary Hearing:            Yes __X__     No _____

    Motion to Suppress:             Yes _____     No __X__

4. How did you plead?

    Guilty __X__    Not Guilty _____    Nolo Contendere _____

    Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?  N/A

    Jury _____    Judge alone _____    Judge alone on a transcript _____

6. Did you testify at your trial?   N/A        Yes _____     No _____

7. Did you have an attorney at the following proceedings:

    (a)    Arraignment               Yes __X__     No _____

    (b)    Preliminary hearing      Yes __X__     No _____

    (c)    Time of plea             Yes __X__     No _____

    (d)    Trial              N/A  Yes _____     No _____

    (e)    Sentencing            Yes __X__     No _____

    (f)    Appeal           N/A  Yes _____     No _____

    (g)    Other post-conviction proceeding    Yes _____     No __X__

8. Did you appeal your conviction?        Yes _____     No __X__

    (a)    If you did, to what court(s) did you appeal?

         Court of Appeal             Yes _____     No _____

         Year: _____    Result:_____

         Supreme Court of California    Yes _____     No _____

         Year: _____    Result:_____

         Any other court             Yes _____     No _____

         Year: _____    Result:_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS        - 3 -

1     petition?          Yes _____    No_____

2       (c)    Was there an opinion?       Yes _____    No_____

3       (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                        Yes _X__      No_____

5          If you did, give the name of the court and the result:

6          _____

7          _____

8   9.  Other than appeals, have you previously filed any petitions, applications or motions with respect to

9   this conviction in any court, state or federal?      Yes _____    No_____

10          [Note:  If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition.  You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28

15   U.S.C. §§ 2244(b).]

16       (a)    If you sought relief in any proceeding other than an appeal, answer the following

17          questions for each proceeding.  Attach extra paper if you need more space.

18       I.     Name of Court: <u>Los Angeles County Superior Court</u>

19          Type of Proceeding: <u>Habeas petition</u>

20          Grounds raised (Be brief but specific):

21          a.<u>The Board violated due process</u>

22          b.<u>The Board failed to fulfill plea agreement</u>

23          c._____

24          d._____

25          Result: <u>Denial</u>         Date of Result: <u>10/29/07</u>

26       II.    Name of Court: <u>2nd Appellate District Court of Appeal</u>

27          Type of Proceeding: <u>Habeas petition</u>

28          Grounds raised (Be brief but specific):

a. Board violated due process _____

b. Board failed to fulfill plea agreement _____

c. _____

d. _____

Result: __Denial_____ Date of Result: 2/15/08

III.  Name of Court: __Supreme Court of California__

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. Board violated due process _____

b. Board failed to fulfill plea agreement _____

c. _____

d. _____

Result: __Denial_____ Date of Result: 4/23/08

IV.  Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____ Date of Result: _____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes __X____    No_____

Name and location of court: __Los Angeles County Superior Court__

**B. GROUNDS FOR RELIEF**

State briefly every reason that you believe you are being confined unlawfully. Give facts to support each claim. For example, what legal right or privilege were you denied? What happened? Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS         - 5 -

1   need more space. Answer the same questions for each claim.

2       [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3   petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4   499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5   Claim One: THE BOARD VIOLATED PETITIONER'S RIGHT TO DUE PROCESS BY CONTINUALLY DENYING PAROLE BASED ON THE PREDICTIVE VALUE OF HIS 20 YEAR OLD OFFENSE IN THE FACE OF EXEMPLARY IMPRISONMENT, AND IN VIOLATION OF HIS PLEA AGREEMENT TO A LESSER OFFENSE.

6

7   Supporting Facts: See page 8.

8   _____

9   _____

10  _____

11  Claim Two: _____

12  _____

13  Supporting Facts: _____

14  _____

15  _____

16  _____

17  Claim Three: _____

18  _____

19  Supporting Facts: _____

20  _____

21  _____

22  _____

23      If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  _____

26  _____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS        - 6 -

List, by name and citation only, any cases that you think are close factually to yours so that they are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning of these cases:

See page 23

_____

_____

_____

Do you have an attorney for this petition?     Yes_____     No  X _____

If you do, give the name and address of your attorney:

_____

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

Executed on  5-26-08                         Roger H. Smalley
                Date                              Signature of Petitioner

(Rev. 6/02)

PET. FOR WRIT OF HAB. CORPUS          - 7 -

## INTRODUCTION

Petitioner, Roger Sundberg, respectfully submits the following Writ of Habeas Corpus in the above entitled case and alleges that his confinement is in violation of both the California and United States Constitutions.  Petitioner seeks relief from the California Board of Prison Terms' June 7, 2006 decision finding him unsuitable for parole.

The sole question in determining parole suitability is whether the inmate currently presents an "unreasonable risk of danger to society if released" on parole (see Cal. Penal Code § 3041(b); Cal. Code Regs. tit. 15 § 2402(a); In re Wen Lee, 49 Cal.Rptr.3d 931, 937; In re Scott [Scott II] (2005) 133 Cal.App.4th 573, 594-595, 34 Cal.Rptr.3d 905; Hayward v. Marshall (9th Cir. 2008) 512 F.3d 536, 543).  The Board's decision lacks any evidentiary support that Petitioner currently poses an unreasonable risk to society and violates his original plea agreement to the lesser offense of second degree murder.

The Board's 6/7/06 decision is Petitioner's fifth parole denial despite his lack of prior criminality, his stable social history, nearly twenty years of exemplary behavior, realistic parole plans, and multiple professional opinions by both Correctional Counselors and Psychologists concluding that he has a "low risk of violence" that is "no more than the average citizen in the community."  The basis for these denials has in every case been the immutable factors of the offense.  This has been the case despite Petitioner's plea agreement reducing his offense to second degree murder and despite the failure of the Board to show a nexus between the unchanging factors of the offense and his current risk to society.

Petitioner's only hope is that at some undetermined point in the future the Board will find that his crime was not "callous" or "cruel" despite the fact that the circumstances of the offense will not have changed.

### STATEMENT OF FACTS

#### I

Petitioner's fifth parole hearing took place at Correctional Training Facility on June 7, 2006.  The two member Board panel consisted of Linda Shelton as Presiding Commissioner and Bill Keenan, Deputy Commissioner.  Petitioner was received into the Department of Corrections on March 7, 1988 on one count of murder in the second degree with the use of a firearm. (Exh. A, p. 1) Petitioner stands convicted of second degree murder as a result of a plea agreement reached with the Los Angeles County District Attorney's Office and approved by the Superior Court of Los Angeles County, through which Petitioner accepted responsibility for his actions and granted the state the benefit of his uncontested imprisonment.  The sentence was 17 years to life and Petitioner's Minimum Eligible Parole Date was August 4, 1998.  The sentencing transcript, which the Board had before it but failed to consider, reflects that the sentencing judge noted "a number of mitigating factors which can be asserted on behalf of the defendant" but that Petitioner was ineligible for probation or any other sentence by law.  No aggravating factors were cited by the sentencing court. Therefore, at the time of this hearing Petitioner had already served 8 years beyond his Minimum Eligible Parole Date for the offense and sentence agreed upon by the District Attorney's Office (Exh. B, p. 3)

## II

Twenty years ago Petitioner and the victim, Steve Summers, were neighbors.  Both were married and were experiencing marital problems for different reasons.  Petitioner was distraught and depressed over an affair his wife refused to break off.  Summers, an abusive drug user and dealer, was estranged from his wife Pamela. Petitioner and Pamela Summers began a relationship, at first as friends sharing their troubles, then later becoming romantically involved.  Pamela Summers confided to Petitioner and his wife the physical and emotional abuse she suffered at the hands of her estranged husband who, in turn, taunted and threatened Petitioner and his wife for interfering.  Ultimately, Pamela obtained a restraining order against Summers but he repeatedly violated it by returning to their house.  During this stressful period, Petitioner, who has a family history of depression, became suicidally depressed.  On the day of the crime Petitioner had been drinking and arguing with his wife and had become despondent, convinced his marriage and life were over.  Unfortunately, at this moment he glanced out of his open doorway and saw that Summers had returned to the garage, presumably to resume his abusive relationship with Pamela.  Unbeknownst to Petitioner Pamela had given in to her husband and allowed him to live in the garage despite the restraining order.  In a fit of emotion, Petitioner grabbed his pistol and ammunition, went over to the garage and confronted the victim, whom he believed to be a threat to Pamela as well as to his wife and himself, and who he saw as the source of much of the stress he was under.  They struggled in the garage with Summers punching Petitioner in the head and Petitioner firing

10

at Summers and wounding him.  The struggle continued and the victim's young son became an unfortunate witness to events.  The struggle concluded in the bathroom with Petitioner shooting and killing the victim before turning the gun on himself.  This suicide attempt failed but left Petitioner with permanent brain damage resulting in a life long seizure disorder. (Exh. A, pp. 11-14)

The Board failed to consider the Probation Report's evaluation of the crime which it had before it.  The Probation Report says that:

> This crime appears to be significantly out of character for him as attested by his arrest-free life to this date and by the numerous letters from family and friends all of whom agreed that this crime is an unlikely occurrence in their experience with defendant.

> It appears that the crime was the result of passion, jealousy and rage aggravated by alcohol which drove defendant to lose control.  There is some indication that defendant suffers from chronic depression which he has been able to control most of his life without medical treatment.  It also appears that there were some financial pressures on defendant since he was trying to support a family of four on an income of $1,200 per month.

The report concludes:

> Defendant has no prior crime record of arrests or convictions and the present matter appears to be significantly out of character for him, indicating perhaps more emotional instability than criminal make up. (Exh. C, pp. 10-11)

Contrary to regulations (Cal. Code Regs. tit. 15 § 2402 (b)) the Board failed to consider the information contained in the Probation Report which indicates that the crime was the result of significant stress that had occurred over a long period of time and that the crime was out of character and therefore unlikely to be repeated.

11

### III

The Board positively noted Petitioner's lack of any criminal history and his stable social history. Petitioner has no juvenile or adult record. Petitioner had been employed by AT&T as a telephone operator for nine years at the time of the crime. Petitioner remains in regular contact with his mother, sisters, brothers and youngest son. (Exh. A, pp. 15-31)

### IV

Petitioner admitted drinking 2 to 4 cans of beer a day during the period before the crime itself (Exh. A, pp. 22-23) The record shows that even though readily available, Petitioner has not used drugs or alcohol during his imprisonment. Furthermore, he has continuously attended Alcoholic's Anonymous since 1989, soon after his reception, and during that time has served as both Secretary and Vice Chairman of his group. (Exh. A, pp. 37-38)

### V

The Board's discussion of Petitioner's medical history reveals that he has a family history of depression affecting his mother, sisters and one brother. Petitioner also suffers from depression and had attended group counseling in high school. During the period before the crime Petitioner had become suicidal and had called suicide prevention several times but was unable to obtain a referral because his problems were marriage related and suicide prevention could not provide him a referral for marriage counseling. (Exh. A, pp. 24-26) Petitioner is Currently on C.C.C.M.S. status due to the medication he takes for his depression, and takes medication for seizures as a result of his self-inflicted head wound. According to the Psychological Evaluation prepared by Dr. S. Stack

12

1  on 9/20/2004 Petitioner's symptoms of depression are "well
2  controlled" by both medications and self-help group participation.
3  Dr. Stack also concludes that Petitioner "has learned strategies
4  for dealing with that stress in the future and I do not expect
5  that he would ever commit another serious crime like this again."
6  (Exh. D, p. 4)  This opinion is repeated as far back as the
7  5/23/2000 Psychological Evaluation which found Petitioner's Major
8  Depressive Disorder in "good remission" and noted the "strategies"
9  he had learned to deal with stress and that he was "not expected"
10  to ever commit a violent crime again. (Exh. E, pp. 3-4)  Petitioner
11  has clearly made significant gains in treating his depression,
12  a root cause of his commitment offense, and has maintained those
13  gains for a significant period of time.

**VI**

15  Petitioner was granted a Level III override from reception
16  due to the Correctional Counselor's opinion that "subject is not
17  viewed as a serious management problem." (Exh. F, p. 2)  Petitioner
18  has confirmed the Counselor's opinion by remaining disciplinary
19  free throughout his incarceration.  He has never received a CDC
20  115 disciplinary report and has only one (1) Counseling Chrono
21  received on 5/7/98 for grooming standards because he neglected
22  to shave during a prison lockdown. (Exh. A, pp. 45-46)  Petitioner
23  currently has a lowest possible classification score of 19. (Exh.
24  A, pp. 26-27)  Petitioner remains housed at a Level II facility,
25  which is not allowed for a term to life prisoner if the crime
26  involves "unusual violence". (Cal. Code Regs. tit. 15 §
27  3375.2(c)(7)(A))  The Life Prisoner's Evaluation Reports, prepared
28  by prison custody Counselors for the Board, from June 2003 and

13

July 2004 both refer to Petitioner's Threat Assessment[1] as a "low
degree of threat to the public if released." (Exh. H, p. 4, Exh.
I, p. 3)  Therefore, in the expert opinions of CDCR staff Petitioner
is not an unreasonable threat to others and has not been a security
risk throughout his incarceration.

### VII

Petitioner has worked or attended school continuously
throughout his incarceration earning "exceptional grades" and
comments from his supervisors such as "great worker" and "pleasant
attitude and generous nature". (Exh. A, pp. 30-31)  Petitioner
earned an Associate of Arts Degree in General Education from
Hartnell College graduating Cum Laude on 6/1/94. (Exh. J, p. 1)
He has continued his education at Coastline College working towards
a Computer Science degree.  He was certified in Vocational Data
Processing on 3/26/93 and has worked as a computer (repair)
technician with excellent Work Supervisor Performance Reports.
(Exh. A, pp. 32-33)  Petitioner has clearly improved his education
and learned a marketable skill as noted by Board panels as far
back as 6/6/2001. (Exh. K, p. 64)

### VIII

Petitioner has made a sincere commitment to improve himself
throughout his incarceration by participating in every available
self-help program. Most recently, Dr. D. Woods reported on 1/19/06
that Petitioner "is an active and insightful participant" in his
Self Esteem Group whose "energy and enthusiasm for self-improvement
will assist him to be a positive and productive citizen upon his

[1] The CCI's Threat Assessment has been discontinued.

14

release." (Exh. A, p. 34)  Licensed Clinical Social Worker C.
Mitchell noted on 6/14/06 that Petitioner had been an "active
participant" in a Depression Management Group for several years.
Petitioner was described as "open in sharing his own issues" as
well as offering "effective advice to group members", and noted
that for 6 months Petitioner had been "providing emotional and
physical support to a terminally ill cellmate." (Exh. A, p. 35)
The Board also noted Petitioner's participation in a 12 week Anger
Management course and a 13 week IMPACT workshop "designed to provide
an opportunity for education and awareness as to the profound
negative impact of crime on victims." (Exh. A, pp. 36-37)  The
record clearly shows Petitioner's dedication to self-improvement
as well as his personal growth as a result of these efforts.

IX

Petitioner's parole plans are to live in Long Beach CA with
his mother and his sister.  Though not required by regulation,
Petitioner has a job offer as a computer programmer or technician
with a company owned by a friend of a family friend who promised
to hire Petitioner even as a janitor until a computer position
became available.  The Board acknowledged that he has marketable
computer skills. (Exh. A, pp. 56-58)  The Board has also found
Petitioner to have "good family support", "realistic parole plans"
and, a "marketable skill" as far back as his 6/6/01 hearing. (Exh.
E, p. 64)  These factors have not changed and clearly exceed the
factors set out by regulation. (Cal. Code Regs. tit. 15 § 2402(d)(8)

X

At the conclusion of the hearing, Deputy District Attorney
Pearson urged the Board to deny parole (Exh. A, p. 99) in violation

15

of the plea agreement reached with the District Attorney's Office and in violation of Penal Code § 1192.1[2] which attaches to Petitioner's plea agreement as an express term.  At each of Petitioner's four (4) prior hearings his parole has been opposed by the District Attorney's Office in violation of Petitioner's constitutionally established liberty interest as a result of his plea.

XI

In their 6/7/06 decision the Board denied parole for one year. The Board found that despite Petitioner's "enormous amount of programming" and "serious introspection" the crime was carried out in an "especially cruel and callous manner" and that the "motive was trivial for the action." (Exh. A, pp. 106-107)  All of which are aggravating or special (capital) circumstances in violation of Petitioner's plea to the lesser offense of second degree murder with only mitigating factors noted by the sentencing court.  The Board also, inexplicably found that Petitioner did not have a job offer despite their earlier review of the letter offering a job and, spoke extensively about Petitioner improving his already exceptional parole plans though the Board did not expressly find his parole plans inadequate. (Exh. A, pp. 108-111)  The Board mentioned some of Petitioner's positive factors but failed to consider them as factors of suitability as required by regulations. (Cal. Code Regs. tit. 15 § 2402(d))

---

[2] A plea agreement is a contract (<u>People v. Shelton</u> (2006) 37 Cal.4th 757, 767)  Applicable Statutory code automatically attaches as a term of a plea agreement contract whether or not expressly stated in the agreement.  (<u>Farmer's Bank v. Federal Reserve Bank</u> (1923) 262 U.S. 649, 660)  See <u>People v. Watts</u> (1977) 67 Cal.App.3d 173, 178, 180, holding the requirements of Penal Code § 1192.1 apply to a plea to second degree murder carrying an indeterminate sentence.

The 6/7/06 hearing was an almost exact replication of Petitioner's previous four (4) hearings. In each case, despite Petitioner's exemplary behavior, positive Psychological Evaluation, and realistic parole plans he is denied parole primarily on the immutable crime factors despite his plea agreement to the lesser offense of second degree murder. At his first parole hearing on 7/24/97 Petitioner was disciplinary free, enrolled in a vocation developing a marketable skill, and was found by the psychologist to be "competent and responsible" with a "below average" violence potential compared with the Level II minimum security prison population. (Exh. L, p. 2) However, the Board found his crime was "especially cruel and callous," and carried out in a "manner which exhibits a callous disregard for human suffering" and "in a calculated and dispassionate manner." (Exh. M, p. 48) Parole was denied for three years.

At Petitioner's second hearing conducted on 6/6/01 Petitioner had continued his discipline free behavior, completed his marketable computer skill and had been found by the psychologist to have a violence potential "no greater than the average citizen in the community." (Exh. E, p. 4) The Board found him "not suitable" and denied parole for two years. The Board stated that the crime was "cruel and callous" and that it "demonstrated a callous disregard for human suffering." (Exh. K, p. 63) The Board also found that Petitioner "needs continued therapy to face, discuss, and cope with stress in a non-destructive manner" (Exh. K, p. 64) despite the opinion of the Psychological Evaluation which read that Petitioner had "learned strategies for dealing with stress in the future" and that he was "not expected to ever commit a

1    serious crime like this again." (Exh. E, p. 4)

2    Petitioner's third hearing took place on 7/31/03. Once again
3    Petitioner had remained disciplinary free, continued participating
4    in every available self-help program, and maintained his realistic
5    parole plans. Again the Board found him "not suitable" in a one
6    year denial. Again the Board found that the crime was carried
7    out "in an especially vicious manner." The Board inexplicably
8    found that Petitioner "had not sufficiently participated in
9    beneficial self-help and therapy" but failed to note any available
10   self-help or therapy programs that Petitioner could have
11   participated in but had not. (Exh. N, pp. 42-43)

12   Petitioner's fourth hearing took place on 10/28/04. Again
13   Petitioner continued his exemplary behavior and both the
14   Correctional Counselor and Psychologist found his violence potential
15   to be "low." (Exh. I, p. 3) The Board again found Petitioner "not
16   suitable" in a one year denial. Once more the crime was found
17   to have been carried out in an "especially violent and brutal
18   manner." (Exh. O, p. 61) These repeated denials demonstrate a
19   pattern indicating that no matter what progress Petitioner makes,
20   the crime will always trump his programming. Therefore, Petitioner
21   has no reasonable expectation of parole unless, at some point,
22   a Board panel will find that these same crime factors found by
23   other panels to be "cruel and callous" are not cruel or callous
24   and grant him parole.

                                    XII

25   To date Petitioner has twenty (20) years of exemplary behavior
26   in prison. With presentencing credits of 439 days (Exh. B, p.
27   3) and post conviction credits of four (4) months per year (Cal.

                                    18

Code Regs. tit. 15 § 2409(b)) Petitioner has credit for over twenty-six (26) years in custody.  The matrix for second degree murder runs from 15-21 years, and first degree murder from 25-33 years. (Cal. Code Regs. tit. 15 § 2403(c)).  Petitioner has exceeded the matrix for second degree murder and is well into the term for first degree murder in violation of his plea agreement and Penal Code § 1192.1

### XIII

The Board's reliance on the commitment offense to deny parole is grossly unfounded.  The commitment offense is a second degree murder established by plea agreement and is no more egregious than that of other life prisoners who have been granted dates by the Board and relief by the courts in cases such as Rosenkrantz v. Marshall, In re Scott, In re Lee and In re Weider, furthermore, Petitioner's actions were the result of significant stress in his life as the result of marital and financial problems, the prolonged conflict with the victim, and his propensity for depression.  These circumstances must be considered, and in a way that meaningfully addresses whether he continues to present an unreasonable risk of danger to society if paroled. (In re Wen Lee, 49 Cal.Rptr.3d 931, 937 citing In re Scott 133 Cal.App.4th 537, 594-595; In re Ernest Smith (2004) 114 Cal.App.4th 343; Hayward v. Marshall (9th Cir. 2003) 512 F.3d 536, 543)  Under this type of evaluation, the conclusion is inescapable that this life offense is not "particularly egregious" or among the "gravest" of such offenses, especially when viewed from the standpoint of Petitioner's mental state at the time of the crime, his dramatic transformation after nearly twenty (20) years in prison and his plea agreement to the

19

1  lesser offense of second degree murder, nor does the crime have

2  any predictive value in determining the Petitioner's current risk

3  to society.  No evidence shows that the crime alone makes Petitioner

4  a current danger to society if paroled.  Thus the Board has failed

5  to tie the facts of the offense to proof of current dangerousness.

6  (Lee, supra, Hayward, supra)

7                              XIV

8      In their decision filed 11/20/07 the Superior Court of Los

9  Angeles County denied Petitioner's Writ of Habeas Corpus challenging

10  the Board's 6/6/07 denial of parole.  The court found that there

11  was some evidence to support the Board's finding that Petitioner's

12  crime was exceptionally callous and that the motive was very

13  trivial.  This analysis is incomplete and improper in that the

14  court, like the Board, failed to point to some evidence that

15  Petitioner's twenty (20) year old offense makes him a current risk

16  to public safety if released on supervised parole.  Therefore,

17  the decision was an unreasonable determination of the facts in

18  light of the evidence.  Petitioner did not ask the court to re-

19  weigh the evidence, but to address the question of the predictive

20  value of his commitment offense in the face of two decades of

21  exemplary imprisonment and personal growth.  The court failed to

22  address this question and therefore failed to apply the appropriate

23  controlling legal standards.

24      Furthermore, the court misstates Petitioner's claim concerning

25  the Board's failure to honor his plea agreement by unnecessarily

26  finding that the District Attorney's office may oppose parole.

27  Petitioner's writ is not against the District Attorney but is

28  against the Board for unconstitutionally depriving him of the

                              20

benefit of his plea to a lesser offense by continually denying
parole based solely on the facts of the offense.    Review by this
court is necessary to properly address Petitioner's claims.

## XV

Petitioner has no plain, speedy or adequate remedy in the
ordinary course of the law.   Petitioner contends that further
participation in hearings or any aspect of the administrative
process of parole consideration will be futile in that he has been
denied parole at five (5) consecutive hearings, always for reasons
unsupported by the evidence before the Board.    Each such denial
has been repeatedly upheld by the Board's Decision Review Committee
and the Governor has never reviewed any of these denials.    Thus,
the only available avenue for relief is through the court system
by way of the instant Petition for Writ of Habeas Corpus.
Petitioner's continued confinement is unlawful, in that he is
entitled to be paroled but has been wrongfully denied that right.
Said confinement violates the United States Constitution's V and
XIV Amendment's due process clause, as well as the comparable
provisions of the California Constitution.

21

## PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully requests that this court:

1. Issue a Writ of Habeas Corpus or Order to Show Cause to the Warden of Correctional Training Facility, the Director of the Department of Corrections and Rehabilitation, the Governor and Board of Parole Hearings to inquire into the legality of Petitioner's incarceration;

2. Order the immediate release of Petitioner, or alternatively, order the Board to hold a new parole hearing within forty-five (45) days at which Petitioner will be found suitable and to set a date for release or alternatively, conduct a hearing and if no new information is presented that establishes Petitioner poses a present threat of future violence, to find Petitioner suitable for parole and set a release date;

3. Conduct an evidentiary hearing if necessary to resolve any disputed factual issues, and after the hearing, issue an order directing the State and Board to act as set forth above, and;

4. Discharge Petitioner free from both actual and constructive custody, or alternatively, apply any excess time in custody beyond the proper term for his offense against his maximum period of parole, and;

5. Grant such other and further relief as justice may require, and;

6. Retain jurisdiction to see that relief is actually achieved.


Date: 5-26-08

Roger D. Sundberg
Petitioner in Pro Per

22

## MEMORANDUM OF POINTS AND AUTHORITIES

### STANDARD OR REVIEW

The current judicial standard for reviewing a decision of the Board of Parole Hearings to deny parole is to determine if some reliable, relevant evidence was considered showing the prisoner currently poses an unreasonable risk to public safety. (In re Lee (2006) 49 Cal.Rptr.3d 931, 936; Hayward v. Marshall (9th Cir. 2008) 512 F.3d 536, 543) Furthermore, the reasons the Board used to deny parole must be viewed in the context of other factors the Board must consider to see if some evidence shows that the prisoner continues to pose an unreasonable risk to public safety. (Lee, supra, 937 quoting In re Scott [Scott II] (2005) 133 Cal.App.4th at pp. 594, 595, 34 Cal.Rptr.3d; see also In re Capistran (2003) 107 Cal.App.4th 1299, 1306) Finally, a determination should be made whether continuing to deny parole based on the immutable factors of the offense violates due process. (Scott II, supra; Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 916-917) However, should the Board misinterpret statutory law and fail to honor the terms of a plea agreement, and in the process violate a prisoner's due process, the non-deferential review standard applies. (Ghirardo v. Antonidi (1994) 8 Cal.4th 791, 800 [questions of law are reviewed de novo]; Brown v. Pool (9th Cir. 2003) 337 F.3d 1155)

I. THE BOARD VIOLATES DUE PROCESS AND DEPRIVES AN APPEARING PRISONER OF THEIR FEDERALLY PROTECTED LIBERTY INTEREST BY UNCONSTITUTIONALLY CHANGING THE NATURE OF A COMMITMENT OFFENSE AND/OR REPEATEDLY RELYING ON THE UNCHANGING FACTORS OF THE CRIME IN THE FACE OF EVIDENCE OTHERWISE.

Courts have repeatedly held that even in cases where offense circumstances support parole denial under regulatory law, due process may preclude the crime alone justifying parole denials

23

1  in the face of a prisoner's long term exemplary type prison record
2  demonstrating rehabilitation. (See e.g. In re Lee (2006) 49
3  Cal.Rptr.3d 931, 939; Scott II, supra, 34 Cal.Rptr.3d at pp. 916-
4  920; Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 916-916;
5  Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.2d 1063, 1084;
6  Hayward v. Marshall (9th Cir. 2008) 512 F.3d 536, 543)  This
7  Petitioner has been denied parole five (5) times based on the
8  unchanging circumstances of his offense and has served a term well
9  beyond the minimum number of years to which he was sentenced. (Irons
10 v. Carey [Irons II] (2007) 479 F.3d 658, 665)  Petitioner has no
11 criminal history other than his commitment offense.  Prior to
12 imprisonment he had a stable social history and continues to have
13 strong family support expressed in the form of letters of support
14 and strong parole plans.  In prison, Petitioner has remained
15 disciplinary free, completed a CDC Vocational program (Data
16 Processing), worked as a computer technician, completed an A.A.
17 degree from Hartnell College, and participated in every self-help
18 and therapy program available and applicable to him.
19 A. Repeated Reliance on Unchanging Factors Violates Due Process.
20       In Biggs v. Terhune, supra at 917, the court, clearly referring
21 to a prisoner having been denied parole multiple times based solely
22 on the offense, with a prison record such as Petitioner's held:
23       [While] the parole board's sole...reliance on the gravity
         of the offense...to justify denial of parole [may] be
24       initially justified as fulfilling the requirements set
         forth by State law, over time, however, should [a
25       petitioner] continue to demonstrate exemplary behavior
         and evidence of rehabilitation, denying him parole simply
26       because of the nature of his offense would raise serious
         questions involving his liberty interest.
27
28 Prior to this holding, the Biggs court reviewed California's Penal

1  Code and found Penal Code "Section 3041 [,subd.(b)] creates in

2  every inmate a cognizable liberty interest in parole which is

3  protected by the procedural safeguards of the Due Process Clause,"

4  holding that interest arises "upon the incarceration of the inmate."

5  (Biggs, Id. at 914-915, relying in part on McQuillon v. Duncan

6  (9th Cir. 2002) 306 F.3d 895, 901-902)  The In re Dannenberg (2005)

7  34 Cal.4th 1061 ruling is limited to the uniform provision of Penal

8  Code section 3041, subd. (a) and has no bearing on the Ninth Circuit

9  holding that the mandatory language of section 3041 (b) creates

10  a liberty interest in parole. (See Sass v. California Board of

11  Prison Terms (9th Cir. 2006) 461 F.3d 1123)

12      Recently California's Appellate Courts have issued rulings

13  affirming the reasoning in Biggs beginning with the case of In

14  re Scott [Scott II] (2005) 133 Cal.App.4th 573, 34 Cal.Rptr.3d

15  905.  The court in Scott II was mindful of the due process problems

16  of relying on the commitment offense to deny parole.  In a case

17  with many parallels to Petitioner's Scott was convicted of second

18  degree murder with use of a firearm in 1986.  The victim was a

19  drug user who Scott suspected of having an affair with his wife,

20  in the course of which the victim provided her with drugs.  After

21  several prior confrontations, Scott approached the victim in front

22  of his residence where both Scott's wife and son were present and

23  shot his victim several times striking him in the head and thigh

24  and killing him. (Id. at 571-580)  During his incarceration Scott,

25  like Petitioner, exhibited exemplary behavior, received

26  psychological evaluations indicating that his potential for violence

27  was no greater than the average citizen in the community, and that

28  his offense was the product of significant stress. (Id. at 582-

585)  In 2004 the Board found Scott suitable for parole and the
Governor reversed, citing the nature of the offense. (Id. at 586-
588)  The court granted Scott's petition for writ of habeas corpus
ruling "the commitment offense can negate suitability only if
circumstances of the crime reliably established by evidence in
the record rationally indicate that offender presents an
unreasonable public safety risk if released from prison. (Scott
II, 133 Cal.App.4th at 595) (Emphasis added)  The Governor in Scott
II, like the Board in Petitioner's case, failed to make a rational
connection between the offense and Scott's current danger to the
community.

B. Unchanging Offense Factors Lose their Predictive Value with
   the Passage of Time.

     In the case of In re Lee (2006) 49 Cal.Rptr.3d 931 the
California Appellate Court for the 2nd District affirmed this
reasoning as well.  Lee had plead guilty to second degree murder
and attempted premeditated murder in 1989.  In 1987 he had taken
a pistol and ammunition to a restaurant to confront a man who owed
him money.  Lee had decided to shoot the man and then himself if
the man did not pay him.  Lee fired five times wounding the man
and unintentionally killing the man's wife. (Id. at 933)  Lee was
sentenced to 17 years to life for second degree murder and life
for attempted murder. (Id. at 933)  Sixteen years later the Board
granted Lee parole indicating his lack of a prior criminal record,
his excellent behavior in prison, his advanced age and deteriorating
health, his mental evaluations indicating a "very low risk of
violence", his realistic parole plans and his signs of remorse.
(Id. at 933-934)  The Governor reversed the decision citing the

26

"atrocious" nature of the crime and that Lee's remorse was only recently expressed. (Id. at 934)

The court granted Lee's petition citing that "besides not being especially heinous or callous, Lee's crimes have little, if any, predictive value for future criminality. Simply from the passing of time, Lee's crimes almost 20 years ago have lost much of their usefulness in foreseeing the likelihood of future offense than if he had committed them five or ten years ago." (Id. at 939) The court also held that Lee's motivation for the shooting...augers against any future offenses," (Id. at 939) because it, like Scott's and Petitioner's was the result of significant stress in his life, which had built up over time.

The Sixth appellate District Court has also made similar findings in In re Weider (2006) 52 Cal.Rptr.3d 147, a case which also has many similarities to Petitioner's. Weider was distraught over his wife's leaving him for another man, he had made suicide attempts and finally, after almost two years had passed, he confronted his wife and the other man, George Laird, in a crowded restaurant with a pistol he had obtained from his car. Weider fired at the victims, struggled with the victim, his wife, and bystanders resulting in the victims death and the wounding of two bystanders. (Weider, supra at 150-151) Weider plead guilty to second degree murder and two counts of assault with a firearm. (Id. at 151) Like Petitioner Weider demonstrated a model prison record and was judged by a psychologist to be a "low risk" of violence if paroled. Despite this evidence of suitability, the Board in 2002, 2004, and 2005 found Weider unsuitable for parole based primarily on the circumstances of his commitment offense.

27

(Id. at 152-153)  In its ruling upholding a granting of the writ
by the Trial Court, the Appellate Court found that despite the
nature of the crime and that multiple victims were hurt Weider's
crime was not "so violent or vicious that Weider remains a public
safety risk." (Id. at 161)

The Court elaborated that the "Board failed to acknowledge
that the crime was the result of significant stress...that had
built up over a long period of time," and went on to acknowledge
that "the regulation requiring the Board to consider the role that
stress may have played in the commission of the crime reflects
the law's awareness of human nature." (Id. at 161)  The Board's
behavior in Petitioner's case place him in precisely the same
situation after a greater number of hearings.

Of Particular note are the near simultaneous rulings by the
Superior Court for the County of Los Angeles and the Federal
District Court in the latest and last chapter of the Rosenkrantz
saga.  In In re Rosenkrantz, 29 Cal.4th at 625, 128 Cal.Rptr.2d
104 the California Supreme Court established the doctrine that
in order for a parole denial to stand it must contain at least
"some evidence" that the prisoner poses an unreasonable risk to
public safety.  The crime itself may constitute "some evidence"
if it is found to be "particularly egregious" compared to other
similar offenses as long as this does not "swallow the rule that
parole normally be granted." (In re Rosenkrantz, 29 Cal.4th at
683 quoting In re Ramirez, (2001) 94 Cal.App.4th 549)  In
Rosenkrantz's case, the fact that he had, over a period of days,
bought a gun, practiced with it, waited outside the victim's
apartment before confronting him, shooting him ten times and killing

28

1  him, was found to be "some evidence" that the crime was "calculated

2  and dispassionate," and included elements of first degree murder,

3  and therefore grounds for denying parole.  However, even though

4  this crime was clearly "particularly egregious" both State and

5  Federal courts have found its predictive value to have diminished

6  with time and Rosenkrantz's continuous exemplary conduct.

7       In an order dated 6/26/06 the Superior Court for the County

8  of Los Angeles found that "[Rosenkrantz] has reached the point

9  in which the denial of parole can no longer be justified by reliance

10 on his commitment offense.  The Board's continued reliance on the

11 circumstances of the offense runs contrary to the rehabilitative

12 goals espoused by the prison system and has violated due process."

13 (Case No: BH003529) and granted his writ vacating the April 25,

14 2005 Board decision denying parole and releasing Rosenkrantz into

15 the community.  In a similar Order the Federal District Court

16 further reinforced this reasoning.  They found that the Board's

17 2004 decision denying parole based on crime factors violated due

18 process for two reasons:

19        First, continued reliance upon the unchanging facts of
20        Petitioner's crime makes a sham of California's parole
           system and amounts to an arbitrary denial of Petitioner's
21        liberty interest.

22        Second...the circumstances of Petitioner's crime do not
           amount to some evidence supporting the conclusion that
23        Petitioner poses an unreasonable risk of danger if
           released.

24        ...After nearly twenty years of rehabilitation, the
           ability to predict a prisoner's future dangerousness
25        based simply on the circumstances of his or her crime
           is nil. (Rosenkrantz v. Marshall 444 F.Supp.2d 1063,
26        1084 (C.D. Cal. 2006)

27 Thus, Petitioner, who like Rosenkrantz has 20 years of exemplary

28 behavior but unlike Rosenkrantz has crime factors that are not

                                   29

as egregious and a conviction that is the result of a plea to the

lesser offense of second degree murder rather than a jury verdict,

is clearly entitled to relief.

C. Petitioner's Crime Factors are not Sufficiently Egregious to

   Support Parole Denial After 20 Years.

In Petitioner's case the Board found that the crime was

"carried out in an especially cruel and callous manner...a manner

which demonstrates exceptionally callous disregard for human

suffering...[and that the] motive was very trivial." (Exh. A, pp.

106-107)  Despite overwhelming evidence, the Board failed to

consider that Petitioner's crime was a result of significant stress

which had built up over a long period of time.  Like Weider and

Lee, Petitioner had become suicidally depressed due to the break

up of his marriage.  Like Weider and Lee, Petitioner picked up

a gun, confronted and killed the victim whom he had come to believe

was the source of his stress.  However, unlike Weider and Lee,

Petitioner did not shoot multiple victims, among them innocent

bystanders.  Furthermore, unlike Weider and Lee, Petitioner's

decision to confront his victim was nearly instantaneous when

immediately following an argument with his wife during which he

became convinced his marriage and life were over, he observed the

victim in the garage next door, grabbed his gun and walked directly

over there.  Weider's wife had left him two years earlier and Lee

had obtained his gun and driven some distance to the restaurant

in order to confront his victim.

In the case of Scott, the breakup of his marriage was likewise

a period of significant stress which, like Petitioner, involved

numerous, escalating prior confrontations with a victim who was

30

frequently under the influence of drugs.  Scott too shot his victim
in front of a minor, in that case Scott's own son. (<u>In re Scott</u>,
[<u>Scott II</u>], (2004) 15 Cal.Rptr.3d 32, 35)  However, like Lee but
unlike Petitioner, Scott had driven a substantial distance before
confronting his victim and had ample time to think what the
consequences of this confrontation might be.

As in Petitioner's case, the Board found that Scott's motive
was "very trivial".  However, the court found that "there is no
motive for unlawfully taking the life of another human being that
could not reasonable be deemed 'trivial'." (<u>Scott I</u>, supra, at
47)  The court also found that the record showed that the
"Unpremeditated offense resulted from some provocation on the part
of the victim" and while the law on provocation did not limit
Scott's criminal liability, it did reflect the "law's concession
to human weakness under stressful conditions."  Thus finding that
Scott's motive was very trivial "ignored not only the evidence
that he was under significant stress when he committed his crime,
but human nature and experience," and was not supported by even
a "modicum of evidence". (<u>Id.</u> at 48)  Petitioner's motive was
virtually identical to Scott's including the significant stress
he was under as a result of the break up of his marriage and his
concern for a loved one who was endangered by a relationship with
a violent drug abuser.  There is no more evidence that Petitioner's
motive was "very trivial" than Scott's.

When compared to each of these cases: <u>Scott</u>; <u>Lee</u>; <u>Weider</u>;
and <u>Rosenkrantz</u>, Petitioner's offense can be seen as no more callous
or egregious than theirs and contains many circumstances which
make it, if anything, less severe.  Like each of the prisoners

31

in these cases, the Board failed to acknowledge evidence that the crime was committed as a result of significant stress over a prolonged period of time.  Like each of these cases Petitioner has served nearly twenty years of exemplary prison time and been found by both Correctional staff and psychologists to have a low threat of violence.  Like each of these cases Petitioner's crime has no predictive value as to his current or future potential for violence and, therefore, is not "some evidence" Petitioner currently poses a risk of danger to society.  Like each and all of these cases, Petitioner is entitled to relief.

D. All of the Evidence Before the Board Supports Petitioner's
   Suitability for Parole

The Board is required to consider "All relevant, reliable information" in making their determination of Petitioner's parole suitability. (Cal. Code Regs. tit. 15 § 2281 (b))  Included in this information are circumstances which tend to show both suitability and unsuitability for parole.  The Circumstances Tending to Show Unsuitability cited by the Board in Petitioner's case have already been addressed.  The Circumstances Tending to Show Suitability are as follows:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.
(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.
(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or the prisoner has given indications that he understands the nature and magnitude of the offense.
(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress had built over a long period of time.

32

(5) Battered Woman Syndrome.
(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.
(7) Age. The Prisoner's present age reduces the probability of recidivism.
(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release. (Cal. Code Regs. tit. 15 § 2402(d))

Petitioner fulfills all these circumstances except Battered Woman Syndrome. He has no juvenile record; he has a stable social history; showed remorse by indicating he understands the nature and magnitude of his offense; committed his crime as a result of significant stress which had built up over time; lacks a criminal history; turned fifty (50) years old in 2007, indicating a reduced probability of recidivism; has demonstrated plans for the future and developed marketable skills; and has twenty (20) years of exemplary institutional behavior. Though the Board mentioned some of these circumstances during the hearing it did not consider them as tending to show suitability in their decision. This was contrary to regulations and thus denied Petitioner the individualized consideration required by due process. (Scott I, supra, at 51) Petitioner has been a model candidate for parole since his first parole hearing and remains so to date. He is therefore entitled to relief that is long overdue.

II. DUE PROCESS IS VIOLATED WHEN A PRISONER IS DEPRIVED OF ALL BENEFIT FROM PLEADING GUILTY TO A LESSER OFFENSE.

A. Plea Agreements are Governed by Contract Law Standards.

In California, "courts are required to construe and interpret plea agreements in accordance with state contract law." (Buckley

33

v. Terhune (9th Cir. 2006) 444 F.3d 688, 695) California has a
three step process for interpreting contracts. First, a court
must look to the plain meaning of the agreement's language. (Cal.
Civil Code § 1638, § 1644) Second, if the language in the contract
is ambiguous, "it must be interpreted in the sense in which the
promisor believed, at the time of making it, that the promisee
understood it." (Cal. Civil Code § 1649) The inquiry considers
not the subjective belief of the promisor but, rather the
"objectively reasonable expectations" of the promisee. (Bank of
the West v. Superior Court, 2 Cal.4th 1254, 1265) Finally, if
after this second inquiry the ambiguity remains, "the language
of a contract should be interpreted most strongly against the party
who caused the uncertainty to exist." (Cal. Civil Code § 1654)
"Focusing on the defendant's reasonable understanding also reflects
the proper constitutional focus on what induced the defendant to
plead guilty." (Brown v. Poole, (9th Cir. 2003) 337 F.3d 1155,
1160 quoting United States v. De La Fuente, (9th Cir. 1993) 8 F.3d
1333, 1337)

California contract law also requires consideration be given
the implied terms-the law underlying the agreement, specifically
noting, "All things that in law or usage are considered as
incidental to a contract, as necessary to carry it into effect
are implied there from, unless some of them are expressly mentioned
therein, when all other things of the same class are determined
to be excluded." (Cal. Civil Code § 1656) Elaborating on this
standard, Grubb v. Ranger Ins. Co. (1978) 77 Cal.App.3d 526, holds
that under California law all applicable laws in existence when
an agreement is made necessarily enter such contract and form part

34

1    of it, without any stipulation to that effect as if they were

2    expressly referred to and incorporated into its terms.  Such

3    principle is held to embrace a state's statutes.  Also see Southern

4    Pacific Milling Co. v. Billwack (1942) 50 Cal.App.2d 79, holding

5    that as regards to contracts, it is a well-settled principle that

6    that which is implied by law becomes part of that contract as that

7    which is therein written, and if the contract is clear and complete,

8    when aided by that which is imported into it by legal implications,

9    it cannot be contradicted by parol in respect of that which is

10   implied any more than in respect of that which is written.  Not

11   only are all applicable law and statues expressly contained in

12   the plea agreement but also all government entities (i.e. agencies)

13   are bound by the plea including the Governor and the Board. (Giglio

14   v. United States (1972) 450 U.S. 150, 154)

15   B. Contract Law Requires Lesser Punishment for a Plea to a Lesser

16      Offense.

17       California Penal Code § 1192.1 is therefore an expressly

18   attached term of Petitioner's plea contract, and the Board, as

19   a part of the California State Government, is bound by these terms.

20   Penal Code § 1192.1 reads:

21       Upon a plea of guilty to an information or indictment
         accusing the defendant of a crime or attempted crime
22       divided into degrees when consented to by the prosecuting
         attorney in open court and approved by the court, such
23       plea may specify the degree there of and in such event
         the defendant cannot be punished for a higher degree
24       of the crime or attempted crime than the degree specified.

25   Penal Code § 3041 is also an express term of Petitioner's plea

26   contract and the Board is bound by it as well.  P.C. § 3041 reads:

27       One year prior to the inmate's minimum eligible parole
         date a panel consisting of at least two Commissioners
28       of the Board of Prison Terms shall meet with the inmate

35

1    and shall <u>normally</u> set a parole release date as provided
2    in section 3041.5 (Emphasis added)

3    When Petitioner accepted responsibility for his actions and
4    plead guilty to the lesser offense of second degree murder, and
5    was sentenced to 17 years to life the court noted the mitigating
6    factors of his crime. Neither the court nor the prosecution raised
7    aggravating factors, leading Petitioner to reasonably understand
8    that, barring misconduct on his part, his uniform term would be
9    set according to the matrix for second degree murder, at his first
10   parole hearing as required by the Penal Code sections then became
11   a part of his plea contract, when it was accepted by the court
12   and he was sentenced. These Penal Code sections that became a
13   part of his plea contract, when it was accepted by the court and
14   he was sentenced. These Penal Code sections need not have been
15   known to him at the time because their implications are the same
16   as the plain meaning of the language of his plea; that his crime
17   would be treated, and punished, like an ordinary second degree
18   murder. It would be completely unreasonable for anyone to conclude
19   from these facts that Petitioner would be repeatedly denied parole
20   based solely on the crime until he had served a term commensurate
21   with a first degree murder and even then, <u>would still be in prison</u>
22   with no reasonable expectation of parole.
23 C. <u>Contract Las Requires the Reciprocal Benefit of Lessened</u>
24    <u>Punishment be Provided to Petitioner.</u>
25   California's courts have consistently recognized parties to
26   a plea contract enter into that agreement understanding both will
27   mutually benefit, the State from the defendant's unopposed
28   imprisonment and the defendant by serving a lessor term than that

36

contemplated for the original offense charged. Describing that
basis for plea bargains, the court in People v. Collins (1996)
45 Cal.App.4th 849, 862, noted:

> Both our State Supreme Court and the United States Supreme
> Court have recognized that a plea bargain is based upon
> "reciprocal benefit" or "mutuality of advantage between
> the prosecutor and the defendant (e.g. People v. Collins
> (1978) 21 Cal.3d 208, 214-215, Brady v. United States
> (1970) 397 U.S. 742, 752, 90 S.Ct. 1463, 1471, 25 L.Ed.2d
> 747)" (Emphasis added)

Since a plea bargain is "based upon reciprocal benefit" Collins
45 Cal.App.4th clearly stands for the principle that unless both
parties to a plea bargain mutually benefit, there is no plea
contract. Previously recognizing this principle, the court in
People v. Collins 21 Cal.3d at 214-215, held the concept of
"reciprocal benefits" is "critical" to plea agreements, explaining
that in exchange for providing the state his uncontested
imprisonment, the defendant receives "lessened punishment." Collins
characterization of reciprocal benefits as critical is instructive.
It establishes that exchange of benefits as crucial to plea
bargains, thus so essential its absence renders a plea invalid.

Reiterating the State's long standing position that parties
to a plea agreement must reciprocally benefit if there is to be
a plea contract, the court in People v. Rhoden (1999) 75 Cal.App.4th
346, 351, held:

> Pursuant to this procedure the defendant agrees to plead
> guilty in order to obtain a reciprocal benefit, generally
> consisting of less sever punishment than that which could
> result if he were convicted of all the offenses charged.
> [Citation] This more lenient disposition of the charges
> is secured in part by prosecutorial consent to the
> imposition of clement punishment (§1192.5) by the People's
> acceptance of a plea to a lesser offense than that
> charged, either in degree (§ 1192.1, § 1192.2) or kind
> [citation], or by the prosecutor's dismissal of one or
> more counts of a multicount indictment or information.

Recognizing the principle of "lessened punishment" is essential to a plea agreement, the federal court in Weaver v. Graham (1981) 450 U.S. 24, 32, 67 L.Ed.2d 17, 25, 101 S.Ct. 460, held that, "we previously recognized that a prisoners eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed. Wolf v. McDonnell, 418 U.S. 539, 557, 4 L.Ed.2d 395, 94 S.Ct. 2693" Punishment reduction for those pleading guilty was recognized in Corbit v. New Jersey (1978) 489 U.S. 212, 223-224, holding, "[there is] leniency in return for a plea [of guilty], leniency that is denied if one goes to trial, [as] the standard of punishment is necessarily different for those who plead and those who go to trial." Addressing the same principles, the California court similarly held in People v. Cimarusti (1978) 81 Cal.App.3d 314, 323, "[I]t is the function of the executive branch to engage in negotiation with the defense by which a lenient disposition of the charge made is secured without trial." Also see People v. Superior Court for Los Angeles County (Felman) (1976) 59 Cal.App.3d 270 holding, the plea bargain process includes acceptance of a plea of guilty in return for clemency in punishment.

D. Some Evidence Standard is Inappropriate for Plea Conviction.

A plea contract resulting in a defendant being indeterminately sentenced is executed in multiple stages. Following the parties agreement, the plea's express terms and consequences are specified before the court, and the People may stipulate the offense for which the defendant is being convicted and punished. During the next stage the defendant is sentenced, providing the State its

38

mutual benefit in the form of his uncontested imprisonment. Once
the defendant serves the uniform term specified by statute and
regulation for the gravity, circumstances and degree of the
stipulated offense, the State must timely provide the defendant
with their reciprocal benefit, their critically owed lessened
punishment for the agreed upon offense type and degree. (People
v. Collins, supra, 21 Cal.3d at 214-215)  Should the State executive
fail to provide the defendant with his reciprocal benefit, the
Court, as a party to the agreement and stipulation must act to
ensure the defendant receives his bargained for consideration.
This is not a "some evidence" question, it is instead a contract
dispute settled under California contract law.  As a party bound
by the plea contract it approved, the court now has the
responsibility to enforce its terms by providing Petitioner his
owed contractual benefits.

   At this point in time, twenty (20) years after entering his
plea and granting the State its benefit, Petitioner has lost the
only benefit he could have received under contract, a parole date
within the matrix for second degree murder.  The irrevocable loss
of this benefit is a result of the Board's repeated denials of
parole based primarily on the factors of the offense.  Denial based
solely on the factors of the offense has been found to be lawful
by the California Supreme Court in the cases of In re Rosenkrantz,
supra, at 625) and in In re Dannenberg, ((2005) 34 Cal.4th 1061)
if the crime factors are found to be "particularly egregious"
(Rosenkrantz, supra, at 683 quoting Ramirez, supra, at 570) which
means "more than the minimum necessary to sustain the conviction"
(Dannenberg, supra, at 1071).  However, both of these cases arose

39

out of jury trials where the "some evidence" standard used by the Board was found to be less than the "reasonable doubt" standard juries are held to.  Consequently, this standard is opposite that held applicable for convictions as a result of plea agreements, which require a more lenient disposition.

If the executive branch of government is permitted to consider an offense as more severe than that stipulated at plea, that action would deprive the plea convicted prisoner of their owed leniency and remove their eligibility for reduced punishment.  It would apply the same standard of punishment to one convicted by plea or by trial, contrary to Corbit v. New Jersey, 439 U.S. at 223-224 holding identical "standard[s] of punishment" are not applied to "those who pled" versus "those who [went] to trial," as those who pled receive "leniency" in the form of "reduced punishment." Using the Dannenberg standard, the Board found Petitioner's offense to be of a more serious nature than the minimum necessary to sustain a conviction and thus depriving him of his plea owed lenient disposition.  Such action on the part of a government agency violated the implied covenant of good faith and fair dealing present in Petitioner's contract with the State, unreasonably depriving him of the substantial benefit on which his acceptance of the offered plea was clearly predicated.  Mere consideration for parole, where unchanging factors of the stipulated offense may be used to trump the requirement that parole normally be granted (Rosenkrantz, supra, 29 Cal.4th at 683) cannot reasonable be considered a benefit as it does not provide the leniency or reduced punishment required by law.  Any benefit to Petitioner from the plea bargain becomes purely illusory in this situation.  Indeed,

40

1  if Petitioner is held under the <u>Dannenberg</u> standard he will find

2  himself in the puzzling position of having a weaker case for parole

3  as a result of his plea to the lesser offense of second degree

4  murder, which the Board finds to be more serious than the minimum

5  necessary to sustain a conviction, then he would have if he had

6  rejected the plea and been convicted of the greater offense of

7  first degree murder by a jury.  Then, as a first degree murder,

8  it would be much more difficult for the Board to consider his

9  offense as "more serious" or "particularly egregious" and therefore

10  it would not justify denial of parole.  California law holds that

11  neither party to a contract may do anything injuring the right

12  of the other to receive benefits of that agreement. (<u>Lee v.</u>

13  <u>Crusader</u>, 49 Cal.App.4th 1750, <u>Foson v. Palace</u> 73 F.3d 1448)

14  Accordingly the Board's contractually estopped behavior in this

15  case requires their decision to deny parole be vacated.

16

17                              **CONCLUSION**

18       Through the actions of its representatives the State of

19  California violated the express and implied terms of their plea

20  contract with Petitioner, depriving him of the contractually owed

21  beneficial consequences from the mutually advantageous agreement.

22  It is equally clear that after 20 years, given Petitioner's positive

23  prison program, that the immutable factors of his offense no longer

24  provide predictive value demonstrating he currently poses an

25  unreasonable risk of danger to society if released.  Accordingly,

26  Petitioner respectfully submits this court should issue a Writ

27  of Habeas Corpus or Order to Show Cause, directed to the State

28  Executive to inquire into the legality of Petitioner's continued

imprisonment, and after briefing and an evidentiary hearing, issue
an order to release Petitioner and discharge him from parole, direct
any and all such other relief as is appropriate under the
circumstances, and retain jurisdiction to see that relief is
actually achieved.

Date: 5-26-08                    Respectfully submitted,


Roger D. Sundberg    D79282
Petitioner, In Pro Per

42

## TABLE OF EXHIBITS

| Exh. | Description | Date | Pages |
|------|-------------|------|-------|
| A | BPH Transcript | 07/07/2006 | 117 |
| B | Sentencing Transcript | 02/24/1988 | 5 |
| C | Evaluation from Probation Report | 02/16/1988 | 4 |
| D | Psychological Evaluation | 09/20/2004 | 4 |
| E | Psychological Evaluation | 05/23/2000 | 5 |
| F | Institutional Staff Recommendation Summary | 03/18/1988 | 2 |
| G | Life Prisoner Evaluation Report | Oct. 2005 | 9 |
| H | Life Prisoner Evaluation Report | June 2003 | 9 |
| I | Life Prisoner Evaluation Report | July 2004 | 6 |
| J | Post Conviction Progress Report | July 1997 | 1 |
| K | BPH Hearing Decision | 06/06/2001 | 10 |
| L | Psychological Evaluation | 04/24/1997 | 2 |
| M | BPH Hearing Decision | 07/24/1997 | 8 |
| N | BPH Hearing Decision | 07/31/2003 | 10 |
| O | BPH Hearing Decision | 10/28/2004 | 9 |
| P | Psychological Evaluation | 07/19/1991 | 2 |
| Q | Psychological Evaluation | 05/16/1994 | 3 |
| R | Superior Court Order re: Habeas Petition | 11/20/2007 | 5 |
| S | Appellate Court Order re: Habeas Petition | 02/15/2008 | 2 |
| T | CA Supr. Ct. Order re: Petition for Review | Feb. 2008 | 1 |

# EXHIBIT   "A"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:            )        CDC Number D-79282
                       )
ROGER SUNDBERG         )
                       )
_____)

INMATE
COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JUNE 7, 2006

9:30 A.M.

PANEL PRESENT:

Ms. Linda Shelton, Presiding Commissioner
Mr. Bill Keenan, Deputy Commissioner


OTHERS PRESENT:

Mr. Roger Sundberg, Inmate
Mr. Richard Rutledge, Attorney for Inmate
Mr. David Pearson, Deputy District Attorney
Correctional Officers Unidentified




CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____        See Review of Hearing
_____        Transcript Memorandum


**Berenice Billington, Peters Shorthand Reporting**

ii

## INDEX

PAGE

Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Case Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Pre-Commitment Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Post-Commitment Factors . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Parole Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Closing Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Recess . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Adjournment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

Transcriber Certification . . . . . . . . . . . . . . . . . . . . . . . 117

--oOo--

1

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **DEPUTY COMMISSIONER KEENAN:**  On record. |
| 3 | **PRESIDING COMMISSIONER SHELTON:**  Okay. |
| 4 | Good morning again, sir.  Today we are here for |
| 5 | a Subsequent Parole Consideration Hearing for |
| 6 | Roger Sundberg, D as in David 79282.  Today's |
| 7 | date is June 7th, 2006.  The time is 9:30 a.m. |
| 8 | We are located at CTF.  Mr. Sundberg was |
| 9 | received on March 7th, 1988, committed from Los |
| 10 | Angeles County.  His life term began on August |
| 11 | 4th, 1988, with his minimum eligible parole date |
| 12 | being August 4th, 1998.  The controlling offense |
| 13 | for which the Inmate is committed is set forth |
| 14 | in case number A474007, charging in count one |
| 15 | violation of PC 187, murder in the second |
| 16 | degree, with a 12022.5 PC, use of a firearm. |
| 17 | The Inmate received a term of 15 years to life |
| 18 | plus two-year enhancement equaling 17 years to |
| 19 | life.  Okay.  Mr. Sundberg, this hearing is |
| 20 | being tape recorded for voice identification |
| 21 | purposes, so we will go around the room and say |
| 22 | our first name, our last name, spell our last |
| 23 | name, and when we get to you, please add your |
| 24 | CDC number.  I will start and go to my left.  My |
| 25 | name is Linda Shelton, S-H-E-L-T-O-N, |
| 26 | Commissioner. |
| 27 | **DEPUTY COMMISSIONER KEENAN:**  Bill Keenan, |

2

1   K-double-E-N-A-N, Deputy Commissioner.

2       **DEPUTY DISTRICT ATTORNEY PEARSON:**  David

3   Pearson, P-E-A-R-S-O-N, Deputy District Attorney

4   from Los Angeles.

5       **ATTORNEY RUTLEDGE:**  Richard Rutledge,

6   R-U-T-L-E-D-G-E, counsel for Mr. Sundberg.

7       **INMATE SUNDBERG:**  Roger Sundberg, S-U-N-

8   D-B-E-R-G, number is D as in David 79282.

9       **PRESIDING COMMISSIONER SHELTON:**  Thank

10  you.  And for the record, we have two officers

11  in the room for security purposes who will not

12  be participating in today's hearing.  All right.

13  Mr. Sundberg, before we started, you were

14  mentioning that you had been having some blood

15  work and you were fasting.  Are you going to be

16  able to walk through this hearing okay?

17      **INMATE SUNDBERG:**  Sure.

18      **PRESIDING COMMISSIONER SHELTON:**  I want

19  to clarify a few things.  I know in - the

20  records indicate that you signed BPT Form 1073

21  on June 10th of 2005, and you signed a form

22  today for accommodation for disability, so I

23  want to take a second to walk through - through

24  those for the record.  Now how long had you been

25  fasting for your blood work?

26      **INMATE SUNDBERG:**  Since last night.

27      **PRESIDING COMMISSIONER SHELTON:**  Okay.

3

1   So you'll be able to hang in there for another –

2       **INMATE SUNDBERG:** Yeah.

3       **PRESIDING COMMISSIONER SHELTON:** - couple

4   hours?

5       **INMATE SUNDBERG:** Yeah. I'm just envying

6   you your coffee.

7       **PRESIDING COMMISSIONER SHELTON:** Oh. I'm

8   sorry. Do you want me to put it away?

9       **INMATE SUNDBERG:** No.

10      **PRESIDING COMMISSIONER SHELTON:** All

11  right. I also note for the record you're

12  wearing glasses. Are those prescription?

13      **INMATE SUNDBERG:** Yes.

14      **PRESIDING COMMISSIONER SHELTON:** And do

15  they adequately meet your visual needs?

16      **INMATE SUNDBERG:** Yes. I have this pair

17  for general vision and a separate for being able

18  to read.

19      **PRESIDING COMMISSIONER SHELTON:** Okay.

20  And you're comfortable with all of that. Do you

21  have any –

22      **INMATE SUNDBERG:** Right.

23      **PRESIDING COMMISSIONER SHELTON:** - kind

24  of hearing difficulties?

25      **INMATE SUNDBERG:** No.

26      **PRESIDING COMMISSIONER SHELTON:** And it

27  looks to me like you're fairly mobile, no

4

1   problems walking in here or walking out or -

2         **INMATE SUNDBERG:**  Not so far.

3         **PRESIDING COMMISSIONER SHELTON:**  Not so

4   far.  Okay.  Now as I understand it, are you

5   actively participating in Triple CMS currently?

6         **INMATE SUNDBERG:**  Yes.

7         **PRESIDING COMMISSIONER SHELTON:**  And can

8   you tell me what kind of medication you are on?

9         **INMATE SUNDBERG:**  I'm on antidepressants

10  and - and an antihistamine to help with sleep,

11  and I'm on some other medications besides what

12  I'm on for Triple CMS.  I'm also - I take

13  seizure disorder drugs to keep from having

14  seizures, and aspirin and -

15        **PRESIDING COMMISSIONER SHELTON:**  What

16  kind of -

17        **INMATE SUNDBERG:**  - just (indiscernible)

18  things.

19        **PRESIDING COMMISSIONER SHELTON:**  -

20  seizures?

21        **INMATE SUNDBERG:**  Generally fairly light

22  seizures, but they're from the - the gunshot

23  wound to the head.

24        **PRESIDING COMMISSIONER SHELTON:**  So it's

25  not an epilepsy condition?

26        **INMATE SUNDBERG:**  Well, technically I

27  guess you could call it that, but it's under

5

1    control.

2         **PRESIDING COMMISSIONER SHELTON:**  Okay.

3    Is there any reason you can't participate in

4    today's hearing because of those medications?

5    Do you feel alert and active?   You appear to be

6    to me.

7         **INMATE SUNDBERG:**  I believe I can

8    participate, you know, normally.

9         **PRESIDING COMMISSIONER SHELTON:**  Okay.

10   How long have you been involved in Triple CMS,

11   sir?

12        **INMATE SUNDBERG:**  Oh, I've been under

13   psychiatric care since I came into the - the

14   system, so I don't think they called it Triple

15   CMS then, but -

16        **PRESIDING COMMISSIONER SHELTON:**  So the

17   whole time you've been incarcerated?

18        **INMATE SUNDBERG:**  Yes.

19        **PRESIDING COMMISSIONER SHELTON:**  Okay.

20   Mr. Rutledge, have we met all the accommodations

21   needed for your client?

22        **ATTORNEY RUTLEDGE:**  Yes, Commissioner.

23        **PRESIDING COMMISSIONER SHELTON:**  Okay.

24   Now Mr. Sundberg, you've been involved in these

25   hearings before.

26        **INMATE SUNDBERG:**  This is the fifth one,

27   I believe.

6

1          **PRESIDING COMMISSIONER SHELTON:**  Okay.

2   Can you tell us what you think they're about?  I

3   want to show for the record that you understand

4   why you're here.

5          **INMATE SUNDBERG:**  The Board is required

6   to do periodic hearings.  I believe there's –

7   that an inmate is normally supposed to be

8   released to parole after he's done his minimum

9   term but has to go through a parole hearing at

10  which time they determine whether he's – if

11  there's some reason that he's unsuitable to be

12  paroled at that time.

13         **PRESIDING COMMISSIONER SHELTON:**

14  Basically you're right.  I would like to turn it

15  around into a more positive light though in that

16  we're here to determine your suitability for

17  parole.  We're not here to look for reasons to

18  not parole you; we're looking for reasons to

19  parole you, so – and that's why we get your

20  involvement.  So you've been here before, you

21  know the process.  You know you have certain

22  rights, and one of those rights is to have an

23  impartial panel, and that would be Commissioner

24  Keenan and myself.  Do you have any problems

25  with us being your panel today?

26         **INMATE SUNDBERG:**  I don't know anything

27  about either of you personally, so nothing to my

7

1   knowledge would indicate that.

2        **PRESIDING COMMISSIONER SHELTON:**  So

3   you're find if we go ahead?

4        **INMATE SUNDBERG:**  We can go ahead.

5        **PRESIDING COMMISSIONER SHELTON:**  All

6   right.  Terrific.  The other right I want to let

7   you know is that if you wanted to appeal any

8   decision today, there's a new process you may or

9   may know about, you have to go through the court

10   process for an appeal issue, and your attorney

11   can tell you about that or you can find out more

12   about that in the prison law library.

13        **INMATE SUNDBERG:**  Okay.

14        **PRESIDING COMMISSIONER SHELTON:**  This

15   came up about two years ago so I didn't know if

16   you were aware of it or not but I wanted you to

17   be aware.

18        **INMATE SUNDBERG:**  And I think it's come

19   up since my last Board.

20        **PRESIDING COMMISSIONER SHELTON:**  Okay.

21   All right.  Sir, you are not required to admit

22   to or discuss your offense; however, this panel

23   does accept as true the findings of the court.

24   Do you know what that means?

25        **INMATE SUNDBERG:**  I think so.

26        **PRESIDING COMMISSIONER SHELTON:**  Tell -

27   tell me what you think it means.

8

1        **INMATE SUNDBERG:**  Well –

2        **PRESIDING COMMISSIONER SHELTON:**  We'll

3    walk through this.

4        **INMATE SUNDBERG:**  Okay.  Okay.  I – I

5    took a plea bargain to the offense so

6    essentially the Court found me guilty of the

7    crime.  As to specifics of – of what happened, I

8    don't think that there is – that there are any

9    specifics since it was a – a plea bargain.

10   There was nothing – no trial at which different

11   facts were found to be true or not true.

12       **PRESIDING COMMISSIONER SHELTON:**  What

13   we're going –

14       **INMATE SUNDBERG:**  And I've admitted to

15   having done the crime.

16       **PRESIDING COMMISSIONER SHELTON:**  And

17   that's what – we're going to go off the factual

18   basis as we have it recorded from the paperwork,

19   okay?  Does that – does that make sense to you?

20   We're not here to try you, we're not going to

21   get into all the hooey-bluey of all of that.

22   We're going to talk about what's written down,

23   what's been accepted, what you've acknowledged.

24       **INMATE SUNDBERG:**  Uh-huh.

25       **PRESIDING COMMISSIONER SHELTON:**  Then

26   we're going to talk about your prior record and

27   your social history, and we'll talk about post–

9

1    conviction factors, your parole plans, and have

2    an opportunity to ask you some questions, and

3    we'll go from there.

4         **INMATE SUNDBERG:**  Okay.

5         **PRESIDING COMMISSIONER SHELTON:**  All

6    right?  All right.  Commissioner, do we have any

7    confidential information?

8         **DEPUTY COMMISSIONER KEENAN:**  There's a

9    confidential file.  It may be used.

10        **PRESIDING COMMISSIONER SHELTON:**  And we

11   will notify the attorneys if we go that far,

12   correct?

13        **DEPUTY COMMISSIONER KEENAN:**  I concur.

14        **PRESIDING COMMISSIONER SHELTON:**  Okay.

15   I've already passed the Hearing Checklist around

16   to both attorneys.  Mr. Pearson, you signed and

17   dated you have everything you need for the

18   hearing?

19        **DEPUTY DISTRICT ATTORNEY PEARSON:**  I did.

20        **PRESIDING COMMISSIONER SHELTON:**  And Mr.

21   Rutledge?

22        **ATTORNEY RUTLEDGE:**  Yes, Commissioner.

23        **PRESIDING COMMISSIONER SHELTON:**  Okay.

24   Great.  All right.  Are there any additional

25   documents to be submitted?

26        **ATTORNEY RUTLEDGE:**  There may be a chrono

27   that may be submitted.

10

1        **PRESIDING COMMISSIONER SHELTON:**

2    Depending upon if it's –

3        **ATTORNEY RUTLEDGE:**  We don't

4    (indiscernible).

5        **PRESIDING COMMISSIONER SHELTON:**  Okay.

6    Terrific.  We can do that at any time.  Are

7    there any preliminary objections?

8        **ATTORNEY RUTLEDGE:**  No, Commissioner.

9        **PRESIDING COMMISSIONER SHELTON:**  Will

10   your client be speaking with us today?

11       **ATTORNEY RUTLEDGE:**  He doesn't want to

12   speak about the commitment offense but he will

13   be answering questions regarding family and that

14   type of thing.

15       **PRESIDING COMMISSIONER SHELTON:**

16   Terrific.  All right.  Sir, would you please

17   raise your right hand.  Do you solemnly swear or

18   affirm that the testimony you give at this

19   hearing will be the truth, the whole truth and

20   nothing but the truth?

21       **INMATE SUNDBERG:**  I do.

22       **PRESIDING COMMISSIONER SHELTON:**  Thank

23   you.  All right.  We understand, and you have

24   the right to not speak to the offense.  I will –

25   what I will do is enter into the record a

26   summary of the crime, and I will also enter in

27   your version as it's in the report so that you

11

1   have your side of the story entered as well for

2   you.  So I'm going to refer to the October 2005

3   Board Report summary of the crime.

4            "The victim was estranged from his wife,

5             Pamela Somers, and during their marital

6             difficulties his wife became involved

7             with the prisoner.  At first it was just

8             a matter of talking over her problems,

9             but as time went on, they became

10            romantically involved.  The victim was

11            physically abusive to her so when they

12            separated she had a restraining order

13            placed against him.  During the

14            separation the victim had no place to

15            stay so the victim's wife allowed him to

16            stay in the garage at her residence.

17            While the victim was staying in the

18            garage he still had the freedom to go in

19            and out of the house as well as in the

20            garage and this irritated the prisoner.

21            On the night of the crime, Sundberg saw

22            the victim moving about the garage and

23            back and forth into the house.  The

24            prisoner's house was located next to the

25            victim's residence.  The prisoner's rage

26            escalated to a point where he took a

27            pistol inside his house and went to the

12

1    driveway next-door and shot the victim

2    four times. The victim went inside his

3    wife's house and staggered toward the

4    bedroom. The prisoner followed him with

5    the pistol and occasionally struck the

6    victim. At this point the victim's son,

7    who was in the house, grabbed a plastic

8    baseball bat and tried to stop Sundberg

9    from killing his father. The son was

10    unable to stop the prisoner. Sundberg

11    kept on following the victim into the

12    bathroom where the victim fell into the

13    bathtub. At this point they argued some

14    more and Sundberg shot the victim twice

15    in the heard. The victim's son observed

16    the killing. The prisoner then left the

17    victim's house. Before the police

18    arrived to arrest him, he tried to shoot

19    himself in the head."

20  All right. I'm also going to enter in, as I

21  indicated, the prisoner's version taken from the

22  same report, October 2005 Board Report.

23    "For about a year there was an ongoing

24    conflict between my wife Robin and I, and

25    Steve Somers, the victim. His wife Pam

26    and my wife became friends not long after

27    we moved across from her. She was often

13

1          at her house, sometimes with her son,

2          especially so when she was afraid of

3          Steve.  He was a dealer and heavy user of

4          cocaine and amphetamines.  When he used

5          too much and when he came down, he became

6          very angry and abusive, primarily towards

7          Pam.  She told me that he went - she told

8          me that this went as far as his tying her

9          up and torturing her, which he

10         acknowledge and then laughed about.  He

11         began threatening my wife and me for

12         interfering.  We were supportive of Pam

13         and protective of her and her son, Jimmy.

14         This became increasingly stressful.

15         Eventually, our friendship with Pam

16         developed to include a physical

17         relationship.  My job was stressful, my

18         wife and I were having financial

19         problems, and I began having a marital

20         crisis over her resumption of a previous

21         affair that I was jealous of.  I became

22         severely depressed and suicidal.  Pam got

23         a restraining order to keep Steve away,

24         but he sometimes came back and would

25         leave only when the police were called or

26         he was threatened with their being

27         called.  My wife and I were drinking and

14

1          arguing about her affair and I became

2          utterly despondent, feeling that the

3          marriage my life was based upon was over

4          and therefore my life along with it as

5          well. Walking past my open front door I

6          saw Steve and became enraged that this

7          continuing threat and stress, which I

8          thought was finally gone, was back again.

9          I got my pistol and extra ammunition and

10         went over to the garage he was in. He

11         ran at me, I shot at him, and we fought.

12         I literally saw red after he punched me

13         in the head a few times. I backed up and

14         reloaded. He ran into the house and into

15         the bathroom and I followed. We fought

16         more and I shot more, and at some point I

17         shut the door. He looked to me like he

18         died. I think I reloaded at this point

19         and then I shot myself in the head and

20         blacked out. Bone fragments were later

21         removed from my brain by surgery at USC

22         Medical Center."

23 All right. Sir, we will move on, and I'll need

24 you to work with me on this - well, maybe not

25 too much because I was going to go into your

26 prior record and it appears you have none; no

27 juvenile record, no adult record whatsoever.

15

1        INMATE SUNDBERG:  No.

2        PRESIDING COMMISSIONER SHELTON:  Okay.

3   Good.  Then you can help me walk through your

4   social history.  I want to go through your

5   social history and have you tell me what's

6   right, what's wrong, if you want to add

7   anything, delete anything.  All right.  You were

8   born in Minnesota and brought to California by

9   your parents in 1962 when you were five years

10  old.  You're the youngest of seven siblings, and

11  the record shows that there is no other

12  criminality in your family.  Tell me about your

13  brothers and sisters.

14       INMATE SUNDBERG:  Okay.  I'm the

15  youngest.  My -

16       PRESIDING COMMISSIONER SHELTON:  Why

17  don't you move microphone a little closer to

18  you.  It's pointing in the wrong direction.

19  There you go.  Thank you.

20       INMATE SUNDBERG:  Like so?

21       PRESIDING COMMISSIONER SHELTON:  Yeah,

22  that's perfect.

23       INMATE SUNDBERG:  Okay.  I'm the youngest

24  of - of seven.  There's two boys and four girls

25  besides myself.  I think my oldest brother is

26  approximately maybe 15 years older than I am,

27  maybe a little more than that, and I'm not sure

16

```
 1   what you're looking for, to tell you the truth,

 2   I mean -

 3          PRESIDING COMMISSIONER SHELTON:   What do

 4   they do?

 5          INMATE SUNDBERG:  Oh.  They -

 6          PRESIDING COMMISSIONER SHELTON:   And -

 7   and your relation, are you close with them -

 8          INMATE SUNDBERG:  Oh -

 9          PRESIDING COMMISSIONER SHELTON:  - still

10   -

11          INMATE SUNDBERG:  - okay.

12          PRESIDING COMMISSIONER SHELTON:  - how

13   was your growing-up time?  I came from a large

14   family too, so you know there's always of stuff

15   going on -

16          INMATE SUNDBERG:  Right.

17          PRESIDING COMMISSIONER SHELTON:  - so -

18          INMATE SUNDBERG:  Yeah.  It's - it's a

19   big family so we were - but because of the age

20   spread between us, my oldest brother was already

21   going to college by the time we, you know, moved

22   out to California, and my oldest sisters, around

23   that time also, you know, were grown and moved

24   off on their own but we kept in touch and they'd

25   come back and visit.  My oldest brother has a

26   medical consulting company.  My oldest sister is

27   a housewife and mother, as is the next sister in
```

17

1  line.  Then it would be my brother, who was an

2  engineer, and I think he's current on disability

3  for back problems, and then I had another two

4  sisters, one of which I believe is now on - on

5  disability, she just had a car accident recently

6  and had some bad injuries to her back, and the

7  other sister just works at, you know - I think

8  she works at Walmart, and my mother and my two -

9  the two youngest sisters, they're - but they're

10  all older than me, spend a lot of time with my

11  mother, who's now 90 and - and uses a walker to

12  get around, and helping her around a lot, and

13  I'm planning to live with her when I - if - when

14  I get released.  I'm trying to be positive.

15      PRESIDING COMMISSIONER SHELTON:  There

16  you go.  How much contact do you have with your

17  brothers and sisters?

18      INMATE SUNDBERG:  I think regular

19  contact, mostly through letters, and they don't

20  get up too often, they're kind of spread around

21  the county, a lot of them, so we don't get - we

22  don't do too much visiting, and I don't like to

23  raise huge phone bills since the phones have

24  gotten so expensive, but we keep in regular

25  contact, and them come up -

26      PRESIDING COMMISSIONER SHELTON:  You

27  write letters -

18

1      **INMATE SUNDBERG:** - a couple times -

2      **PRESIDING COMMISSIONER SHELTON:** - and

3  stuff?

4      **INMATE SUNDBERG:** Yeah. One or - once or

5  twice a year usually, and I see my youngest son

6  too, for that matter. My oldest son, once he re

7  - reached his age of adult - legal adulthood,

8  pretty much just moved off on his own and, you

9  know, went to live his own life and, you know,

10  forget about the family, which isn't too unusual

11  I think for kids.

12      **PRESIDING COMMISSIONER SHELTON:** Got to

13  find his way.

14      **INMATE SUNDBERG:** Yeah. He's in his late

15  20s now, and my - my youngest -

16      **PRESIDING COMMISSIONER SHELTON:** So you

17  have two -

18      **INMATE SUNDBERG:** - will be -

19      **PRESIDING COMMISSIONER SHELTON:** - sons?

20      **INMATE SUNDBERG:** - 20 - yeah - will be

21  21 next month. He's going to college and

22  working two jobs to put himself through college.

23      **PRESIDING COMMISSIONER SHELTON:** And you

24  have contact with - well, you said your -

25      **INMATE SUNDBERG:** With the youngest.

26      **PRESIDING COMMISSIONER SHELTON:** With the

27  youngest, and your older son is a - all over

19

1   doing his thing?

2        INMATE SUNDBERG:  Yeah.

3        PRESIDING COMMISSIONER SHELTON:   Who

4   comes and visits you here?

5        INMATE SUNDBERG:  Usually my second-to-

6   the-oldest sister now, and sometimes – that's

7   Joanne, and sometimes my sister Lou, and my

8   sister Mary has also come up, as have a couple

9   of my friends, but my sister Joanne is the one

10  who comes most regularly, usually once or twice

11  a year, and sometimes she'll stop and pick up

12  one of the other members of the family or my

13  son.

14       PRESIDING COMMISSIONER SHELTON:   Good.

15  Let me see.  You graduated in 1975 from Long

16  Beach Polytechnic High School.

17       INMATE SUNDBERG:  Yes.

18       PRESIDING COMMISSIONER SHELTON:   You

19  attended college courses at Long Beach City

20  College and Cal State Long Beach for two years.

21       INMATE SUNDBERG:  Yeah, Long Beach.

22       PRESIDING COMMISSIONER SHELTON:   Did you

23  get an AA there?

24       INMATE SUNDBERG:  No.  I – I only went

25  one semester at Cal State and three – three or

26  four semesters at Long Beach City College.  I

27  didn't earn enough of all the required courses

20

1   to get an associate degree.  I got that when -

2   through the college program here that they used

3   to have from Hartnell College.  I also went to

4   Golden West College for some technical courses

5   too, when I was on the street.

6           **PRESIDING COMMISSIONER SHELTON:**  You

7   married Robin and you have your two children,

8   one's Nathan and one's Neil.  Those are the ones

9   you were just sharing with.

10          **INMATE SUNDBERG:**  Yes.

11          **PRESIDING COMMISSIONER SHELTON:**  Are you

12  still married?

13          **INMATE SUNDBERG:**  Yes.

14          **PRESIDING COMMISSIONER SHELTON:**  To

15  Robin?

16          **INMATE SUNDBERG:**  Yes.

17          **PRESIDING COMMISSIONER SHELTON:**  Okay.

18  What kind of relationship do you have with her?

19          **INMATE SUNDBERG:**  Basically none anymore.

20  We haven't spoken or written to each other for a

21  few years, I haven't kept track, so where I get

22  - I guess that would make us separated

23  technically.  We were still on - on good terms

24  with each other, but I don't expect to ever

25  resume -

26          **PRESIDING COMMISSIONER SHELTON:**  A

27  marriage?

21

1         **INMATE SUNDBERG:**  - an active marriage.

2         **PRESIDING COMMISSIONER SHELTON:**  You were

3    employed by AT&T for nine years as a long-

4    distance operator, and you made about 1700

5    dollars a month.  It says, "Since this crime

6    occurred, your wife moved to Morro Bay to live

7    with her parents."  Is she still there?

8         **INMATE SUNDBERG:**  No, and that's been

9    covered in previous hearings, but I don't mind

10   going over it again.  She lived with her parents

11   for a little while and so did the kids, and then

12   she left and left the kids with her parents, and

13   so the - and she's gone back and forth between

14   living on her own at various places that I'm not

15   aware of very much about, but in L.A. county

16   somewhere, to the best of my knowledge, and -

17   and with her folks, and the kids lived with her

18   folks for a while and with my brother in Utah

19   for a while and in foster homes for a while.

20        **PRESIDING COMMISSIONER SHELTON:**  Your

21   kids lived in foster homes for a while, is that

22   (indiscernible)?

23        **INMATE SUNDBERG:**  Yeah.  I don't remember

24   - yeah, it was - it was not too long after -

25   after Robin left living with her mother, they

26   went into a foster home situation for a while,

27   and then went to live with my brother and lived

22

1  with him for a couple of years I think, and then

2  went back to live with the grandparents again,

3  maternal grandparents.

4      **PRESIDING COMMISSIONER SHELTON:**  It says

5  here that you experimented with cocaine, LSD and

6  PCP when you were younger.

7      **INMATE SUNDBERG:**  Yeah.  The –

8      **PRESIDING COMMISSIONER SHELTON:**  How old?

9      **INMATE SUNDBERG:**  I gave – when I was in

10 high school.  I gave the probation officer a

11 list of everything I could think of.  He wanted

12 to know everything that I had done, but I think

13 I was less of a partying person than what I've

14 read about governor and our president in their

15 youth.

16     **PRESIDING COMMISSIONER SHELTON:**  Okay.

17 You used speed, according to this, a couple of

18 months before the crime occurred.

19     **INMATE SUNDBERG:**  I – I told the

20 probation officer that, so I guess I must have.

21 I don't remember much now.  Usually the only

22 time that I used uppers were when I was up all

23 night with sick kids or trying to take, you

24 know, extra classes or working overtime, and at

25 that time I wasn't taking any extra classes, so

26 my guess would be it was being up with sick

27 kids.

23

1        PRESIDING COMMISSIONER SHELTON:    Also
2    indicates that you were drinking beer every day
3    and you believed it became a problem for you.
4        INMATE SUNDBERG:    Yeah, I was self-
5    medicating.
6        PRESIDING COMMISSIONER SHELTON:    How much
7    beer would you say you were drinking every day?
8        INMATE SUNDBERG:    Probably on most days
9    two to four cans.  Sometimes more –
10        PRESIDING COMMISSIONER SHELTON:    That
11    would be –
12        INMATE SUNDBERG:    – sometimes less.
13        PRESIDING COMMISSIONER SHELTON:    – like
14    16-ounce cans, that's –
15        INMATE SUNDBERG:    Usually.  It would
16    vary.
17        PRESIDING COMMISSIONER SHELTON:    Okay.
18    And it says you drank two 16-ounce cans a beer
19    before the crime occurred.  You also indicate
20    here that you had an emotional problem and that
21    your family in general has problems with
22    depression, including your mom and your sisters,
23    I guess.
24        INMATE SUNDBERG:    And – and one brother,
25    yeah, there's a family history.
26        PRESIDING COMMISSIONER SHELTON:    Had you
27    ever been treated for depression prior to this

24

1   incident?

2       INMATE SUNDBERG:  I hadn't been treated,

3   no.  I'd been in some groups that weren't really

4   therapy groups, they were more like what at the

5   time used to be called rap groups in high

6   school.  It was run by a woman who had a

7   master's in – I don't remember if it was

8   psychology or something related, or counseling,

9   something like that, but it wasn't really a

10  therapy group, and I've never had actual

11  therapy, no.  I had called suicide prevention

12  not too long before that incident, but he

13  couldn't come up with any place to give me a

14  referral to because our problems were related to

15  having a – what they used to call an open

16  marriage, and he couldn't think of any therapist

17  that dealt with that, having experience with

18  that.

19      PRESIDING COMMISSIONER SHELTON:  So when

20  I was reading your side of the offense, and I'm

21  not going to speak to the offense, but your

22  relationship with the victim's wife, it was –

23  that was a sexual relationship with you, your

24  wife and her?

25      INMATE SUNDBERG:  Primarily it was me and

26  her, but yes.

27      PRESIDING COMMISSIONER SHELTON:  Okay.  I

25

1  guess I'm kind of curious.  If you knew you had

2  a depress – depression problem why you didn't

3  seek help for it prior to this particular

4  incident?

5      INMATE SUNDBERG:  I - I - well, like I

6  said, I did call suicide prevention a couple

7  times and they couldn't come up with anybody to

8  refer me to, and I didn't -

9      PRESIDING COMMISSIONER SHELTON:  Well,

10  what were you asking them?  I - I got the

11  impression you were asking them for marriage

12  counseling, or were you asking them -

13      INMATE SUNDBERG:  Well -

14      PRESIDING COMMISSIONER SHELTON:  - for -

15      INMATE SUNDBERG:  - I - I was -

16      PRESIDING COMMISSIONER SHELTON:  -

17  because your -

18      INMATE SUNDBERG:  - suicidal over

19  problems -

20      PRESIDING COMMISSIONER SHELTON:  Okay.

21      INMATE SUNDBERG:  - with the marriage -

22      PRESIDING COMMISSIONER SHELTON:  Okay.

23      INMATE SUNDBERG:  - and extremely

24  depressed over problems with the marriage, and

25  that related to relationships that we had with -

26  with others.  I essentially wanted us to go back

27  to have a - a monogamous relationship and my

26

1  wife wasn't willing to, so I - you know, I had

2  made some efforts but - but obviously not

3  enough.

4       PRESIDING COMMISSIONER SHELTON:  Yeah.

5  If hindsight were what, 20/20 or whatever.

6       INMATE SUNDBERG:  Yeah.

7       PRESIDING COMMISSIONER SHELTON:  All

8  right.  Sir, is there anything that I neglected

9  to discuss with you about your social history or

10  anything that you would like to have added in

11  for the record?

12       INMATE SUNDBERG:  Probably, but I can't

13  think of anything right now.

14       PRESIDING COMMISSIONER SHELTON:  If you

15  do, just let me know and we'll go back and we'll

16  add it on the record for you.

17       INMATE SUNDBERG:  Thank you.

18       PRESIDING COMMISSIONER SHELTON:  All

19  right.  We're going to go to Commissioner Keenan

20  now and your post-conviction factors, which

21  means he's going to talk to you about what

22  you've been doing since you've been

23  incarcerated.

24       DEPUTY COMMISSIONER KEENAN:  Okay.  Mr.

25  Sundberg, okay, first of all, I see you have a

26  classi - have a placement score of 19, it was a

27  classification score of zero going back as far

27

1   as 3/14/95.  The last hearing was on 10/28/04.
2   We recommended that you remain disciplinary free
3   and participate in self-help, and you got a one-
4   year denial.  You have remained disciplinary
5   free.  You have never had a 115.  You have had
6   one 128a for grooming standards.  That was on
7   5/2/98.  Since your last hearing you have been
8   enrolled in Coastline Community College working
9   toward a degree in Computer Science.
10          INMATE SUNDBERG:  Oh, it's not completely
11  accurate.  I was enrolled I think at the time of
12  the last hearing and I haven't taken classes
13  since, and I was hoping to work towards a
14  Computer Science degree but I haven't been able
15  to work anything out with the college to be able
16  to get a Computer Science degree so I'm still
17  trying to, you know, come up with something
18  within a way of doing that but haven't been
19  successful at that.
20          DEPUTY COMMISSIONER KEENAN:  Okay.
21          INMATE SUNDBERG:  So I've just been
22  taking - the classes that I took were just -
23  were general classes, things that might satisfy
24  transfer requirements to a four-year degree,
25  that type of thing.
26          DEPUTY COMMISSIONER KEENAN:  General Ed
27  type of things through Coastline?

28

1        **INMATE SUNDBERG:**  Yeah, like a – a Logic

2    and Critical Thinking course and a Media course,

3    things that satisfy certain requirement areas

4    that I'd never taken before.

5        **DEPUTY COMMISSIONER KEENAN:**  Okay.

6    Ultimately though it's –

7        **INMATE SUNDBERG:**  Ultimately –

8        **DEPUTY COMMISSIONER KEENAN:**  –

9    (indiscernible).

10        **INMATE SUNDBERG:**  Ultimately what I want

11    to do is get a Computer Science degree.

12        **DEPUTY COMMISSIONER KEENAN:**  Okay.  So –

13    it says, "Enrolled –" I'm looking at the post-

14    conviction – the most current post-conviction

15    progress report dated 4/21/06.  It says,

16    "Enrolled in Coastline Community College,

17    working toward a degree in Computer Science."

18        **INMATE SUNDBERG:**  It should have said

19    hoping to work towards a degree.  Yeah.  Sorry.

20        **DEPUTY COMMISSIONER KEENAN:**  But you are

21    taking things that you think are going to allow

22    you to transfer to a place where you can do

23    that?

24        **INMATE SUNDBERG:**  Right.  Or satisfy

25    Coastline's requirements if they can figure out

26    a way for me to get the – the Computer Science

27    through distance learning without –

29

1       **DEPUTY COMMISSIONER KEENAN:**   Oh.

2       **INMATE SUNDBERG:**   - having - being on the

3   Internet.

4       **DEPUTY COMMISSIONER KEENAN:**   Okay.   It

5   says you continue to work as a Computer

6   Technician, work supervisor performance reports

7   remain excellent, continues to participate in AA

8   program.

9       **INMATE SUNDBERG:**   My - my work - I've

10  since I finished two years in the job and had to

11  transfer out so I'm no a ABE Teacher's Aide

12  since - for about a month roughly.

13      **PRESIDING COMMISSIONER SHELTON:**   What is

14  that?

15      **INMATE SUNDBERG:**   Adult Basic Education.

16  Essentially it's elementary school.   I'm

17  primarily a math tutor and - and homework grader

18  and - but I do whatever she asks me to do too,

19  you know.   For instance, she's just assigned me

20  to a couple of inmates that are native Spanish

21  speakers that don't have very much experience

22  with English with - I sit with them when they

23  read aloud and - and help them with words they

24  have trouble pronouncing and - and, you know -

25  or don't know, that type of thing.

26      **DEPUTY COMMISSIONER KEENAN:**   Okay.   So

27  you've been in AA and it notes some 128b chronos

1    dated 10/4/05, 1/3/06, 4/5/06.  Now it says

2    psych treatment: none.  Okay.

3         INMATE SUNDBERG:  Well, I'm - got ongoing

4    Triple CMS and in -

5         DEPUTY COMMISSIONER KEENAN:  Yeah.

6         INMATE SUNDBERG:  - a depression group,

7    so -

8         DEPUTY COMMISSIONER KEENAN:  Yeah, that's

9    what -

10        INMATE SUNDBERG:  - that's what he

11   probably ought to have put that down, but he's

12   just recently taken over as a - a new counselor,

13   if you're reading the one from Morton.

14        DEPUTY COMMISSIONER KEENAN:  I am.

15        INMATE SUNDBERG:  Okay.  Yeah.

16        DEPUTY COMMISSIONER KEENAN:  Prison

17   behavior clear.  Other: continues to have

18   excellent behavior patters.  Okay.  And that's

19   an addendum to the October '05 report, and in

20   that report it notes in part, under the Post-

21   Conviction Factors section, "continues his full-

22   time assignment working as a Computer Tech -" I

23   know that's outdated at this point, based on

24   what you just said - it says, "- in the Computer

25   Refurbishing Program.  Work supervisor's report

26   for this period reflect exceptional grades

27   across the board."  Supervisor comments include

31

1  "great worker, always on time.  His pleasant

2  attitude and generous nature have been a very

3  positive and motivating influence in this

4  program.  Also noted was a laudatory chrono

5  dated 5/10/04 detailing his commendable efforts

6  as an Education Office Clerk from August '93 to

7  September '93."  Are those dates right or –

8          **INMATE SUNDBERG:**  I don't think so.

9          **DEPUTY COMMISSIONER KEENAN:**  It's looks

10  sort of like an odd jump in this current report

11  to jump back to '93, or is that '03 would you

12  say?

13          **PRESIDING COMMISSIONER SHELTON:**  It

14  probably is a typo.

15          **DEPUTY COMMISSIONER KEENAN:**  That's what

16  I'm thinking.

17          **INMATE SUNDBERG:**  It says August – let me

18  get my reading glasses.  Yeah, I think it's a

19  typo.

20          **DEPUTY COMMISSIONER KEENAN:**

21  (indiscernible).

22          **INMATE SUNDBERG:**  Yeah, August '93 to

23  September 2003.  Okay.  Yeah, actually I didn't

24  just have a single –

25          **PRESIDING COMMISSIONER SHELTON:**  Okay.

26          **INMATE SUNDBERG:**  – clerk job, I've

27  worked at a – a number of different jobs for the

32

1   Education and Vocation Departments, but always

2   for them during that whole time period so that I

3   could continue, you know, updating things that

4   I've done for them earlier and – and maintaining

5   them.

6          **DEPUTY COMMISSIONER KEENAN:**  Okay.  Also

7   as I'm going through this, sometimes they'll be

8   like a brief comment or two about a chrono, I

9   may make a little brief comment about it, and if

10  it's a chon – a chrono that you want me to spend

11  more time with, I can go back and look at it and

12  read in more detail if something you think is

13  important to have on the record.

14         **INMATE SUNDBERG:**  Okay.

15         **DEPUTY COMMISSIONER KEENAN:**  So just let

16  me know.  Okay.  Therapy and self-help

17  activities.  "Sundberg is continuing his studies

18  through Coastline Community College working

19  toward a degree in possibly Computer Science it

20  says."  Also noted in the C-File were chronos

21  for completion of the 12-week Anger Management

22  course, 9/15/04, and ongoing participation in

23  CTF's Alcoholics Anonymous group through the

24  first quarter of 2005, 3/15/05 in particular.

25  "Sundberg also states he is continuing his

26  Buddhist meditation studies and his depression

27  management group therapy programs and will try

33

```
 1   to have updated letters in time for his Board

 2   hearing," and I think we do have something that

 3   I'll get to shortly.  Under Employment in this

 4   report it says, "Sundberg has an associate's

 5   degree in General Studies plus completed

 6   vocational Data Processing program at CTF.  In

 7   addition, he has several years' experience

 8   working as a Certified Electronics Technician in

 9   both teaching and employment custodial capacity.

10   Also noted in the Central File were numerous

11   classes from Hartnell College in the Electronics

12   field, and though he does not have a specific

13   job offer, Sundberg is confident he'd be able to

14   provide for his needs if granted a parole date."

15   Okay.  And you already mentioned Hartnell.  I

16   saw in there you got your AA -

17            INMATE SUNDBERG:  Yeah.  Right.

18            DEPUTY COMMISSIONER KEENAN:  - from

19   Hartnell.

20            INMATE SUNDBERG:  Right.  And I'm also

21   currently taking a - a group for lifers, a Life

22   Skills group, which I'll be finishing this

23   month, which I have a chrono for if you don't

24   have it in the file.

25            DEPUTY COMMISSIONER KEENAN:  Hold that

26   thought.

27            INMATE SUNDBERG:  It's not finished.
```

34

1          **DEPUTY COMMISSIONER KEENAN:**  I'll – I'll

2     get to that –

3          **INMATE SUNDBERG:**  Okay.

4          **DEPUTY COMMISSIONER KEENAN:**  – shortly,

5     and if I don't, remind me again.  I'm just sort

6     of reading through this report.

7          **INMATE SUNDBERG:**  Okay.

8          **DEPUTY COMMISSIONER KEENAN:**  Under

9     Assessment it says: "Sundberg has been

10    disciplinary free from Reception, has taken

11    advantage of available self-help therapy,

12    educational opportunities and enjoys substantial

13    support from family and friends."  All right.

14    Okay.  I'm getting back I think to what you were

15    just talking about.  I was looking through the

16    C-File and I saw – you – you mentioned under

17    Psych Treatment it should not have said none,

18    and I – and I saw in the C-File there's some

19    notations here.  There's a 128c from staff

20    psychihatrist D. Woods January 19 of '06:

21    "Sundberg is an active and insightful

22    participant in my Self-Esteem group.  The group

23    meets every week for one hour.  Inmate Sundberg

24    shares relevant personal feelings and

25    experiences with the group.  His energy and

26    enthusiasm for self-improvement will assist him

27    to be a positive and productive citizen upon his

35

1    release."  There's one from C. Mitchell, LCSW,

2    Licensed Clinical Social Worker, a 128c June 14

3    '05.  Okay.

4            "The above-referenced inmate -" that

5            would be you "- has been an active

6            participant in the Depression Management

7            group for several years.  The purpose of

8            this group is to assist and encourage

9            participants to address depression.  The

10           issue of stress management is also

11           discussed as a factor in depression, as

12           is the role of alcohol and drugs.  Mr.

13           Sundberg is open in sharing his own

14           stress and mood issues with group

15           members.  He has done his own search - I

16           think is a - into factors that exacerbate

17           depression, has been able to provide

18           copies to the group of handouts that he

19           has kept for several years.  In addition

20           to discussing his own issues, he has

21           offered effective advice to group

22           members.  This past six months Mr.

23           Sundberg has been providing emotional and

24           physical support to a terminally ill

25           cellmate.  A memo from the associate

26           warden recognized Mr. Sundberg in that

27           role.  Mr. Sundberg's efforts have

36

```
1         allowed the ill person to remain in
2         familiar surroundings as long as
3         possible.  Mr. Sundberg has used the
4         group to process frustrating situations
5         and to monitor his own emotional
6         responses to stress and sadness."
7    And - okay.  October 5 of '04: "Inmate Sundberg
8    has made a second inquiry about the Lifer -
9    Lifers Group offered through the Mental Health
10   Department."  Okay.  You were put on hold at
11   that point.  September 15 of '04 - well, that
12   immediately preceded your last hearing so I'm
13   not quite if it was discussed so I'll mentioned
14   it.  "Commended for participation -" oh, this is
15   from D. Rosskopf, Licensed Clinical Social
16   Worker, 128c, "Commended for his active
17   participation in completion of the 12-week Anger
18   Management course," and that course involved
19   topics such as Personal History, Methods of
20   Dealing with Anger, Ways to Recognize and Avoid
21   Anger, Relaxation Technique - Relaxation
22   Techniques.  That was a group discussion,
23   workbooks, role-playing, practical application
24   to aid in anger management.  "Inmate Sundberg's
25   participation in this group demonstrates a
26   desire for self-improvement."  Also you were a
27   participant in the Impact program.  That's
```

37

1    signed by I. Gara.  That was back in 6/8 of '04.

2    I don't think as I was looking through the past

3    Board Reports that I saw that listed, but it

4    looks like it was a involved program, 13- week

5    Impact Workshop.

6              INMATE SUNDBERG:  Right.

7              DEPUTY COMMISSIONER KEENAN:  Designed to

8    provide an opportunity for education and

9    awareness as to the profound negative impact of

10   crime on victims and - okay.  Whoops.  Okay.

11   And it mentioned AA already, but I see it all

12   throughout your programming, and from what I can

13   tell, you've been involved since 1989.

14             INMATE SUNDBERG:  I believe that's right,

15   yeah, and periodically I've worked as the

16   secretary or - or co-chairman to a group.

17             DEPUTY COMMISSIONER KEENAN:  I saw you

18   were the secretary back in I think it was around

19   '90 -

20             INMATE SUNDBERG:  Uh-huh.

21             DEPUTY COMMISSIONER KEENAN:  - and vice-

22   chair in 2000 and 2001.

23             INMATE SUNDBERG:  It sounds about right,

24   and I was - yeah, off and on, you know, it's -

25             DEPUTY COMMISSIONER KEENAN:  Okay.

26             INMATE SUNDBERG:  - different AA groups

27   that I've been in because I've had more than

38

1   one.  Originally they just had one and I served

2   as secretary of one for a long time, and - and

3   unfortunately I was in a job at that point where

4   I had a computer, so I was able to help them out

5   with - with computerizing some of their stuff.

6   At that time our computer coordinator here was

7   also the AA coordinator, so I was able to help

8   him set up some data-base stuff for tracking his

9   volunteers that come in and when they need to

10  have their approvals renewed and who was going

11  to what meetings and, you know, being able to -

12  at one time he even had to print out duckets

13  because the assignment office said that they

14  were overworked having to printout all the

15  duckets, so I even managed to figure out a way

16  for them to do that, which was a challenge, but

17  I sure learned a lot from it.  Also I don't

18  think that you saw this laudatory chrono -

19          **DEPUTY COMMISSIONER KEENAN:**  Life -

20          **INMATE SUNDBERG:**  - from my former -

21          **DEPUTY COMMISSIONER KEENAN:**  - Life

22  Skills?

23          **INMATE SUNDBERG:**  - boss.  No, this is

24  from my former boss, and then I've got the Life

25  Skills.

26          **DEPUTY COMMISSIONER KEENAN:**  I'd like to

27  see that one too -

39

1        **INMATE SUNDBERG:**  Okay.

2        **DEPUTY COMMISSIONER KEENAN:**  - at this

3   point.

4        **INMATE SUNDBERG:**  I thought it was in the

5   section of the C-File I was looking at but I - I

6   didn't see it.

7        **DEPUTY COMMISSIONER KEENAN:**  Okay.  Yeah,

8   this one I just read through.

9        **INMATE SUNDBERG:**  Oh, okay.

10       **DEPUTY COMMISSIONER KEENAN:**  The Self-

11  Esteem group?  And then May 3rd of '06 Mr.

12  Motherwall.  It says:

13       "Mr. Sundberg has been working with the

14       vocational Computer Repair classroom

15       students April 6 of '04.  On July 26 to

16       30, '04, Mr. Sundberg did participate in

17       helping 20 students with a special

18       project consisting of upgrading AD7

19       computers.  These were California schools

20       in the Sacramento area.  Mr. Sundberg has

21       always been a dedicated and thoughtful

22       individual when it comes to helping

23       students learn about computers, hardware

24       or software.  Mr. Sundberg has helped me

25       tremendously in understanding the Access

26       program I use to track my class - to keep

27       track of my class.  Mr. Sundberg is a

40

```
 1          very knowledgeable person when it comes
 2          to computers and computer programs.
 3          Thanks for a job well done.  Wish I had
 4          more workers like him."
 5          PRESIDING COMMISSIONER SHELTON:  Very
 6 good.
 7          DEPUTY COMMISSIONER KEENAN:  And you have
 8 a Life Skills chrono you said?
 9          INMATE SUNDBERG:  Oh, yeah.  I thought
10 you - I - I don't think I see it in there.  I
11 may have just missed it.
12          PRESIDING COMMISSIONER SHELTON:  You can
13 give these back to him now.
14          INMATE SUNDBERG:  Okay, you wanted Life
15 Skills not the - well, I've got a couple,
16 another one here too that's - these are both
17 pretty old ones though.  Did you mention the
18 Stress Management and Anger Control in 2001
19 already?  I think you did, didn't you.
20          PRESIDING COMMISSIONER SHELTON:  The 12-
21 week program?  Is that a 12-week one?
22          INMATE SUNDBERG:  No.  No, that was a - a
23 different one, an earlier one.  Okay.  Here's
24 these two but they're, you know, late '90s and
25 early 2000s, and you already mentioned the
26 Impact.
27          DEPUTY COMMISSIONER KEENAN:  Yes.  Okay.
```

41

1  11/2 of '92 - oh, okay.  I just might have

2  gotten to this one yet.  Okay.  Life Skill pro -

3  oh, you know, I think I was about to get to

4  this, but all right.  This is from Bruce

5  Bakeman, B-A-K-E-M-A-N, Clinical Psychologist,

6  11/2/92.

7          "This Inmate was an active and successful

8          participant in the Life Skills program.

9          He met in a group with other inmates for

10         one hour per week for ten weeks.  Its

11         purpose of this program is to encourage

12         better impulse control, self-

13         understanding, and more effective living.

14         Topics included - I'm sorry - topics

15         discussed included Substance Abuse,

16         Victim Awareness, Overcoming Anger and

17         Aggression, Stress Management, Building

18         Self-Esteem, Forming Life Goals,

19         Improving Problem-Solving Skills, and

20         Reentry, Making a Successful Return to

21         Society."

22  And then Stress Management and Anger Control

23  group April 20 of '01.  This is from J. Reed -

24  (End Tape 1 - Side A)

25                (Tape 1 - Side B)

26         **DEPUTY COMMISSIONER KEENAN:**  All right.

27  Stress Management and Anger Control group is on

42

 1   a 128c from J. Reed, Clinical Psychologist,

 2   dated April 20, '01. "Inmate Sundberg

 3   successfully participated in Stress Management

 4   and Anger Control Groups. Stress Management

 5   skills developed included controlled breathing,

 6   guided imagery, and progressive deep muscle

 7   relaxation. Also the use of the thought record

 8   is taught to aid in increased awareness and

 9   control of moods, such as anger, depression and

10   anxiety." Okay. All right.

11          INMATE SUNDBERG: Thank you.

12          DEPUTY COMMISSIONER KEENAN: All right.

13   All right. Also I saw Group Therapy, Depression

14   Management, Meditation Group, Depression Group,

15   counseling with Dr. Reed - I think that's

16   perhaps the one I read to - no, that's

17   different, I think. The coun - you had

18   counseling -

19          INMATE SUNDBERG: Yeah.

20          DEPUTY COMMISSIONER KEENAN: - one-on-one

21   with Dr. Reed?

22          INMATE SUNDBERG: Yes.

23          DEPUTY COMMISSIONER KEENAN: Okay. Life

24   - I actually did have it noted down, Life Skills

25   Program.

26          INMATE SUNDBERG: Oh, okay.

27          DEPUTY COMMISSIONER KEENAN: All right.

43

1    All right.  Also you had a chrono back in '93

2    for - you - noted for donating five books to the

3    CTF library and forgot about that?

4          INMATE SUNDBERG:  Yeah.  I think after

5    that one when I realized they put it in my file

6    I asked them not to bother putting in the file

7    anymore because it seemed kind of unnecessary.

8          DEPUTY COMMISSIONER KEENAN:  Okay.  It

9    says you were in vocational Drafting.  How far

10   along did you get in that?

11         INMATE SUNDBERG:  Not very.  I was

12   basically just waiting to get into Data

13   Processing and - and - but I did get a look at

14   their CAD programs which was nice, but I spent

15   more time stootering tudents [sic] in math than

16   anything else there.

17         DEPUTY COMMISSIONER KEENAN:  Okay.  And

18   you got a laudatory chrono for assistance with

19   the Gavilion -

20         INMATE SUNDBERG:  Gavilon.

21         DEPUTY COMMISSIONER KEENAN:  Gavilon,

22   okay, Software program.  What was that all

23   about?

24         INMATE SUNDBERG:  Okay.  That was, like I

25   said at that time, the computer coordinator here

26   was, among other things, the AA coordinator.  He

27   also was the chairman of the vocational - I

44

 1    can't remember what it's called - a group of -
 2    of - of people usually from the mix within the
 3    institution and the community that are
 4    supportive of - of the trades that are being
 5    taught here.  I don't know why I can't think of
 6    the name of it.  But at any rate, he would bring
 7    in outside professionals in the computer
 8    industry that were also - a couple of them were
 9    regular members of the group, and what we did at
10    that time, Data Processing more than anything
11    taught Programming, so he set up what amounted
12    to an inmate company under their supervision
13    that would build programs for the institution,
14    so through the computer coordinator he would
15    talk to whatever, medical or accounting,
16    education, see what things they needed help with
17    computerizing, and then assign a - a team to
18    work on the program and he - and he would
19    supervise it and check it out, and the other
20    programmers from the outside community would
21    check it out too, and, you know, we actually had
22    programs that were used, you know, in a variety
23    of places.  One of them even I think was used
24    through a number of institutions for purchasing
25    and tracking funds that are being spent and that
26    type of stuff, and - and I helped to work on one
27    that was for the pharmacy but it was replaced

45

1   not too long after the started using it with one

2   that came down from Sacramento so it didn't get

3   too much use.

4         **DEPUTY COMMISSIONER KEENAN:**  Okay.  Also

5   looking at your education and work history, and

6   I think I've already commented on most of it,

7   but Clerk in the Education Department, I don't

8   know if I mentioned that, and Waste Control,

9   Teacher's Aide in vocational Computer Repair,

10  and voca – yeah, in vocational Computer Repair,

11  and – all right, and just sort of here and there

12  comments about your excellent work, and actually

13  throughout the file.  I – I haven't seen

14  anything negative.  Is there anything negative I

15  should be aware of?  If you recall.  I know it

16  goes back aways.

17        **INMATE SUNDBERG:**  Yeah.

18        **DEPUTY COMMISSIONER KEENAN:**  Anything of

19  concern that you would like to explain away?  I

20  mean, you know, I – I didn't – what I saw was

21  positive.

22        **INMATE SUNDBERG:**  You know, about the

23  only negative that I can think of was the – the

24  single 128 counseling – I guess it's a

25  counseling chrono, about the – the grooming

26  standards, which was right after they

27  implemented the droom – grooming standards.  We

1    were on lockdown so I wasn't shaving and I

2    probably looked about like I do now, and they've

3    removed the grooming standards and I'm growing

4    my beard back again.

5         **DEPUTY COMMISSIONER KEENAN:**  Okay.  All

6    right.  And let's see here.  July 29 of '05

7    there is a letter or a memo or something from

8    Hugh McMillan, coordinating teacher for Buddhist

9    Meditation Studies at CTF, and:

10             "To the State of California Parole Board.

11             Subject: Letter of Commendation for Mr.

12             Roger Sundberg.  It is our understanding

13             that attendance in the Buddhist

14             Meditation Studies program does not

15             entitle the parolee candidate to a

16             laudatory chrono.  Since the subject

17             parolee – or parole candidate has been a

18             faithful attendee and active and serious

19             participant in the program the teachers

20             would like to acknowledge his commitment

21             with a letter of commendation.  The

22             purpose of this program is to teach

23             traditional Buddhist meditation and

24             ethical practices.  Weekly instruction

25             includes guided meditation practice,

26             lectures on that practice and on Buddhist

27             principles for living an ethical and

47

```
 1          moral life.  Active class discussion on

 2          these topics is an important aspect of

 3          the teaching.  There are also Buddhist

 4          texts and periodicals distributed to

 5          participants and readings and discussions

 6          based on that literature.  This program

 7          began in January '03 and has meet week -

 8          has met weekly unless prohibited by CTF

 9          emergency procedures such as lockdowns.

10          The parole candidate has been attending

11          the program regularly since its

12          inception.  The same teachers have been

13          involved from the beginning so they have

14          come to know the parole candidate fairly

15          well in the classroom context over the

16          past year.  Although the teachers know

17          nothing about the circumstances of Mr.

18          Sundberg's incarceration, based solely on

19          his behavior and attitude in this study

20          program we believe the candidate deserves

21          serious consideration by the Parole

22          Board.  Respectfully submitted, Hugh

23          McMillan."

24  Okay.  And you've participated in a Children's

25  Walkathon in '95.

26          INMATE SUNDBERG:  I had forgot.

27          DEPUTY COMMISSIONER KEENAN:  Okay.  It
```

48

1    sounds like something you did though?

2         **INMATE SUNDBERG:**  It sounds like

3    something I might have participated in in some

4    form.  I don't remember walking but it doesn't

5    mean I didn't do it back then.

6         **DEPUTY COMMISSIONER KEENAN:**  Okay.

7         **INMATE SUNDBERG:**  It's not something that

8    would stick out in my memory as being a big

9    deal.

10        **DEPUTY COMMISSIONER KEENAN:**  Okay.  Yeah,

11   they had - they had it listed in here somewhere

12   in one of the attached post-conviction progress

13   reports.  Okay.  All right.  Have I missed

14   anything?

15        **INMATE SUNDBERG:**  Oh, sure, but I think

16   they've been covered in prior hearings, at least

17   I'm pretty sure they have.

18        **DEPUTY COMMISSIONER KEENAN:**  It looks

19   like you've done a lot over time.  Is there

20   something you want to highlight?  Maybe

21   something that was considered in the past that

22   you think, you know, is worthy of note at, you

23   know, your Subsequent Hearings?

24        **INMATE SUNDBERG:**  Not so much individual

25   things but just I think there's what you might

26   call a - I suppose a theme to it, which is

27   basically that I'm trying to help improve things

49

1   in - you know, in one way, shape or form or

2   another.  You know, when there's a problem with

3   something, if I can see a way of trying to

4   improve it and I have, you know, the opportunity

5   to, you know, then I think that that's the right

6   thing to do.

7         **DEPUTY COMMISSIONER KEENAN:**  It kind of

8   reminds me of - a lot of these hearings where I

9   - I hear people telling me they want to become a

10  productive member of the soci - of society,

11  right?  It sounds like what you're saying is

12  you're being a productive member of this

13  society.

14        **INMATE SUNDBERG:**  Well, this is where I

15  am and this is what I can do.

16        **DEPUTY COMMISSIONER KEENAN:**  All right.

17        **PRESIDING COMMISSIONER SHELTON:**  I think

18  it's a good attitude.

19        **INMATE SUNDBERG:**  Well, I was raised with

20  that attitude, you know, my - my family had -

21  that's the - you know, just the way that we

22  were.  You know, sometimes when inmates and

23  staff people talk to me or about me because I

24  don't exactly fit in here as the run-of-the-mill

25  criminal, you know, I'll tell them I was warped

26  by - by my early upbringing, you know.

27        **PRESIDING COMMISSIONER SHELTON:**  Good

50

1   response.

2       **DEPUTY COMMISSIONER KEENAN:**   Okay.   And

3   you have - you've completed the one vocation,

4   the vocational Data Processing program, right?

5       **INMATE SUNDBERG:**   Right.

6       **DEPUTY COMMISSIONER KEENAN:**   And that's

7   the one where you spend all your time in the

8   whole computer field basically.

9       **INMATE SUNDBERG:**   Pretty much, except for

10  working with the Computer Repair where I was a

11  teacher's aide and then a technician.

12      **DEPUTY COMMISSIONER KEENAN:**   Okay.   All

13  right.

14      **INMATE SUNDBERG:**   And I was thinking,

15  I've been debating with myself whether to go

16  through there as a student or not just so that I

17  could have more time to learn stuff because I

18  was still learning stuff when I was a

19  technician, but I was pretty much spending just

20  about my time working and it would be kind of

21  nice just to be a student again for a while,

22  even if I already know most of it.

23      **DEPUTY COMMISSIONER KEENAN:**   So your

24  marketable skills are the vocational Data

25  Processing and the Technician field.

26      **INMATE SUNDBERG:**   It's all related to

27  computers, yeah.

51

1    **DEPUTY COMMISSIONER KEENAN:**  Okay.  All

2   right.  Anything else you want to highlight?

3       **INMATE SUNDBERG:**  I can't think of

4   anything.

5       **DEPUTY COMMISSIONER KEENAN:**  Okay.  Focus

6   on the psychological evaluation.  The most

7   recent is September 20 of '04 by Dr. S. Stack,

8   S-T-A-C-K, Licensed Psychologist.  Okay.  In

9   assessing you the doctor talks about basic

10  identifying information, developmental history,

11  educational, notes your high school degree,

12  Associate of Arts degree in General Education.

13  It says here that you told the doctor you spent

14  - and that's at this time - over 12,000 hours

15  doing Data Processing during incarceration

16  period and has significant computer experience.

17  (indiscernible) custom application training and

18  tutoring people.  It goes over your family

19  history, psychosexual development and sexual

20  orientation, marital history, military history,

21  employment income history, substance abuse

22  history.  It says:

23          "Inmate Sundberg acknowledges abusing

24          alcohol, stating that he used alcohol to

25          'medicate my depression,' as you've

26          already stated here today.  He

27          acknowledges that this was a significant

52

```
1            problem.  He also acknowledged the
2            experimental use of drugs including
3            marijuana and cocaine although he was
4            never addicted.  He does attend
5            Alcoholics Anonymous."
6    Psychiatric and medical history is discussed and
7    it goes over what you've already discussed about
8    shooting yourself in the head and the seizure
9    disorder, the depression.  It talks about your
10   parole plans, mentioning that part of that would
11   include outpatient – outpatient counseling and
12   in which you are currently researching, and
13   involvement in community meditation and
14   Alcoholics Anonymous meetings.  Sound right?
15           INMATE SUNDBERG:  Uh-huh.
16           DEPUTY COMMISSIONER KEENAN:  It talks
17   about your current mental status and treatment
18   needs and noting in part intellectual
19   functioning was estimated to be in the above
20   average range.
21           "Currently his symptoms of depression are
22           well controlled, and in particular by
23           medications but also by self-help group
24           participation.  He's in the Triple CMS
25           program here at CTF and has been for
26           several years.  His judgment appeared to
27           be sound.  He showed good insight into
```

53

1          his commitment offense."

2    Diagnostic impressions: Axis I, major depressive

3    disorder improved, alcohol abuse and marijuana

4    abuse in institutional remission; Axis II, no

5    contributory personality disorder; Axis V,

6    Global Assessment of Functioning, has you listed

7    as 80, and I have something from the DSM-IV that

8    gives you an explanation to what that means.

9    Okay.  You fall within the 71 to 80 range, so

10   you're at the top of that range, and it says:

11   "If symptoms are present, they are transient and

12   expectable reactions to psychosocial stressors,

13   no more than slight impairment in social,

14   occupational or school functioning."  Okay.  It

15   talks about a review of the life crime.  It

16   says:

17          "Inmate Sundberg essentially agrees with

18          the description in his Central File of

19          the commitment offense.  He stated that

20          he was extremely stressed at the time of

21          the offense and that he - and that should

22          those conditions ever exist again, he

23          would move out of the area rather than

24          stay near someone who was threatening him

25          and his wife, as the victim did.  He

26          stated he now understands that he thought

27          of the victim as less than a human being

54

1      and he now realizes that was a mistake."

2  Assessment of dangerousness in a controlled

3  setting, your violence potential is estimated to

4  be significantly below the average relative to

5  this Level Two inmate population. "If released

6  to the community, his violence potential is

7  estimated to be no more than the average citizen

8  in the community." The doctor also states:

9       "The most significant risk factor for

10      this inmate which would be a precursor to

11      violence would be finding himself in

12      circumstances of extreme stress. It is

13      believed that he has learned strategies

14      for dealing with that stress in the

15      future and I do not expect that he would

16      ever commit another serious crime like

17      that again."

18  Clinical Observations, Comments and

19  Recommendations:

20      "Inmate Sundberg is competent and

21      responsible for his behavior. He has the

22      capacity to abide by institutional

23      standards and has done so during his

24      incarceration period. Inmate Sundberg

25      does suffer from a psychiatric disorder

26      which is well controlled with

27      medications. I believe he could benefit

55

```
 1         from psychiatric treatment following his
 2         parole.  As inmate Sundberg has
 3         acknowledged some abuse of alcohol and
 4         drugs, I would recommend upon parole
 5         abstinence from all illegal drugs and/or
 6         alcohol, monitoring for substance abuse,
 7         and mandatory attendance at self-help
 8         groups such as AA or NA."
 9    Is there anything that you would like to say
10    about that report by Dr. Stack?
11         INMATE SUNDBERG:  I can't think of
12    anything.
13         DEPUTY COMMISSIONER KEENAN:  Okay.  I
14    also saw that there was a prior report back in
15    5/25/2000 by Steven J. Terrini, T-E-R-R-I-N-I,
16    Senior Supervising Psychologist.  Both of these
17    are doctors here at the institution.
18         INMATE SUNDBERG:  Yeah.  Terrini was a
19    regular doctor here and he had also been my case
20    manager for some time, and the other doctor was
21    one who was hired specifically to do Board
22    Reports only.  That's what she told me, she
23    wasn't - she didn't practice any other work here
24    other than doing just Board Reports.
25         DEPUTY COMMISSIONER KEENAN:  Okay.  He
26    notes under Current Diagnostic Impressions:
27    major depressive disorder in good remission;
```

56

1    alcohol abuse and marijuana abuse in

2    institutional remission; no personality

3    disorders, and he had you down as a GAF of 75.

4    It says: "If released to the community, his

5    violence potential is estimated to be no more

6    than the average citizen in the community."

7    Anything you want to say about that report?  I

8    don't know if you've had a chance to review it

9    recently.

10        INMATE SUNDBERG:  Nothing I can think of,

11    thank you.

12        DEPUTY COMMISSIONER KEENAN:  Okay.  I'll

13    turn it back to the chairperson.

14        PRESIDING COMMISSIONER SHELTON:  All

15    right.  Okay.  Mr. Sundberg, we are going to

16    talk about your parole plans now, and I have

17    some information in front of me.  I need to walk

18    through it with you and have you update anything

19    with me that may have changed.  It says here

20    that you would like to parole to your mother's

21    house.

22        INMATE SUNDBERG:  Correct.

23        PRESIDING COMMISSIONER SHELTON:  And does

24    she still live in Long Beach?

25        INMATE SUNDBERG:  Yes.

26        PRESIDING COMMISSIONER SHELTON:  Okay.

27    And I know you mentioned that she was 90 –

57

1        **INMATE SUNDBERG:**  Yes.

2        **PRESIDING COMMISSIONER SHELTON:**  - which

3    I think is outstanding.  Who else lives in her

4    house?

5        **INMATE SUNDBERG:**  Sometimes one or

6    another of my two sisters that are next closest

7    in age, Lou and Mary, Lou more often, but they

8    don't live there all the time, just

9    periodically.  Sometimes they'll live with her

10   and - but more often they try and visit

11   frequently and help her out when they're

12   visiting.

13       **PRESIDING COMMISSIONER SHELTON:**  So they

14   live close by though -

15       **INMATE SUNDBERG:**  Yeah.

16       **PRESIDING COMMISSIONER SHELTON:**  - enough

17   for them for them to do that?  And her health is

18   not real good right now.  I think you said -

19       **INMATE SUNDBERG:**  Well -

20       **PRESIDING COMMISSIONER SHELTON:**  - she

21   was in a walker.

22       **INMATE SUNDBERG:**  - she doesn't - she

23   doesn't - yeah.  She has to use a walker to get

24   around, and her arthri - her arthritis is pretty

25   bad, but she doesn't have anything immediately

26   life threatening, she's just not, you know - she

27   just is old and feels it, mostly I think, I

58

1 guess.

2           PRESIDING COMMISSIONER SHELTON:  Let's

3 talk about employment.  It's -

4           INMATE SUNDBERG:  Well, that's, of

5 course, my weak area.

6           PRESIDING COMMISSIONER SHELTON:  Yeah.

7           INMATE SUNDBERG:  You know, I don't have

8 a job offering.  I do have job skills and I have

9 a friend who's husband works at a company and

10 she's friends with - with the head of the

11 company who says that she can get him to hire me

12 on, if nothing else just as a custodian as a -

13           PRESIDING COMMISSIONER SHELTON:  I saw

14 that -

15           INMATE SUNDBERG:  - to get in -

16           PRESIDING COMMISSIONER SHELTON:  -

17 letter.

18           INMATE SUNDBERG:  - and - and then in.

19           PRESIDING COMMISSIONER SHELTON:  Tell me

20 about -

21           INMATE SUNDBERG:  But that's about the

22 only -

23           PRESIDING COMMISSIONER SHELTON:  I would

24 agree with you, sir.  I think you have a lot of

25 skills.  I think you have a lot of employable

26 skills, especially in this day and age, and

27 since I'm probably one of the least computer

59

1  technical people there are around, I'm impressed

2  with what you're doing.  What I don't understand

3  is why we don't have lots of letters in your

4  file for job offers -

5          **INMATE SUNDBERG:**  Oh, because no -

6          **PRESIDING COMMISSIONER SHELTON:**  -

7  considerations.

8          **INMATE SUNDBERG:**  Two reasons.  Between

9  the last hearing and this one I haven't sent any

10  more letters out.  I've just been collecting

11  information about resources that I would get -

12  gotten them - gotten a - a page of places that -

13  from - at least from the prerelease department

14  here say that they will hire inmates, although

15  some of them I had already written before and I

16  never got any response back from them so I don't

17  know.  Maybe you have to go there in person to

18  get a response, and again, you know, the various

19  places that I've written to, you know, is noted

20  however many I had on one list at the last

21  hearing, I forget what it was, 40 or 50 or

22  something like that.  The only responses that I

23  got back were from the Department of Corrections

24  and the State of California that told me they do

25  hire ex-felons and to check their website when I

26  get out.

27          **PRESIDING COMMISSIONER SHELTON:**  That's

60

1  kind of frustrating, isn't it?

2      **INMATE SUNDBERG:**  Yeah, it is.  It is.  I

3  just, you know - when you do computer

4  programming you have to learn to get a thick

5  skin because you get all these errors one after

6  another after another that you have to track

7  down and figure out, and I'm trying -

8      **PRESIDING COMMISSIONER SHELTON:**  Real

9  life complications -

10     **INMATE SUNDBERG:**  - to keep that same

11 attitude with this, that I don't -

12     **PRESIDING COMMISSIONER SHELTON:**  Just

13 consider an error -

14     **INMATE SUNDBERG:**  - expect to go -

15     **PRESIDING COMMISSIONER SHELTON:**  - letter

16 or something.

17     **INMATE SUNDBERG:**  Yeah.  I expected not

18 to - anything great to happen immediately but if

19 you're persistent enough something will happen,

20 but it does get real discouraging, which is why

21 I haven't been sending out more letters

22 recently, I've just been collecting more

23 information from people about places that

24 supposedly hire inmates and about getting state

25 or federal bonding of inmates, that type of

26 stuff, just trying to get information from

27 networking with other guys in here that are

61

 1    doing the same thing.

 2            **PRESIDING COMMISSIONER SHELTON:**  That's a

 3    good idea.  We have some letters, support

 4    letters in your file.  I know that these are

 5    written back in October of 2005 but I anticipate

 6    that you were supposed to have a hearing a

 7    little sooner than this so these are acceptable

 8    letters, I just want to let you know.  This

 9    first one is from your mom.  "I don't know what

10    else to say except I've missed him for many

11    years," and would like to see you paroled more

12    than anything in the world, and you're always

13    welcome in her home.  The next letter is from

14    your sister Joanne.  She believes that you are

15    different from the average inmate.  She talks

16    about your computer work, your weekly meetings,

17    your vocational Data Processing certificate,

18    your AA degree.  She indicated you graduated

19    magna cum laude.

20            **INMATE SUNDBERG:**  Yes.

21            **PRESIDING COMMISSIONER SHELTON:**

22    Congratulations.

23            **INMATE SUNDBERG:**  Thank you.

24            **PRESIDING COMMISSIONER SHELTON:**  Distance

25    learning class, I think you mentioned that, the

26    Logic and Critical Thinking class from

27    Coastline.  She mentions the other groups that

62

1    you have participated in and activities that you

2    have accomplished.  She finds you to be a warm,

3    loving brother, son and father, and many family

4    members would provide various means of support,

5    "sisters in California will visit him and help

6    provide emotional and spiritual support."  This

7    sister lives in Arizona evidently –

8         INMATE SUNDBERG:  Yes.

9         PRESIDING COMMISSIONER SHELTON:  – with

10   her husband, and they could be able to provide

11   some help financially.  This letter is from

12   Patty.  Is that a sister?

13        INMATE SUNDBERG:  No, a friend.  Someone

14   I've known a long time, since –

15        PRESIDING COMMISSIONER SHELTON:  She said

16   she's you're her best friend's younger brother.

17        INMATE SUNDBERG:  Yes.

18        PRESIDING COMMISSIONER SHELTON:  So she

19   is a friend to one of your sisters, I would

20   assume?

21        INMATE SUNDBERG:  Yes.

22        PRESIDING COMMISSIONER SHELTON:  This is

23   the one you were telling us about that has

24   potentially a job available for you.

25        INMATE SUNDBERG:  Right.

26        PRESIDING COMMISSIONER SHELTON:  Her

27   husband owns a small security system and then

63

1   use computer programmers, they have employed

2   murderers - okay - who have paid their debt.  If

3   the position of janitor is the only position

4   open, then she said that you would take that

5   until an appropriate job was open, and that's

6   what you indicated before.

7           INMATE SUNDBERG:  Yeah.

8           PRESIDING COMMISSIONER SHELTON:  Patty

9   Romney, Ronnie?

10          INMATE SUNDBERG:  Yes.

11          PRESIDING COMMISSIONER SHELTON:  Well,

12  that's the same lady.  This is a duplicate

13  letter then from the year before of support.

14  Lou Sundberg.  This is your sister?

15          INMATE SUNDBERG:  Right.

16          PRESIDING COMMISSIONER SHELTON:  She said

17  that she would share an apartment with you.

18  Where does she live?

19          INMATE SUNDBERG:  I believe she's in Long

20  Beach.  I'm not sure if - because she's -

21  sometimes she stays with my mother in Long Beach

22  and sometimes she's in a separate apartment, and

23  I'm - I'm pretty sure the apartment's in either

24  in Long Beach or one of the very close

25  surrounding cities.

26          PRESIDING COMMISSIONER SHELTON:  So

27  obviously that's a support letter.  That's all I

64

1  have here.  Do you have any other that you're

2  aware of that I haven't indicated?

3      INMATE SUNDBERG:  I think that there was

4  one from my son Neil that - it actually should

5  have gone into the last one but it didn't to my

6  knowledge.  Yeah.  That's the only one that I

7  can think of is the one from my son Neil.

8      PRESIDING COMMISSIONER SHELTON:  Well,

9  let me enter that in and I'll give it back to

10  you.  All right.  This was done in '03 from your

11  son Neil, and three years ago -

12      INMATE SUNDBERG:  That's -

13      PRESIDING COMMISSIONER SHELTON:  - about

14  this time he was 18, so he's 21, as you had

15  indicated.  Is he still at Questa College?

16      INMATE SUNDBERG:  To the best of my

17  knowledge that's the college he's still

18  attending.

19      PRESIDING COMMISSIONER SHELTON:  Talks

20  about his work and his college.  "I'm a good

21  student and a hard worker."  I like this: "I am

22  caring, charismatic and confident person."

23      INMATE SUNDBERG:  He is.  He's a - he's a

24  good kid.

25      PRESIDING COMMISSIONER SHELTON:  It

26  sounds like he would be charismatic even if he

27  knows what the words means, you know.  It's a -

65

1    that's a big word for a young boy, that's cool.

2    Highly motivated.  He wants to see you home.  He

3    wants for you to be able to play a more active

4    part in his life.  He holds the biggest place in

5    my heart and without him, I'm missing the

6    biggest piece.

7            **INMATE SUNDBERG:**  He is —

8            **PRESIDING COMMISSIONER SHELTON:**  Very

9    nice letter.

10           **INMATE SUNDBERG:**  He's a good boy.  He

11   told me an interesting story too.  He — he used

12   to come up on family visits back before they

13   took family visits away from lifers, and so, you

14   know, I kept him informed in what I was doing

15   when I was, you know, taking college classes

16   and, you know, learning stuff about computers

17   and stuff, and he told me that, you know, since

18   I was the only person in prison that, you know,

19   he knew of, it sort of gave him that impression

20   that — that — that was the impression of

21   prisoners that he had was that, you know,

22   they're — they're doing these things to — you

23   know, to continue learning and to improve

24   themselves, and then he went to I guess it was a

25   Scared Straight meeting or something like that

26   and they have, you know, a bunch of gang members

27   there and, you know — you know, most of which

66

1    were, you know, semi-literate and - and he said

2    he was just shocked by the whole thing because

3    it was so entirely different -

4              **PRESIDING COMMISSIONER SHELTON:**   Than -

5              **INMATE SUNDBERG:**   - you know -

6              **PRESIDING COMMISSIONER SHELTON:**   - in his

7    mind?

8              **INMATE SUNDBERG:**   Yeah, than -

9              **PRESIDING COMMISSIONER SHELTON:**   Yeah.

10   His perception of the life.

11             **INMATE SUNDBERG:**   Yeah.

12             **PRESIDING COMMISSIONER SHELTON:**   So did

13   he learn something out of that?

14             **INMATE SUNDBERG:**   Yeah.  He - you know,

15   and I told him, "Well, yeah, don't think that

16   prison is - is anything good, you know, you - if

17   you struggle you can get something out of it but

18   it's - you know, it's not - it's not worth it

19   for - you know, even when they used to have the

20   college program, it's not worth going to prison

21   just to get a - a college degree, you know.

22   It's - it's better to work two jobs and go to

23   school.

24             **PRESIDING COMMISSIONER SHELTON:**   Yeah.

25   Good advice, Dad.

26             **INMATE SUNDBERG:**   Yeah.

27             **PRESIDING COMMISSIONER SHELTON:**   All

```
1    right.  We also have to send out 3042 Notices to
2    agencies that are interested in your situation.
3    As you know, there is a representative from the
4    Los Angeles County District Attorney's Office
5    here who will be speaking shortly.  We also
6    received a letter from the Los Angeles County
7    Sheriff's Department with regard to the issue of
8    your release for parole and I need to enter it
9    into the record.
10              "On the night of May 7th, 1987, inmate
11              Roger Sundberg was at his apartment in
12              the city of Lakewood when he observed his
13              next-door neighbor, Steven Somers, arrive
14              home.  Sundberg had a longstanding
15              dispute with Somers arising from the
16              marital problems between Somers and
17              Somers' wife Pamela.  Sundberg
18              sympathized with Pamela and did not
19              approve of Somers being at the location
20              in violation of the restraining order
21              imposed upon him and the recent
22              reconciliation. Sundberg suffered severe
23              depression and made several prior threats
24              of suicide.  He was also hypoglycemic
25              despite which drank several beers that
26              night.  Over the course of the next few
27              hours Sundberg ranted to his own wife
```

68

1     about Somers' presence next-door.

2     Shortly before 1 a.m. on May 8th, 1987,

3     Sundberg suddenly declared, 'I've had

4     enough.'  He stated he was going to cash

5     in his stamps and as long as he was going

6     to, he was going to take Somers with him.

7     Sundberg armed himself with a hunting

8     knife, a .38 caliber revolver and extra

9     ammunition.  He then went next-door where

10    he found Somers working in his garage.

11    Sundberg attacked Somers, shooting him at

12    least once.  Somers struggled with him

13    over the gun, causing Sundberg to shoot

14    himself in the thigh and grazed himself

15    across the side of the head.  During this

16    time Somers shouted for help.  A neighbor

17    interrupted the incident but fled when

18    Sundberg pointed the gun at him.  Somers'

19    wife and son also came out into the

20    garage.  Upon seeing Somers covered with

21    blood and Sundberg armed with the

22    revolver, they retreated back into the

23    house to call the police.  Moments later

24    Somers entered the house followed by

25    Sundberg, who had now reloaded the

26    revolver.  Sundberg pursued him into a

27    bathroom, striking him several times in

1  the head with the gun.  Somers' 11-year-

2  old son also attempted to intervene by

3  striking Sundberg with a plastic bat.

4  Sundberg then slammed the bathroom door

5  closed and knocked Somers backward into

6  the tub.  As Somers pled for his life,

7  Sundberg declared, 'I've been waiting to

8  do this for a long time,' and shot him

9  three times in the head.  Sundberg fled

10  the location and broke into a neighbor's

11  apartment.  Responding deputies ordered

12  him out but upon coming outside, Sundberg

13  refused to surrender.  He was taken into

14  custody with the assistance of a

15  sheriff's canine.  Following Sundberg's

16  arrest, a search of his apartment

17  revealed an economics book and several

18  .35 millimeter film canisters and a cloth

19  bag inside his bedroom.  Pages of the

20  book had been cut out in the shape of a

21  gun.  The film canisters contained life

22  .38 caliber ammunition.  Sundberg's wife

23  related that the gun was usually kept

24  hidden in the book on a shelf.  She

25  stated, however, that the bag in which

26  these items were found was the same bag

27  that her husband carried to their nine-

70

1        year-old son's school play on the evening

2        prior to the murder.  It is the opinion

3        of this department that parole of inmate

4        Sundberg is inappropriate and should be

5        denied."

6  All right.  At this time -

7        **ATTORNEY RUTLEDGE:**  Commissioner,

8  regarding that letter, could we make one

9  correction?

10       **PRESIDING COMMISSIONER SHELTON:**

11  Certainly.  As you know -

12       **ATTORNEY RUTLEDGE:**  With -

13       **PRESIDING COMMISSIONER SHELTON:**  - these

14  are sometimes not accurate.

15       **ATTORNEY RUTLEDGE:**  And - and that's why

16  I bring it up.  One of the inaccuracies is that

17  my client shot himself in the thigh.  That never

18  did happen.

19       **PRESIDING COMMISSIONER SHELTON:**  Okay.

20       **ATTORNEY RUTLEDGE:**  That's been related

21  in some other documents as well, but that's -

22       **PRESIDING COMMISSIONER SHELTON:**  It

23  didn't -

24       **ATTORNEY RUTLEDGE:**  - (indiscernible) -

25       **PRESIDING COMMISSIONER SHELTON:**  - come

26  up today either.

27       **ATTORNEY RUTLEDGE:**  So -

71

1        **PRESIDING COMMISSIONER SHELTON:**   Are

2   there any other corrections at the moment?

3        **INMATE SUNDBERG:**   Nothing of any real

4   major importance that I can think of without

5   rehashing -

6        **PRESIDING COMMISSIONER SHELTON:**   The

7   whole deal.

8        **INMATE SUNDBERG:**   The whole deal, yeah,

9   which I've -

10       **PRESIDING COMMISSIONER SHELTON:**   All

11  right.

12       **INMATE SUNDBERG:**   - done before.

13       **PRESIDING COMMISSIONER SHELTON:**   Thank

14  you.  I appreciate it.  Now we are moving into

15  the portion of the hearing where we have an

16  opportunity to ask you questions.  We will not

17  discuss the offense with you, but the

18  commissioner and I can ask you questions, and

19  the deputy D.A. can, as well as your own

20  attorney, and I have some questions -

21       **INMATE SUNDBERG:**   Okay.

22       **PRESIDING COMMISSIONER SHELTON:**   - which

23  I wrote down.  You have indicated that you

24  believe alcohol played a portion into this

25  offense and you are on and have been

26  participating in AA.  What have you done with

27  regards to making any parole plans regarding AA?

72

1          **INMATE SUNDBERG:**  Oh.  One of the AA

2   sponsors here says that he has a book with

3   listings of various different places.  Now I

4   think the book is probably old but I'll borrow

5   it from him and copy down the areas in - in Long

6   Beach, you know, if I get a date, and I'm also

7   going to have my sister Joanne and/or my sister

8   Diane log on to the AA website which the AA

9   volunteers that come here say has lists of - of

10  places that meetings are held at.

11         **PRESIDING COMMISSIONER SHELTON:**  I'll be

12  real frank with you.  It's one of my concerns.

13  Obviously you're an extraordinarily bright man

14  and you are very talented.  A lot of people when

15  they get released out on parole who have been on

16  medication that control, for example for you,

17  seizures or depression, here you're - you're

18  given the medication, you take it when you're

19  told to take it.  What guarantee can you give me

20  that if you go outside these doors you're going

21  to continue on that medication?

22         **INMATE SUNDBERG:**  Well, the guarantee is

23  what I face if I don't, you know.  Seizures are

24  not something that somebody wants to have, if

25  you - that - that feeling and loss of control

26  and experience is just not something that you

27  want to go through if you can help it, and the

73

1  same thing goes with - with the bad depression.

2  I mean when you're compulsively suicidal to

3  where - I've - I've heard one speaker on

4  depression say that it's like the second

5  greatest cause of pain - pain of any illness

6  there is, and I forget what he said the first

7  was, maybe arthritis.  When you're experiencing

8  that, you would do a hell of a lot to keep from

9  experiencing that again to the point especially

10  to where you reach the point where actually do

11  try and commit suicide just because anything is

12  better than the continued pain of the

13  depression.

14      **PRESIDING COMMISSIONER SHELTON:**  How many

15  times did you try to commit suicide in your

16  lifetime?

17      **INMATE SUNDBERG:**  I only shot myself

18  once, but at least two or three times I got as

19  far as putting the gun to my head and once

20  taking an - an overdose.

21      **PRESIDING COMMISSIONER SHELTON:**  And

22  that's why my question early is why did not seek

23  assistance and there's - do you have anything in

24  your parole plans - I know that Dr. Stack

25  recommended the ongoing use of psychiatric

26  treatment.  Do you have anybody, any doctor,

27  psychiatrist, lined up that you could

74

1  potentially participate?  He felt you needed to
2  participate in groups as well as in ther -
3  ongoing therapy.
4          INMATE SUNDBERG:  She.
5          PRESIDING COMMISSIONER SHELTON:  She.
6  I'm sorry.
7          INMATE SUNDBERG:  That's okay.  No.  The
8  one special thing that I haven't been able to
9  find that I would really like to get would be
10  something that would continue my depression
11  support group.
12          PRESIDING COMMISSIONER SHELTON:  I know.
13  I got the feeling that those were really -
14          INMATE SUNDBERG:  And -
15          PRESIDING COMMISSIONER SHELTON:  -
16  important to you.
17          INMATE SUNDBERG:  - I have gotten them,
18  addresses of a couple of organizations that deal
19  with depression out of one of the books that I
20  read on it but I haven't written them yet to see
21  - what I'm going to do is try and write them,
22  and I hadn't thought of it before, but I could
23  probably have my sister check on the web to - I
24  should've thought of that before - to see if
25  they've got any listings in that area, but that
26  - that's the one that I really don't have
27  anything for.  Other than that, I actually saw a

75

1    - some information about the parole department

2    that says that they provide some of those

3    services, and I know that the County Mental

4    Health in L.A. also provides some of those types

5    of services.

6         **PRESIDING COMMISSIONER SHELTON:**  Probably

7    with an extraordinarily long waiting list.

8         **INMATE SUNDBERG:**  That could be.  That

9    could be.

10        **PRESIDING COMMISSIONER SHELTON:**  What

11   else was I going to ask you?  I think those were

12   my only questions at the moment.

13        **INMATE SUNDBERG:**  Okay, yeah.  One of the

14   - letter from the Parole and Community Services

15   Division says that it doesn't specifically

16   address - I thought it addressed psychiatric

17   specifically but I don't see it here right now,

18   but it talk - it says, "P&CSD also provides

19   services to homeless parolees through

20   residential" etcetera list - and it says, "This

21   community-based program provides lodging, meals,

22   individual and group counseling, substance abuse

23   counseling, parenting skills training, money

24   management, life skills training, and medical

25   referrals."  So I figure if they can do medical

26   referrals they can probably do psychiatric

27   referrals too.  And I - I read something but I

76

1  can't seem to find where it is right here, about

2  them providing medications for psychiatric

3  problems too, but I don't think I brought that

4  paper with me.

5         PRESIDING COMMISSIONER SHELTON:  Do you

6  know –

7         INMATE SUNDBERG:  Oh, that was – it might

8  have been Employment Development Department too.

9  Do I know?

10        PRESIDING COMMISSIONER SHELTON:  Let me

11  ask you this, because I don't know the answer.

12  Would you possibly be eligible for SSI based

13  upon your diagnosis of depression as well as you

14  seizure disorder?

15        INMATE SUNDBERG:  I might.

16        PRESIDING COMMISSIONER SHELTON:  I don't

17  know how –

18        INMATE SUNDBERG:  I really hadn't

19  considered that because that's not what I want

20  to do.

21        PRESIDING COMMISSIONER SHELTON:  No, I

22  understand.

23        INMATE SUNDBERG:  Yeah.

24        PRESIDING COMMISSIONER SHELTON:  But I

25  mean as a –

26        INMATE SUNDBERG:  As something to help.

27        PRESIDING COMMISSIONER SHELTON:  Well,

77

```
 1    what I'm going to suggest is - is this, and
 2    maybe I'm putting the cart before the horse and
 3    people probably are sick of me saying this here,
 4    but I believe in not putting all your eggs in
 5    one basket and -
 6              INMATE SUNDBERG:   Good advice.
 7              PRESIDING COMMISSIONER SHELTON:   - to try
 8    to shore up as many alternatives for you in
 9    terms of resources so if A doesn't pan out you
10    got plan B.   If plan B doesn't pan out you got
11    plan C.
12              INMATE SUNDBERG:   Right.
13              PRESIDING COMMISSIONER SHELTON:   But I'm
14    looking at those thinking you may have
15    difficulty getting a driver's license with your
16    seizure disorder.
17              INMATE SUNDBERG:   Hmm.
18              PRESIDING COMMISSIONER SHELTON:   And so
19    you might need to take a look at, even though it
20    appears to be under control with medication,
21    people may not want to, you know -
22              INMATE SUNDBERG:   May not want to risk
23    it.
24              PRESIDING COMMISSIONER SHELTON:   Yeah.
25    May not want to risk that there might be a
26    chance that one day it doesn't work under
27    medication.   So you would have to look at
```

78

1    alternatives for transportation issues.  That

2    might be part of when you're structuring your

3    plans to make sure you know how you're going to

4    get to and from work with this.  So I'm just -

5    I'm trying to get you to think outside the box a

6    little bit here and look at those kinds of

7    things as well.  As well, my other suggestion

8    would be - then I'll let somebody else talk

9    besides me - when it comes to residence, God

10   forbid anything happen to your mom soon -

11          **INMATE SUNDBERG:**  Well, my - my sister

12   Lou has also said that I can stay with her.

13          **PRESIDING COMMISSIONER SHELTON:**  Right.

14          **INMATE SUNDBERG:**  And - well, so have my

15   brother and my -

16          **PRESIDING COMMISSIONER SHELTON:**  Okay.

17          **INMATE SUNDBERG:**  - my sister Joanne, but

18   they're all out of state, so that I have would

19   have to arrange -

20          **PRESIDING COMMISSIONER SHELTON:**  And -

21          **INMATE SUNDBERG:**  - all of that stuff.

22          **PRESIDING COMMISSIONER SHELTON:**  Yeah.

23   And one of my recommendations would be too,

24   based on your medical issues, is taking a look

25   at transitional housing, and transitional

26   housing programs they provide you with resources

27   such as transportation, employment search and

79

1   groups, counseling groups with that, and they

2   have the ability to help put you in touch with

3   resources that may be difficult for you to

4   locate sitting in here.

5           **INMATE SUNDBERG:**  Right.

6           **PRESIDING COMMISSIONER SHELTON:**  Just

7   consider that somewhere in the back of your head

8   -

9           **INMATE SUNDBERG:**  Yeah.

10          **PRESIDING COMMISSIONER SHELTON:**  - as an

11  -

12          **INMATE SUNDBERG:**  Yeah.

13          **PRESIDING COMMISSIONER SHELTON:**  - as an

14  alternative.

15          **INMATE SUNDBERG:**  Yeah.  Yeah, I know.  I

16  thought about - when I know they do paroles to

17  halfway houses, but most of those, the ones that

18  I've look into, you're not eligible for if you

19  have that type of medical or psychiatric

20  problems.

21          **PRESIDING COMMISSIONER SHELTON:**  You

22  might with transitional housing.

23          **INMATE SUNDBERG:**  You might with

24  transitional.

25          **PRESIDING COMMISSIONER SHELTON:**  Because

26  transitional's a tad bit different that halfway

27  houses.

80

1        **INMATE SUNDBERG:**  Right.

2        **PRESIDING COMMISSIONER SHELTON:**  I think

3   transitional is more of a -

4        **INMATE SUNDBERG:**  It's - it's similar to

5   what I was just reading from -

6        **PRESIDING COMMISSIONER SHELTON:**  It's

7   more of a helping -

8        **INMATE SUNDBERG:**  - from the health

9   department.

10       **PRESIDING COMMISSIONER SHELTON:**  -

11  helping place.  Halfway is kind of like you go

12  there and, you know, it's -

13       **INMATE SUNDBERG:**  Right.  And that's

14  good.  Yeah, I've actually got a whole list of

15  places that do that that I've collected in my

16  resource -

17       **PRESIDING COMMISSIONER SHELTON:**  It just

18  might -

19       **INMATE SUNDBERG:**  - that I've been

20  collecting.

21       **PRESIDING COMMISSIONER SHELTON:**  - just

22  give you a little bit of something to look at.

23       **INMATE SUNDBERG:**  Right.

24       **PRESIDING COMMISSIONER SHELTON:**  All

25  right.  Commissioner, do you have any questions?

26       **DEPUTY COMMISSIONER KEENAN:**  I do have

27  some questions.

81

1          **PRESIDING COMMISSIONER SHELTON:**  Okay.

2  Change the tape in a second?

3          **DEPUTY COMMISSIONER KEENAN:**  We all have

4  to -

5          **PRESIDING COMMISSIONER SHELTON:**

6  (indiscernible).

7          **DEPUTY COMMISSIONER KEENAN:**  - change the

8  tape and I have somebody - somebody's looking

9  for some extra tapes right now, so at any rate -

10         **PRESIDING COMMISSIONER SHELTON:**  Tapes.

11         **DEPUTY COMMISSIONER KEENAN:**  Do you have

12  - do you have ones from the stips that you did

13  (indiscernible)?  Well, let's go off record and

14  -

15         **PRESIDING COMMISSIONER SHELTON:**  Take a

16  recess.

17         **DEPUTY COMMISSIONER KEENAN:**  Yeah.

18         **PRESIDING COMMISSIONER SHELTON:**  It's

19  ele -

20              (Off the record)

21         **DEPUTY COMMISSIONER KEENAN:**  Back on

22  record, Tape 2, Side 1.  All parties previously

23  identified are present.  Okay.  Yes, I did have

24  a couple of questions, and just to follow-up on

25  that, and I'm not - not sure I understood this.

26  You - you plan to stay with your mother.

27         **INMATE SUNDBERG:**  Correct, or my sister

82

1    as an alternate.

2        **DEPUTY COMMISSIONER KEENAN:**  Okay.

3        **INMATE SUNDBERG:**  My sister, Lou.

4        **DEPUTY COMMISSIONER KEENAN:**  And - and

5    where she at, what city?

6        **INMATE SUNDBERG:**  I believe she's in Long

7    Beach.  She's in L.A. County at any rate.  She

8    said that she wrote a letter to the Parole

9    Department stating that but I didn't -

10        **PRESIDING COMMISSIONER SHELTON:**  I did -

11        **INMATE SUNDBERG:**  - hear that one.

12        **PRESIDING COMMISSIONER SHELTON:**  I did

13    review a statement from his sister.  It said -

14    remember the one that she - you could share her

15    apartment with her?

16        **DEPUTY COMMISSIONER KEENAN:**  Oh, right,

17    right.  You're right.

18        **INMATE SUNDBERG:**  Okay.  Okay.

19        **DEPUTY COMMISSIONER KEENAN:**  Read that.

20    Thank you.  And also at the time of the

21    commitment offense you were not taking

22    medication?

23        **INMATE SUNDBERG:**  Correct.

24        **DEPUTY COMMISSIONER KEENAN:**  The first

25    time you took it was when you were in the

26    institution?

27        **INMATE SUNDBERG:**  Yeah, when I was in the

83

1   county jail after I had been sentenced, I went

2   to see the psychiatrist there to start taking

3   antidepressants.

4        **DEPUTY COMMISSIONER KEENAN:**  All right.

5   And I have another question - well, actually,

6   let me back up.  Before you were, you know, in

7   prison and apart from the commitment offense,

8   would you consider yourself a functional guy, I

9   mean able to make your way in the world and earn

10  a living, support yourself?

11       **INMATE SUNDBERG:**  Yeah.

12       **DEPUTY COMMISSIONER KEENAN:**  Other than

13  that -

14       **INMATE SUNDBERG:**  Things were - were

15  sometimes a struggle, but I'd managed to, you

16  know, feed and house my family for ten years

17  roughly.

18       **DEPUTY COMMISSIONER KEENAN:**  Okay.

19       **INMATE SUNDBERG:**  You know, since we had

20  our first child born.

21       **DEPUTY COMMISSIONER KEENAN:**  Okay.

22       **INMATE SUNDBERG:**  Maintain, you know, a

23  steady job with a fairly conservative company

24  that you have to be, you know, pretty adaptable

25  to - you know, big business to work for.

26       **DEPUTY COMMISSIONER KEENAN:**  Okay.  And

27  that was sort of my impressions as I - as we

84

1   went through this that you were functional in

2   that way in the community, and I see that

3   similarly you're functional here.  You know,

4   you're able to get things done.  You know, you

5   actually – you seem organized.  You're getting

6   into programs, you seem to be goal directed,

7   you're participating in therapy and you're doing

8   the computer work and, you know, building

9   skills, building education, you're functional

10  here as well, and – and that's great, it's good

11  to know that you're going to be functional when

12  you're on the outside, but when you were on the

13  outside you were functional and you committed

14  this crime and so, for me, the fact that you

15  achieve things while you're here doesn't tell

16  the whole story.  My concern, and it's – I don't

17  know if it's really so much a question but I'll

18  just sort of state a concern and give you a

19  chance to talk about it, and if it's easier, you

20  can just talk about it during your closing

21  comments, you'll have a chance to do that if

22  you'd like to, and that'll give a chance to

23  think about it.  And also I should note, I know

24  you don't want to talk about the commitment

25  offense and – and that's perfectly fine, and so

26  to the extent to answer the question or – or to

27  address the concern you have to get into that,

85

1    just let me know, "Hey, I don't want to get into
2    that," you know, or maybe answer as best you
3    can, but my concern is when I look at this, I
4    wonder – this is a serious commitment offense,
5    and I look at it and, you know, you read the
6    facts and it's – it's a heavy scene, you know,
7    it's – it's a very serious crime, and I wonder,
8    I look at that, I go: what kind of a guy could
9    do something like that, you know, and I wonder,
10   as I listen to you, do you have insight into who
11   you were deep down inside, at the core, you
12   know?  Do you know, you know, what you were all
13   about back then?  Do you have a good handle on
14   how you could do something like that?  And what
15   you've done in the institution, has it really
16   addressed those issues?  Has there been a
17   significant change?  Are you – are you a
18   different kind of guy?  Are – or are you the
19   same kind of guy deep down that in the right set
20   of circumstances could do something like that
21   again?  You know, I know that you've worked hard
22   for personal change, you know, for growth, but
23   I'm just wondering, the old Mr. Sundberg, the
24   guy who committed that – that commitment
25   offense, that part of you, is that dead and
26   buried –
27          **INMATE SUNDBERG:**  Uh-huh.

86

1        **DEPUTY COMMISSIONER KEENAN:**  - has that

2    been fully addressed?  I know that sits - that's

3    not a very concise question but it's just a

4    concern I have.

5        **INMATE SUNDBERG:**  Well, yeah, and it's -

6    it's a pretty legitimate concern too I think,

7    and it's - it's - it's certainly one that I've,

8    you know, thought of myself and talked to, you

9    know, shrinks about, and of course, you know,

10   talking to counselors is - is part of what's

11   important because - well, I - anyone has the

12   po - that potential with enough wrong

13   circumstances, and part of the key is learning

14   what those circumstances are, learning what your

15   weaknesses are and not letting things exac -

16   become exacerbated or - or too much to that

17   extent.  Okay, I had a - a tendency to just go

18   with whatever I had to and just, you know,

19   endure whatever had to be endured, you know,

20   just be a stoic and, you know, bite the bullet

21   and keep going until, you know, I couldn't

22   anymore, and so that's one of the things that

23   I've learned, and that's, you know, one reason

24   why I've - I've made a point of, you know,

25   keeping trying to get, you know, counselors that

26   I can talk to and a support group so that I

27   don't do that again, because I do - that is -

87

1  you know, a tendency is to, you know, I tend to

2  take on responsibilities when I see things – you

3  know, when I see somebody that needs help or

4  some, you know – my tendency, you know, from the

5  way that I'm brought up is to try and – and take

6  that on, and you can't take everything on, and

7  sometimes it's not appropriate for you to take

8  something on, sometimes it's better to, you

9  know, direct it to somebody else or let someone

10  work out their own problems, you know, as they

11  have to work it out, and it's – even if – even

12  if it hurts you to see it happening. So it's –

13  I think it's – it's possible with anybody, but I

14  think it's less possible for me at this point

15  than most people because I know what can happen

16  and I know what has happened and I think that I

17  can pretty much steer clear and compensate as

18  need be, you know, for various ways that I've

19  learned to maintain stress, you know,

20  particularly doing the meditation, although you

21  learn – there's a lot of things in common

22  between the meditation and between AA and

23  between different groups especially that deal

24  with cognitive therapy and that the meditation

25  is a mind – what they call a mindfulness

26  meditation, so the whole – a lot of the idea is

27  to be aware – be more aware of your thoughts and

88

1   your feelings, and especially of - of looking at
2   them and - and challenging them when they're not
3   really rational and talking to somebody to get
4   feedback about it, see if you're looking at
5   thing from a - things from a distorted point of
6   view, and also, like I said, especially to talk
7   to people about not just enduring stressful
8   conditions just because you're supposed to be a
9   stoic and you're just supposed to, you know,
10  deal with it.  So I don't believe that there is
11  anything to worry about, but like I said, I - I
12  - I think that I probably have less to worry
13  about my - myself than the average person that
14  doesn't know what's possible with the wrong set
15  of circumstances and, you know, problems,
16  because I know I have to look out for it.  I'm
17  not sure that - I don't feel like I answered you
18  quite adequately but I can't think of -
19          **DEPUTY COMMISSIONER KEENAN:**  No, you'll -
20          **INMATE SUNDBERG:**  - what else to say.
21          **DEPUTY COMMISSIONER KEENAN:**  - get a
22  chance with a closing comment to.  If there's
23  something you forgot, you could mention it.  So
24  that - that mindfulness, awareness, is sort of
25  one of the cornerstones of -
26          **INMATE SUNDBERG:**  Yes.
27          **DEPUTY COMMISSIONER KEENAN:**  - therapy

89

```
 1   you've worked on?
 2        INMATE SUNDBERG:  Yeah.
 3        DEPUTY COMMISSIONER KEENAN:  Okay.
 4        INMATE SUNDBERG:  Right.
 5        DEPUTY COMMISSIONER KEENAN:  That helped
 6   -
 7        INMATE SUNDBERG:  Mindfullness -
 8        DEPUTY COMMISSIONER KEENAN:  - you?
 9        INMATE SUNDBERG:  is part of the
10   meditation and the various different - the
11   depression therapy and also in some of the other
12   - other groups it's - have dealt with - with
13   modified cognitive therapy, which also deals
14   with aware - awareness in dealing with your -
15   keeping a record of your thoughts and looking at
16   them -
17        DEPUTY COMMISSIONER KEENAN:  I was just
18   going to -
19        INMATE SUNDBERG:  - and questioning them.
20        DEPUTY COMMISSIONER KEENAN:  - ask you if
21   you still did that thought record.
22        INMATE SUNDBERG:  I - I haven't been
23   keeping one, no.  Do you think it's a good idea?
24        DEPUTY COMMISSIONER KEENAN:  I'm not a
25   psychologist.  It just struck me -
26        INMATE SUNDBERG:  Yeah. ·
27        DEPUTY COMMISSIONER KEENAN:  - it struck
```

90

1  me as an interesting idea.

2      **INMATE SUNDBERG:**  Yeah.  Although I am –

3      **DEPUTY COMMISSIONER KEENAN:**  So you can

4  sort of track where you're at.

5      **INMATE SUNDBERG:**  It could be.  I'm doing

6  something a little bit similar.  I'm writing

7  stuff for Ms. Woods.  I've been seeing her for a

8  few times in – in weekly sessions, and I've been

9  writing stuff down to show her, which is in that

10  direction although not exactly the same thing.

11      **DEPUTY COMMISSIONER KEENAN:**  Okay.  All

12  right.  Thank you.

13      **PRESIDING COMMISSIONER SHELTON:**  All

14  right.  Mr. Pearson, do you have any questions?

15      **DEPUTY DISTRICT ATTORNEY PEARSON:**  Yes.

16  I would like to know from the Inmate if he would

17  at least consider getting into a open marriage

18  situation in the future.

19      **INMATE SUNDBERG:**  No.  I – I might

20  consider, you know, dating people who don't have

21  a marriage or – or a relationship that's –

22  that's close to that, dating different people

23  and have – dating girls that date different

24  guys, or women that date different guys, but no,

25  I think I've, you know, found from experience in

26  it, and although in – in theory it's wonderful,

27  you know, and it's – it's idealistic and it's

91

1    great, but in - in practice in my own personal

2    life, you know, there were just times when it

3    doesn't work.  Did that answer the question?

4         **DEPUTY DISTRICT ATTORNEY PEARSON:**

5    Somewhat.  I'd like to know what the Inmate

6    thinks were probably the most positive things

7    about the open marriage situation.

8         **INMATE SUNDBERG:**  Well, one of them was

9    being honest with each other and not having -

10   neither of us having to worry about the other

11   one ever doing something behind the other one's

12   back or something hidden, you know.  If - if

13   you're going to have a relationship, you know,

14   it was generally talked about ahead of time and

15   that - or if it happened unexpectedly, which

16   only happened once that I can think of with -

17   and that was Robin and not me - you know, you -

18   you don't hide it, you know, and, you know, the

19   openness and the - and the trying to work

20   together and - you know, trying to care more

21   about each other and trying, you know, not to be

22   jealous and - and excessively possessive, you

23   know.  I mean it's - it's really idealistic.

24   It's - it's too idealistic for most people I

25   think, to be able to - to do it successfully.

26        **DEPUTY DISTRICT ATTORNEY PEARSON:**  No

27   further questions.

92

1    **PRESIDING COMMISSIONER SHELTON:**  All

2  right.  Mr. Rutledge, do you have any questions?

3    **ATTORNEY RUTLEDGE:**  Thank you,

4  Commissioner, just - just briefly, just to

5  follow up the People's question.  How did you

6  feel when you went to your wife and you said,

7  you know, "I - I - don't want to have an open

8  marriage anymore, I - I want it to be just you

9  and I," and she said, "No, I'm going to stick

10  with what we're doing"?  How'd that

11  (indiscernible)?

12    **INMATE SUNDBERG:**  Oh, I - I broke down

13  drying.  I just felt like if - if that was the

14  case then everything that mattered was - was

15  just wiped out.  I was just despondent.

16    **ATTORNEY RUTLEDGE:**  And at that time in

17  your life you were saying you were just -

18  continued to just take and do whatever was

19  required of you, like being the good soldier,

20  have you learned through counseling that that's

21  not something that anybody could talk onto their

22  shoulders?

23    **INMATE SUNDBERG:**  Oh, no, I mean it's -

24  it's, you know, the macho American male ideal,

25  but it's not human, it's not realistic, and -

26  you know, I mean it's - it's - it's good within

27  limits but you've got to be really careful of

93

1  those limits.  You know, it's good to have -

2  it's good to have perseverance - excuse me - and

3  to have, you know, staying power, but just to

4  keep staying in a situation that's driving you

5  crazy - crazy ultimately is - is just stupid.

6          **ATTORNEY RUTLEDGE:**  And again, you've

7  learned not to place yourself in that kind of a

8  position again?

9          **INMATE SUNDBERG:**  Yeah, and - and if you

10  find yourself getting into one of those

11  positions then you damn well better start

12  talking to somebody and finding, you know, a way

13  out of it.

14          **ATTORNEY RUTLEDGE:**  Today it's - it's

15  real common for us to - to get counseling and to

16  - to seek out a psychologist or a psychiatrist

17  to speak with.  Back before the commitment

18  offense did you believe it was very common to

19  have somebody do that?

20          **INMATE SUNDBERG:**  I didn't think it was

21  fairly common but I didn't have any bias against

22  it.  I thought that it was a good thing.  I just

23  didn't know who specifically to go to because

24  like the - the women who had ran the - the - the

25  encounter sort of groups in high school that I

26  went to made a point of saying that, you know,

27  "You don't really want to let someone mess with

94

1   your head unless you have to because it can be -

2   if you don't need it, it can be more damaging

3   than good," and I wanted to find somebody like,

4   you know, thought could deal with a particular

5   situation that I had and hadn't found one.

6            **ATTORNEY RUTLEDGE:**  Thank you,

7   Commissioner.

8            **PRESIDING COMMISSIONER SHELTON:**  One more

9   quick question before we go to closing

10  statements, something that Commissioner Keenan

11  brought up and I agree, and this basically what

12  I - what we want to know is how you feel about

13  your victim?  I don't want to talk about the

14  offense, I just want to know how you feel about

15  the victim, about how do you feel about what you

16  did, the inside feeling stuff.

17           **INMATE SUNDBERG:**  Mostly sad I guess,

18  because I mean I know that I was - I'm trying to

19  talk about this without talking about the crime

20  itself and it's hard, talking about that I was

21  able to do it because in my mind he'd become

22  dehumanized, you know, because of, you know,

23  things that he did to Pam and that he didn't

24  seem to have a conscience so, you know, between

25  caring about Pam and feeling empathy for her and

26  then dehumanizing him, you know, I stopped also

27  empathizing with him to the degree that you

95

1   should with - with any human being, and that's

2   something that - that the Buddhist class has

3   been good for me and that - because I do tend to

4   emphasize with - with people but you want to -

5   you don't want to empathize with one person so

6   much that you stop caring at all about the other

7   person, and although - I mean I doubt that I'll

8   ever like him after, you known, the things that

9   Pam told me about him doing to her, but

10  nevertheless - I - I guess now I just have more

11  - a little bit more of a sense of sadness and

12  compassion and - and that it - you know, that it

13  was just all wrong, you know, if he needed some

14  kind of - of treatment or something and - and

15  the whole thing is - is just a damn nightmare

16  and was not good for anybody.

17          **PRESIDING COMMISSIONER SHELTON:**  Did he

18  deserve to die?

19          **INMATE SUNDBERG:**  I don't think so.  I

20  don't think so.  You know, unless things got to

21  the point where it was necessary to - to

22  actually save somebody's life, I don't think

23  it's justifiable.

24          **PRESIDING COMMISSIONER SHELTON:**  Okay.

25  Thank you.  We are going to move into closing

26  comments, and Mr. Pearson?

27          **DEPUTY DISTRICT ATTORNEY PEARSON:**  Yes.

96

1    Thank you.  I think the inmate we have before us

2    is a very interesting man, for one thing, has a

3    - a kind of unusual background in a way of - of

4    abilities, and I enjoyed listening to sort of

5    his past and parts of it and - and seeing what

6    got him here.  It's very interesting, but

7    unfortunately I view him as a walking time bomb,

8    I really do.  It's - I think he's very

9    unpredictable as to what might happen in the

10   future for a number of reasons.  I think he's

11   unstable and unpredictable and the things that

12   came in my head, of course, were the - he talked

13   about family depression and the suicide, even

14   suicide attempts that he has made, and I think

15   anyone that attempts suicide, that's such a

16   drastic thing for any of us to do to ourselves

17   that I think that makes the person really

18   unpredictable, you wonder if you would destroy

19   yourself, if you got angry at someone else,

20   would - would you hesitate to destroy them?  And

21   my feeling, the answer probably is no.  I think

22   you could almost protect yourself above anyone

23   else on earth are basically self - somewhat

24   selfish and self-centered, I think most of us,

25   and to me, that's the unthinkable.  I think I

26   would never attempt to destroy myself, but he's

27   in that category and here we had of course beer

97

1    involved, two 16-ounce cans involved, we have

2    guns involved, which I think makes it a very

3    complex situation, and there was a child

4    involved, the - the victim in this case had the

5    11-year-old son there trying to interfere and

6    stop this happening, so he actually murdered the

7    - the man's - well, the child's father right in

8    front of the child, which I think is a very

9    aggravated situation also.  Another thing I

10   noticed in this, one of the places I read in

11   there, it says that he shot a minimum of 14

12   times.  I don't know that necessarily 14 shots

13   hit - hit the victim, I don't think so, but it

14   did mention here that he struck the - the victim

15   in a number of parts of his body: he was shot in

16   the head and he was shot in the chest, he was

17   shot in the forearm and in the wrist, and I

18   supposed the forearm and the wrist were the

19   victim probably putting his hands up trying to

20   defend himself and the - the shots hit his - his

21   arms and his - and his wrist in this - in this

22   case.  So there was a lot of shooting here.  And

23   I noticed that the - the weapon that he was

24   shooting apparently only held five bullets at

25   one time, and so they mention there were reloads

26   in this case, I think it was twice, the gun was

27   reloaded two times, which means that he had some

98

```
1   time to think about what he was doing and

2   reflect on it and hopefully stop. He didn't

3   apparently do that, but it could have stopped

4   him, and the reload is - is very important I

5   think in this case, it's - so it's like separate

6   incidents: you reload and fire again, and then

7   reload and fire again, and that's a lot of

8   thinking time in there. I know I used to shoot

9   competitively when I was a police officer some

10  years ago, I shot in pistol matches around the

11  state, and the key I always learned is load fast

12  and shoot slow. That's the key thing. You -

13  you make the - the reload quick, and prac -

14  practice fast reloads, and then you shoot slow

15  and deliberate so you make sure you hit your

16  target. Well, here he was - he was certainly

17  hitting the target, unfortunately, but he had

18  time really to think about this, and he's a

19  thinking man. A lot of people we see in here I

20  think are not necessarily thinking men, in fact

21  the reason they're in here is because they

22  didn't think, they didn't think at all, and they

23  just did it and it was done, and it's kind of

24  sad to think this is a non-thinking person and

25  look what that for you. You know, here is a

26  thinking man who has a good mind and

27  unfortunately that didn't stop him, it didn't
```

99

1    stop him until he had fired at least 14 times,

2    so I think it's a - a very flagrant and a very

3    offensive killing in this case, against an

4    unarmed man, he wasn't armed at the time, he was

5    in own - own house.  The inmate here followed

6    him into his own home, the victim, followed him

7    into the bathroom, shot him in the bathroom, and

8    - and here is trying to protect himself and

9    defend him - defend against the inmate, and that

10   didn't stop him from continuing to shoot.  His -

11   his little boy there didn't - didn't stop him,

12   so I think it's an extremely flagrant crime and

13   it's one that I'm sure some thought went into

14   committing the offense by a thoughtful man.  So

15   for these reasons I would urge the - the Board

16   to deny him parole at this time.  Thank you.

17          **PRESIDING COMMISSIONER SHELTON:**  Thank

18   you.  Oh, I'm sorry.  Mr. Rutledge?

19          **ATTORNEY RUTLEDGE:**  Thank you,

20   Commissioner.  I think Counsel brings up some

21   good points.  I agree, I think that my client is

22   a very thinking man, and the person that we see

23   today is a different person than the person that

24   committed the offense.  The person that

25   committed the offense was, although I believe an

26   intelligent individual, he was also a sick

27   individual, an individual that had severe

100

1    depression, that by his own admission had –
2    tried to take his own life, and I'd agree with –
3    with Counsel that normally we are selfish
4    people, and normally we do everything possible
5    to try to protect ourselves, but a person who's
6    depressed is in a different state of mind.  A
7    person who's depressed isn't trying to help
8    themselves, they're beyond that, and that's what
9    he has said, and that's the results of what we
10   saw.  Now just also to address, in the record
11   there was 14 shots that were fired, 11 of the
12   shots went elsewhere, according to the record,
13   and this wasn't a – a victim that – and I – I'm
14   not wanting – no one deserves to die, and I
15   think my client agrees and has stated that
16   unless you're trying to protect somebody else's
17   life that nobody's life should be taken, but
18   this is not a victim who was completely
19   sympathetic.  This is a victim that also did
20   attack my client, there was a fight, it wasn't
21   just a one-sided where he was – my client was
22   chasing him down trying to shoot him, he was
23   fighting, and this is a person who also had been
24   extremely abusive towards his own wife, had tied
25   her up, had abused her.  Now this is a – kind of
26   a unusual situation for us I think to – to think
27   about, but my client had had a intimate

101

1    relationship with this person who had been tied

2    up and abused by the person that he shot, and I

3    made the comment and the question, he was the

4    good soldier, he is the person who would try to

5    fix things, and in a depressed state of mind,

6    with alcohol added to it, and he sees this

7    person that he knows that has been extremely

8    abusive somebody that he cared very much for

9    there, and he saw red, as he said, and was

10   trying to be the good soldier and try to fix a

11   problem in a - in a inappropriate manner.  I

12   think that we need to commend him because while

13   he was in county jail, though he did himself, he

14   sought out help because it was available to him

15   there, and did see a psychiatrist or a

16   psychologist to be able to help with the

17   depression.  He didn't have any juvenile record,

18   he didn't have any adult record, he has

19   indicated remorse, while being here he has no

20   115s, no 128s.  If in a different setting, I - I

21   couldn't help but feel that somewhat in the

22   question and the responses, if we were a

23   committee that was going to hire someone that

24   had an opening, I - my sense is that we'd

25   probably all say, "Yeah, we should hire him.

26   He's a hard worker, he's a good person, he's

27   somebody who we would feel comfortable being

102

1    with us," and I - I understand the People's

2    concern of him being a - a time bomb, and that

3    would be my concern as well but for the fact

4    that he has shown a tremendous amount of insight

5    in his depression and how to handle it, so much

6    insight that it's not just him helping himself,

7    he's helping others in these groups, the - the

8    chronos that he has, and this is a humble man

9    too.  He - when it was mentioned about donating

10   the books he said, "I - I didn't even want them

11   to put that in there," so we don't know how much

12   other good he's done.  I got writer's cramp

13   writing out all the chronos - and finally

14   stopped - that - that he had received, and we

15   don't even know how much else he's - he's

16   helped, and again, in a different setting with

17   all the volunteering that he has done, he - he

18   gets in and does the self-help for himself, but

19   he takes it the other step and - and wants to

20   help the other inmates with the math, he wants

21   to even help the institution by writing programs

22   to try to help, and in another setting he could

23   - in many of these years he would be a candidate

24   for citizen volunteer of the year, and so I - I

25   think that very serious consideration should be

26   given to giving him a date, and in the

27   alternative that a term be set.  I think he's an

103

1  outstanding candidate.

2      **PRESIDING COMMISSIONER SHELTON:**  Thank

3  you.  All right.  Sir, it's your opportunity to

4  speak in your own behalf and tell us why you

5  think you're suitable for parole.

6      **INMATE SUNDBERG:**  Okay.  Well, first of

7  all, I'd like to say that I understand the

8  district attorney's concerns and – and if I was

9  in that position I would probably be, you know,

10  extremely similar; however, I think that that's

11  – it's more – that's more applicable to my state

12  of mind prior to and at the time of the crime

13  than it is currently.  Although I'm always, you

14  know, at risk for worsening depression episodes,

15  at this, you know, point in my – in my life, if

16  something like that happened, you know, it's – I

17  might become more suicidal, and this is also the

18  opinion of – of I know one of the psychiatrists

19  that I've talked to for many years, but that,

20  you know, should anything – you know, a bad

21  episode happen again that it would be almost

22  entirely probably suicidal, it wouldn't be

23  directed towards anyone else because of – of my

24  awareness of – of what I've done in the past and

25  my awareness that you have to be – take each

26  person as a human being even if, you know, they

27  do something that makes you want to put them in

104

1   some category, you know, some label, that you

2   can't forget that at some level they're the same

3   as everybody else, they feel the same pain as

4   everybody else and – and they want to be happy

5   just like everybody else, so you can't blow up

6   at – at someone else even if – even if there

7   are, you know, things that they have done that

8   have – have aggravated you, or things that to

9   some people might be an acceptable rationale.  I

10  know some of the – even one or two, you know,

11  COs and – and staff people that I've talked to a

12  little bit seem to – to think that it was ex –

13  you know, excusable or, you know, that he had it

14  coming, and I've tried to tell them, "Well, no,"

15  because first of all, you know, if this person

16  has does – has done something, and this is – and

17  there – there are some kind of cause and effect

18  going on, you know, whether you want to look at

19  it as – as a religious sense, you know, like

20  sowing what you reap or – or karma, okay, that's

21  – that's – that person and that's their life,

22  that's not you.  That doesn't mean that you have

23  anything to do with that or any right to do

24  anything with that, so you have to maintain

25  awareness of everybody, even people that you

26  don't like and that you think bad things about,

27  as another human being with a lot of the same

105

1    things in common with you, and the Buddhist

2    meditation, the classes really emphasize that a

3    lot, that, you know, everyone is deserving of –

4    of trying to be happy and of just being allowed

5    to live, so, you know, even if you're judgmental

6    with them that doesn't – it doesn't justify –

7    anyhow, that's – I guess that's mostly just I

8    want to say, that – that I can – and I – I

9    appreciate the district attorney for not really

10   beating me up too, that – that, you know,

11   dealing with what I think are legitimate

12   concerns, and I can understand that, although I

13   just have to respectfully think that that really

14   is – is looking at – at the past and that the

15   situation now, that there are different elements

16   involved that keep – are – would keep that from

17   being the same kind of problem now.

18           **PRESIDING COMMISSIONER SHELTON:**   Thank

19   you, sir.  We are going to recess for

20   deliberations.  The time is 11:35 a.m.

21                   **R E C E S S**

22                   --oOo--

23

24

25

26

27

106

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2              D E C I S I O N

3        DEPUTY COMMISSIONER KEENAN:   Back on

4    record.

5        PRESIDING COMMISSIONER SHELTON:   All

6    right.  We're back in the parole consideration

7    hearing for Roger Sundberg, S-U-N-D-B-E-R-G, CDC

8    number D-79282.  The time is 12 noon.  Everyone

9    has returned to the hearing room that was here

10   during the hearing.  The panel has reviewed all

11   the information received and relied on the

12   following circumstances in concluding, Mr.

13   Sundberg, that you are not yet suitable for

14   parole and would pose an unreasonable risk of

15   danger to society or a threat to public safety

16   if released from prison, and we're giving you a

17   year, and there are certain things that you need

18   to accomplish during this next year.  Some of

19   them we've already touched on but I will be

20   reviewing them with you.  First of all, sir, I

21   would like to say you're a very interesting

22   person.  We were both very impressed with your

23   thought processes and I think Mr. Pearson hit it

24   right on the head when he called you a thinking

25   man.  You have done an incredible amount of

26   programming and obviously some serious

27   **R. SUNDBERG    D-79282    DECISION PAGE 1    6/7/06**

107

1   introspection.  I want to get into some of that

2   but I'm going to go through this process that we

3   need to go through, and then I want to talk to

4   about what you need to do to put yourself closer

5   to a parole date, all right?

6           **INMATE SUNDBERG:**  Right.

7           **PRESIDING COMMISSIONER SHELTON:**  First of

8   all, we talked about the commitment offense.  It

9   was carried out in an especially cruel and

10  callous manner.  A boy watched his father die.

11  It was indicated that you shot, or you fired 14

12  times.  Fortunately 11 missed.  The gun was

13  reloaded twice.  The offense was carried out in

14  a manner which demonstrates exceptionally

15  callous disregard for human suffering, and – and

16  to be truthful, the motive was very trivial for

17  the actions.  The conclusions are drawn from the

18  Statement of Facts taken from the Board Report

19  dated October 2005.  To your benefit, you have

20  absolutely no prior record and it does not

21  appear that you had any unstable social history.

22  Based on our discussion about your family, it

23  seemed that you were raised in a very supportive

24  home environment, and obviously to this day

25  they're still supportive.  Your institutional

26  behavior, to your credit you have never received

27  **R. SUNDBERG    D-79282    DECISION PAGE 2    6/7/06**

108

1    a 115, and you received one 128 back in '98,

2    that was for grooming standards, and you

3    explained that situation to us.  We reviewed

4    your psychiatric records.  They were discussed

5    here today.  You had a - a psychiatric

6    evaluation in September '04 by Dr. Stack.  She

7    indicated your depression was controlled by

8    medication and your participation in groups.

9    Your GAF score was 80, and I think Commissioner

10   Keenan relayed what that consisted of, and your

11   violence level is considered below average to

12   the average inmate, average to any citizen on

13   the street.  There was discussion that stress

14   still is an issue.  Her recommendation was that

15   you needed psychiatric treatment after release,

16   and you needed to participate - or ongoing

17   participation in groups.  Dr. Terrini's eval in

18   2002 was somewhat similar.  Parole plans.  I

19   want to talk about parole plans.  We talked

20   about them briefly.  What you really need to

21   work on is some strongly parole plans this next

22   year.  We talked about transitional housing.  I

23   think I did the don't-put-your-eggs-all-in-one-

24   basket remark.  I would love to see in your file

25   a couple alternatives for you for transitional

26   housing.  One of the things - I don't know if

27   **R. SUNDBERG    D-79282    DECISION PAGE 3    6/7/06**

1  anybody ever told you this, sir, but - excuse me

2  - we're not the first stop on the parole issue,

3  parole release issue.  When you are granted a

4  date - and I will be optimistic for you as well

5  - it goes to another hearing pan - not a hearing

6  panel but a decision review process, and they

7  look in your files.  They don't get to talk to

8  you, so if it's not in your file, you don't have

9  a second chance.  So my recommendation is to get

10 everything you possible can in your file.  So

11 some of the papers that you handed us today, if

12 they're not in your file, get them to somebody

13 to get them in your file.

14          INMATE SUNDBERG:  Okay.

15          PRESIDING COMMISSIONER SHELTON:  As well,

16 the third stop's to the Governor.  Same

17 situation there.  You don't to talk to him so

18 they won't know the quality or kind of person

19 you are, so it's a paper process as well.  The

20 other thing that should be in your file is - and

21 I've seen other inmates do it so it's - I

22 recommend it.  With regards to AA, if you're

23 going to parole to your mom's house, you know

24 the general location, find out the times of the

25 AA groups available to you in that area and how

26 you're going to get there.  We discussed the

27 **R. SUNDBERG    D-79282    DECISION PAGE 4    6/7/06**

110

1   possibility that you might not be able to get a

2   driver's license, so prepare for those options.

3   So if somebody says to you, "Well, that's all

4   fine and dandy but this is three miles from your

5   mom's home, how're you going to get there?"  Be

6   prepared to give them an answer.

7        **INMATE SUNDBERG:**  Right.  Well, yeah, I

8   mean, I suppose I should've addressed that when

9   you were mentioning it, but Long Beach has a

10  pretty good bus system, or did 20 years ago when

11  I was there, because I know when my car broke

12  down I had to go from Long Beach to Bell for

13  several months using, you know, the local and

14  the RTD bus system.

15       **PRESIDING COMMISSIONER SHELTON:**  And what

16  I'm indicating is get it in writing.  Put it

17  down as part of your parole plan.  Get a copy of

18  the bus schedule -

19       **INMATE SUNDBERG:**  Okay.

20       **PRESIDING COMMISSIONER SHELTON:**  -

21  (indiscernible), you know.  Get a copy of the AA

22  schedule, get a copy of the bus schedule.  Since

23  your psychiatrist - or since the psych eval

24  indicated that you should participate in groups

25  and you should have psychiatric assistance when

26  you leave here, you need to see what you can do

27  **R. SUNDBERG   D-79282   DECISION PAGE 5   6/7/06**

111

1    about finding a doctor or a service or a medical

2    service that you could participate in and

3    document that as well.  I'm not going to be the

4    only one in your world that has a concern about

5    whether you're going to take your medications or

6    whether you have a support system.  What - I

7    guess what I'm asking you to do, sir, is to

8    build a support system for you on the outside

9    like you've developed here on the inside.

10          INMATE SUNDBERG:  Right.  But as far as

11    the Parole Department not being my first stop,

12    well, okay, I can appreciate that; however, if

13    they - if they offer services, I'm certainly

14    going to take advantage of them.

15          PRESIDING COMMISSIONER SHELTON:  Most

16    definitely, but don't let it be the only stop.

17          INMATE SUNDBERG:  Yeah.

18          PRESIDING COMMISSIONER SHELTON:  Yeah.

19    The other thing that we talked about before is

20    employment opportunities.  You're a very

21    talented person.  See if you can put some

22    feelers out there, and at the very least, even

23    though you write and people don't write you

24    back, put your letters in the record -

25          INMATE SUNDBERG:  Oh, okay.

26          PRESIDING COMMISSIONER SHELTON:  - that

27    R. SUNDBERG   D-79282   DECISION PAGE 6   6/7/06

112

1   you've sent out.  What that shows - and I don't

2   doubt you when you said you wrote 40 or 50 of

3   them, I don't doubt that one bit, somebody else

4   might, but what it does show in writing is "Wow,

5   look at the efforts and attempts that he's gone

6   to to secure employment."  You don't have to

7   have a job to parole, you have to have made an

8   attempt, and that documents your attempt, so put

9   those in the file.  So we've covered a couple

10  alternatives for housing, we already discussed

11  there's a mom potential, a sister potential,

12  look into the transitional housing.  That covers

13  a lot of bases for you.  Follow-up with AA,

14  psychiatric assistance through a group process

15  and one-on-one counseling, employment

16  opportunities, and of course you need to - you

17  need to figure out how you're going to get

18  ongoing medication, you know.  Are you going to

19  be on MediCal when you first get out?  If you

20  get out and you don't have a job, how are you

21  going to pay for that kind of stuff?  You know

22  you have to keep your medication going, you

23  can't like wait, "Oh, well, I can do without for

24  two weeks until I get a paycheck."  So have a

25  way to substantiate your ongoing care.  As you

26  know, we had two 3042 responses, one was from

27  **R. SUNDBERG    D-79282    DECISION PAGE 7    6/7/06**

113

1   the District Attorney's Office in L.A. and one

2   was the from the L.A. Sheriff's Department, both

3   in opposition to a parole date for you.  I want

4   to talk about the good things, and then I want

5   to talk about a concern.  You have done an

6   incredible job here, and I want – for the

7   record, I want the record to know that we

8   already indicated, no disciplinary issues

9   whatsoever, and this is not necessarily an order

10  of participation, but these are some of the

11  things, not all of them, that you've

12  participated in in your time here.  You are in

13  an ongoing Depression Management group and a

14  Self-Esteem group; you've participated in a 12-

15  week Anger Management program; you received a

16  letter of commendation for your participation in

17  Buddhist meditation studies; you are enrolled in

18  Coastline Community College and are

19  participating in General Ed classes with the

20  hopes of moving forward into a Computer Science

21  degree; your vocation is in Data Processing; you

22  were a Computer Technician for two years;

23  currently your assignment is working as an Adult

24  Basic Ed Tutor, especially in math and homework

25  grading; you've been in AA ongoing since 1989;

26  you've received exceptional grades; you've been

27  **R. SUNDBERG    D-79282    DECISION PAGE 8    6/7/06**

114

1    - you're considered a great worker and you have

2    a positive attitude; you've participated in Life

3    Skills in '92, Stress and Anger Control in 2001,

4    the Impact program June of '04, that was a 13-

5    week program -

6                    (Off the record)

7         **DEPUTY COMMISSIONER KEENAN:**  Back on

8    record, Side 2.

9         **PRESIDING COMMISSIONER SHELTON:**  Okay.  I

10   was going over some of the good hard work done

11   by Mr. Sundberg and I was indicating that you

12   had received your AA in General Studies through

13   Hartnell College.  You received a laudatory

14   chrono in May of 2006 in - with regards to a

15   vocational Computer Repair class, you helped

16   students upgrade I think it was 87 computers.  I

17   think that's what I wrote down.  I'm impressed,

18   Mr. Sundberg.  You have - I'm fortunate -

19   fortunate enough to run across a few men like

20   you who have done just about everything that

21   they can possibly do with the hopes of bettering

22   themselves, but the one thing I wanted to talk

23   to you about is I'm concerned about what I feel

24   is a disconnect, and I know you're very

25   thoughtful, and in fact analytical, and I think

26   a lot of your stuff stays up here, but you need

27   **R. SUNDBERG    D-79282    DECISION PAGE 9    6/7/06**

115

1   to deal with here, and I think it's - there's a

2   - a head versus heart thing I'm dealing with

3   here.  You struggle so hard to say the right

4   things and to do the right things.  I'm not sure

5   if you're feeling the right things.  It's -

6         **INMATE SUNDBERG:**  What do you mean by the

7   right things?

8         **PRESIDING COMMISSIONER SHELTON:**  Or

9   anything, maybe that matter.  Maybe instead of -

10  it's - it's very hard for me to explain this to

11  you, but I'm a touchy-feely person and you're an

12  analytical person.  You think things through.

13  You - you struggled very hard today analyzing

14  our questions.  You did a wonderful job.  It's

15  not anything negative.  I just don't know how

16  much of it is internalized and what you truly

17  deep down inside of yourself believe to be true,

18  or if you're saying what you think you've

19  learned in meditation or some of your other

20  studies.  You're very introspective, but I don't

21  know what you feel.  I know what you think, but

22  I don't know what you feel, and I'm not asking

23  for an answer to that.  That's something that I

24  would like to see you become more in touch with

25  your heart while you're coming - becoming in

26  touch with your head.  You have done a very good

27  **R. SUNDBERG  D-79282     DECISION PAGE 10    6/7/06**

116

1  job here.  I think you've got to put a few more

2  ducks in order to strengthen your support system

3  outside.  Do you have any comments,

4  Commissioner?

5      **DEPUTY COMMISSIONER KEENAN:**  No.  I just

6  note that confidential information was not used.

7      **PRESIDING COMMISSIONER SHELTON:**  All

8  right.  I wish you all the luck in the world,

9  sir.  That concludes this hearing.  It is 12:15.

10                    --oOo—

11

12

13

14

15

16

17

18

19

20

21

22

23  **PAROLE DENIED ONE YEAR**

24  **THIS DECISION WILL BE FINAL ON:**_____  OCT 0 5 2006

25  **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26  **DATE, THE DECISION IS MODIFIED.**

27  **R. SUNDBERG  D-79282    DECISION PAGE 11    6/7/06**

117

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, BERENICE BILLINGTON, a duly designated

transcriber, PETERS SHORTHAND REPORTING, do hereby

declare and certify under penalty of perjury that I

have transcribed tape(s) which total two in number and

cover a total of pages numbered 1 - 116, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF ROGER

SUNDBERG, CDC NO. D-79282, ON JUNE 7, 2006, and that

the foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tapes to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated SEPTEMBER 4, 2006, at Sacramento,

California.


*Berenice Billington*

BERENICE BILLINGTON
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT    "B"

1   in CCCMS.  And you say you've been in CCCMS since

2   you've been incarcerated?

3        INMATE SUNDBERG:  I believe so, provided that

4   they called it that then.

5        PRESIDING COMMISSIONER BIGGERS:  All right.  So

6   you've been getting -- receiving psychotropic

7   medication since you've been in prison?

8        INMATE SUNDBERG:  And therapy, yes.

9        PRESIDING COMMISSIONER BIGGERS:  And therapy?

10  How long has your therapy?  What kind of therapy are

11  you on, sir?

12       INMATE SUNDBERG:  I've had all kinds of therapy.

13  I've, you know, met regularly with psychologists and

14  psychologists -- and psychologists and psychiatrists,

15  you know, every 90 days since the beginning, as well as

16  having a variety of different groups, and 7 R's, and

17  one-on-one counseling's over the years.

18       PRESIDING COMMISSIONER BIGGERS:  Okay.  Are they

19  helping you?

20       INMATE SUNDBERG:  Oh, tremendously.

21       PRESIDING COMMISSIONER BIGGERS:  Okay.  All

22  right.  How far did you get in school on the streets?

23       INMATE SUNDBERG:  I had some college.

24       PRESIDING COMMISSIONER BIGGERS:  Some college?

25  Do you have any -- did you ever have to take any

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT SE E   HON. MICHAEL A. COWELL, JUDGE PRO TEMPORE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,   ) | |
| ) | |
| PLAINTIFF,   ) | |
| ) | |
| VS.                          .          ) | NO. A 474007 |
| ) | |
| ROGER SUNBERG,                          ) | STATE PRISON |
| ) | |
| DEFENDANT.   ) | |

NORWALK, CALIFORNIA; WEDNESDAY, FEBRUARY 24, 1988

10:40 A.M.

UPON THE ABOVE DATE, THE DEFENDANT BEING PRESENT IN COURT AND REPRESENTED BY COUNSEL, JOAN GARROTT, DEPUTY PUBLIC DEFENDER OF LOS ANGELES COUNTY; THE PEOPLE BEING REPRESENTED BY MARGARET HAY, DEPUTY DISTRICT ATTORNEY OF LOS ANGELES COUNTY, THE FOLLOWING PROCEEDINGS WERE HELD:

(DEBORAH D. COUWENBERG, CSR #2803, OFFICIAL REPORTER.)

THE COURT:   302, PEOPLE VERSUS ROGER SUNBERG.

MS. GARROTT:   READY ON THAT MATTER, YOUR HONOR.

YOUR HONOR, MAY I APPROACH, BRIEFLY?

1

1    (CONFERENCE AT THE BENCH NOT REPORTED.)

2    THE COURT:  THE DEFENDANT, ROGER SUNBERG, IS

3  PRESENT BEFORE THE COURT WITH COUNSEL.

4    COUNSEL, DO YOU WAIVE FORMAL ARRAIGNMENT FOR

5  JUDGMENT AND SENTENCING?

6    MS. GARROTT:  SO WAIVED.

7    THERE IS NO LEGAL CAUSE WHY SENTENCE MAY NOT

8  NOW BE IMPOSED.

9    THE COURT:  IN THIS MATTER I HAVE READ AND

10  CONSIDERED THE REPORT OF THE PROBATION OFFICER IN ITS

11  ENTIRETY, THE REPORT CONSISTING OF 12 PAGES, ALONG WITH

12  THE NUMEROUS LETTER ATTACHMENTS SUBMITTED IN BEHALF OF THE

13  DEFENDANT BY RELATIVES, FRIENDS, AND CO-WORKERS.

14    I HAVE JUST RECEIVED A WRITTEN STATEMENT FROM

15  THE DEFENDANT HIMSELF, AND IF YOU'LL BEAR WITH ME FOR A

16  MOMENT --

17    VERY WELL.

18    I HAVE READ AND CONSIDERED THAT FIVE-PAGE

19  LETTER SUBMITTED BY THE DEFENDANT.

20    IS THERE ANY LEGAL CAUSE WHY SENTENCE SHOULD

21  NOT NOW BE IMPOSED?

22    MS. GARROTT:  THERE IS NONE, YOUR HONOR.

23    THE COURT:  DO YOU WISH TO BE HEARD, COUNSEL?

24    MS. GARROTT:  NO, YOUR HONOR.  I WOULD SUBMIT IT ON

25  THE LETTERS, AND THE POLICE REPORTS, AND THE NEGOTIATED

26  DISPOSITION.

27    THE COURT:  THE PEOPLE WISH TO BE HEARD?

28    MS. HAY:  SUBMITTED ON THE NEGOTIATED PLEA, WHICH

2

1   IS 17 TO LIFE, AND THERE IS NO DISCRETION IN THAT.

2        THE COURT:   WHILE THERE ARE A NUMBER OF MITIGATING

3   FACTORS THAT VERY ASSUREDLY CAN BE ASSERTED ON BEHALF OF

4   THE DEFENDANT, THE DISTRICT ATTORNEY IS QUITE CORRECT IN

5   ASSERTING THAT THERE IS NO DISCRETION IN THE PART OF THE

6   COURT.

7        THE DISPOSITION WAS A PLEA OF GUILTY TO

8   SECOND-DEGREE MURDER, AND THE SENTENCE AS REQUIRED BY LAW

9   IS 17 YEARS TO LIFE.

10        IT IS THEREFORE THE ORDER OF THE COURT THAT

11   THE DEFENDANT, WHO IS INELIGIBLE FOR PROBATION, BE

12   SENTENCED TO STATE PRISON FOR THE TERM OF 17 YEARS TO

13   LIFE.

14        WITH RESPECT TO CUSTODY CREDITS, I BELIEVE

15   MS. GARROTT, YOU INDICATED THAT THE NUMBER SHOWN IS IN

16   ERROR.

17        MS. GARROTT:   YES, YOUR HONOR, MY CALCULATIONS

18   INDICATE THAT HE HAS 293 ACTUAL, AND 146 BEHAVIOR, FOR A

19   TOTAL OF 439 DAYS.

20        THE COURT:   ALL RIGHT.

21        IT IS ORDERED THAT HE RECEIVE TIME CREDITS IN

22   THAT AMOUNT, AS RECITED BY COUNSEL, 439 DAYS' TIME TOTAL

23   SERVED.

24        THE COURT WILL ASSESS A $100 RESTITUTION

25   FINE, PURSUANT TO SECTION 13967 OF THE GOVERNMENT CODE.

26        COUNSEL IS RELIEVED.

27        MS. GARROTT:   YOUR HONOR, WITH RESPECT TO LOCATION

28   IN THE DEPARTMENT OF CORRECTIONS, I REALIZE THE COURT HAS

3

1    NO AUTHORITY TO ORDER A SPECIFIC LOCATION.  HOWEVER,

2    MR. SUNBERG HAS ASKED THAT THE COURT RECOMMEND THAT HE BE

3    HOUSED AT SAN LUIS OBISPO C.M.C. EAST, IF THE COURT --

4         THE COURT:  VERY WELL.

5             THE COURT WILL MAKE THAT RECOMMENDATION.

6         MS. GARROTT:  THANK YOU.

7         THE COURT:  THANK YOU, COUNSEL.

8                 (PROCEEDINGS CONCLUDED.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                   FOR THE COUNTY OF LOS ANGELES

 3      DEPARTMENT SE E   HON. MICHAEL A. COWELL, JUDGE PRO TEMPORE

 4

 5      THE PEOPLE OF THE STATE OF CALIFORNIA,  )
                                                )
 6                                  PLAINTIFF,  )
                                                )
 7                      VS.                      )    NO. A 474007
                                                )
 8      ROGER SUNBERG,                          )
                                                )
 9                                  DEFENDANT.  )
        _____)

10

11                     REPORTER'S CERTIFICATE

12

13      STATE OF CALIFORNIA        )
                                   )  SS
14      COUNTY OF LOS ANGELES      )

15           I, DEBORAH D. COUWENBERG, OFFICIAL REPORTER OF THE

16      SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY

17      OF LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING IS A

18      TRUE AND CORRECT TRANSCRIPT OF ALL OF THE PROCEEDINGS HELD

19      AT THE TIME OF PRONOUNCING SENTENCE; AND, FURTHER, THAT

20      THE VIEWS AND RECOMMENDATIONS OF THE COURT, IF ANY, ARE

21      CONTAINED THEREIN, PURSUANT TO SECTION 1203.01 OF THE

22      PENAL CODE.

23           DATED THIS 15TH DAY OF MARCH, 1988.

24

25      _____ CSR #2803
                        OFFICIAL REPORTER
26

27

28
```

5

# EXHIBIT    "C"

**PERSONAL HISTORY:**
   (CONTINUED)

| SOURCES OF INFORMATION (this page) |
| --- |
| DEFENDANT |

| EMPLOYMENT STATUS | [X] EMPLOYED [ ] UNEMPLOYED | REFERRED TO WORK FURLOUGH [ ] YES [X] NO | EMPLOYER AWARE OF PRESENT OFFENSE [ ] N/A [X] YES [ ] NO |
| --- | --- | --- | --- |

| ~~XXXXX~~/LAST EMPLOYER / ADDRESS / PHONE | OCCUPATION | PERIOD OF EMPLOYMENT | GROSS MONTHLY WAGE |
| --- | --- | --- | --- |
| AT&T<br>4949 LAKEWOOD BLVD.<br>LAKEWOOD, CA<br>[X] VERIFIED [ ] UNVERIFIED | LONG-DISTANCE<br>TELEPHONE OPR. | NINE YEARS | $1,700. |
| | EMPLOYMENT STABILITY LAST 5 YEARS<br>GOOD | TYPES OF PREVIOUS EMPLOYMENT<br>CUSTODIAN | |

Additional information

| FINANCIAL STATUS | INCOME STABILITY<br>FAIR | NET MONTHLY INCOME<br>$1,200 |
| --- | --- | --- |
| PRIMARY INCOME SOURCE<br>EMPLOYMENT | SECONDARY INCOME SOURCE(S)<br>NONE | EST. TOTAL ASSETS<br>NONE | EST. TOTAL LIABILITIES<br>UNKNOWN |

MAJOR ASSETS / ESTIMATED VALUE

NONE

MAJOR LIABILITIES / ESTIMATED AMOUNT (MONTHLY)

$1,200 BILL OWING TO CREDIT CARD ACCOUNTS.

Additional information

     DEFENDANT STATES THAT SINCE THIS CRIME OCCURRED HIS

WIFE HAS HAD TO MOVE TO MORO BAY TO LIVE WITH HER PARENTS BECAUSE

THERE IS NO INCOME AND NO RESOURCES.

GANG ACTIVITY   [ ] YES  [X] NO      Name of Gang _____

  -9- (SUNBERG)
76P725B—Prob. 19SC (Rev. 6/85)  8/87

DEFENDANT'S STATEMENT:

        DEFENDANT WAS INTERVIEWED IN LOS ANGELES COUNTY
JAIL AND DURING THE INTERVIEW HE BECAME VERY UPSET WHEN ASKED
IF HE WANTED TO MAKE A STATEMENT AND AS HE THOUGHT ABOUT IT,
HE DECIDED THAT HE WAS NOT ABLE TO THINK OF ANYTHING APPROPRIATE
TO SAY AT THAT TIME AND INDICATED THAT HE WOULD TRY TO WRITE
A LETTER TO THE COURT IN TIME TO HAVE IT INCLUDED WITH THIS REPORT
OR BRING IT TO COURT FOR THE JUDGE TO READ. NO WRITTEN
COMMUNICATION HAS BEEN RECEIVED FROM THE DEFENDANT AT THE TIME
OF THIS DICTATION.

INTERESTED PARTIES:

        ATTACHED TO THIS REPORT ARE NUMEROUS LETTERS FROM
DEFENDANT'S FAMILY AND FRIENDS ATTESTING TO HIS CHARACTER AND
EACH OF THESE LETTERS DESCRIBES DEFENDANT AS A PEACEFUL,
INTELLECTUAL, UNASSUMING FAMILY-MAN WHO WAS SELDOM EVER HEARD
TO EXPRESS A WORD IN ANGER. IN EVERY LETTER THERE IS SURPRISE
AND SHOCK EXPRESSED THAT THIS KIND OF AN OCCURRENCE COULD HAPPEN
TO THIS DEFENDANT.

EVALUATION:

        DEFENDANT HAS BEEN CONVICTED OF A SERIOUS FELONY
IN COMMITTING THE PRESENT OFFENSE. HE ACCEPTS RESPONSIBILITY
AND EXPRESSES REMORSE FOR HIS ACTIONS. THIS CRIME APPEARS TO
BE SIGNIFICANTLY OUT OF CHARACTER FOR HIM AS ATTESTED BY HIS

       -10- (SUNBERG)

1   ARREST-FREE LIFE TO THIS DATE AND BY THE NUMEROUS LETTERS FROM

2   FAMILY AND FRIENDS ALL OF WHOM AGREE THAT THIS CRIME IS AN UNLIKELY

3   OCCURRENCE IN THEIR EXPERIENCE WITH DEFENDANT.  WHILE DEFENDANT

4   DOES INDICATE THAT HE WAS DRINKING TOO MUCH ALCOHOL IN THE DAYS

5   PRIOR TO THE CRIME, HE DOES NOT BLAME THE ALCOHOL FOR HIS CRIME.

6            DEFENDANT DENIED THAT HE HAD DEVELOPED A PERMANENT

7   ROMANTIC RELATIONSHIP WITH THE VICTIM'S WIFE, HOWEVER HE DOES

8   ADMIT TO HAVING INTIMATE RELATIONS WITH HER AND TO SPENDING LONG

9   HOURS TRYING TO BE OF HELP TO HER.  IT APPEARS THAT THIS CRIME

10  WAS THE RESULT OF PASSION, JEALOUSY AND RAGE AGGRAVATED BY ALCOHOL

11  WHICH DROVE DEFENDANT TO LOSE CONTROL.  THERE IS ALSO SOME

12  INDICATION THAT DEFENDANT SUFFERS FROM CHRONIC DEPRESSION WHICH

13  HE HAS BEEN ABLE TO KEEP UNDER CONTROL MOST OF HIS LIFE WITHOUT

14  MEDICAL TREATMENT.  IT ALSO APPEARS THAT THERE WERE SOME FINANCIAL

15  PRESSURES ON DEFENDANT SINCE HE WAS TRYING TO SUPPORT A FAMILY

16  OF FOUR ON AN INCOME OF $1,200 PER MONTH.

17           DEFENDANT HAS NO PRIOR CRIME RECORD OF ARRESTS

18  OR CONVICTIONS AND THE PRESENT MATTER APPEARS TO BE SIGNIFICANTLY

19  OUT OF CHARACTER FOR HIM, INDICATING PERHAPS MORE EMOTIONAL

20  INSTABILITY THAN CRIMINAL MAKEUP.

21           SENTENCING CONSIDERATIONS:

22           DEFENDANT DOES NOT APPEAR TO BE ELIGIBLE FOR

23  PROBATION SINCE THIS IS A SERIOUS FELONY.

         -11-  (SUNBERG)

1     CIRCUMSTANCES IN AGGRAVATION:

2         1.  THE CRIME INVOLVED GREAT VIOLENCE.

3     CIRCUMSTANCES IN MITIGATION:

4         1.  THE DEFENDANT HAS NO PRIOR RECORD.

5  RECOMMENDATION:

6         IT IS RECOMMENDED THAT DEFENDANT BE SENTENCED

7  AS PRESCRIBED BY LAW.

8  RESPECTFULLY SUBMITTED,

9  BARRY J. NIDORF,
   PROBATION OFFICER

10

11

   BY _____
12    H. GRADY ROGERS, DEPUTY
      RIO HONDO AREA OFFICE
13    213-692-7011

14 READ AND APPROVED:                    I HAVE READ AND CONSIDERED
                                         THE FOREGOING REPORT OF THE
15                                       PROBATION OFFICER.

16 _____
   EUGENE MONTEILH, SDPO
17
   (SUBMITTED 2-16-88)              _____
18 (TYPED 2-18-88)                  JUDGE OF THE SUPERIOR COURT
   HGR:BAC (7)
19

20

21

22

23

      -12- (SUNBERG)

76C692G — PROB. 5A — PS 12-86

# EXHIBIT    "D"



COPY TO INMATE ON
OCT 0 1 2004

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
(REVISED AUGUST 1998)
PAROLE CONSIDERATION HEARING
OCTOBER 2004 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
SEPTEMBER 20, 2004

This is the sixth psychological evaluation for the Board of Prison Terms on inmate Roger
Sundberg, CDC# D-79282. This report is the product of a personal interview, conducted
on 09/20/04, as well as a review of his central file and unit health record.

## PSYCHOSOCIAL ASSESSMENT

I.  **IDENTIFYING INFORMATION:**

Inmate Sundberg is a 46-year-old, separated, Caucasian male. His date of birth is
07/31/57. He stated he does not have any religious affiliation. There were no
unusual physical characteristics noted, and he denied any history of nicknames or
aliases.

II. **DEVELOPMENTAL HISTORY:**

Inmate Sundberg denied any history of birth defects or abnormalities of
developmental milestones, a history of cruelty to animals, any significant
childhood medical history, or a childhood history of physical or sexual abuse as
either a predator or a victim.

III. **EDUCATIONAL HISTORY:**

Inmate Sundberg has a high school degree, as well as an Associate of Arts degree
in general education. He stated that he spent over 12,000 hours doing data
processing during his incarceration period, and has significant computer
experience developing custom applications, and training and tutoring people.

IV. **FAMILY HISTORY:**

Inmate Sundberg's father died over 19 years ago. His mother is still alive at age
89, and is in fragile health. He keeps in contact with her through letters. He has
six siblings whom he also maintains close contact with. He denied that any
family members have ever had significant criminal problems. He said that
depression runs in his family, and that several family members have been afflicted
with that disorder. He also has two siblings who either have or had substance
abuse problems. He stated that he has a good relationship with all of his family
members.

SUNDBERG        D-79282        CTF-CENTRAL        09/17/04        gmj

SUNDBERG, ROGER
CDC NUMBER: D-79282
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

V.   PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Sundberg stated that he is a heterosexual male. He denied any history of
sexual aggression.

VI.   MARITAL HISTORY:

Inmate Sundberg is currently married, but separated from his wife, and has
minimal contact with her. This is his first marriage. He has two sons from this
marriage with whom he stays in contact.

VII.   MILITARY HISTORY:

Inmate Sundberg denied any history of military service.

VIII.   EMPLOYMENT/INCOME HISTORY:

In the past, inmate Sundberg has been employed at several jobs in the community.
His most significant job experience was as a telephone operator, which he did for
approximately ten years. When he paroles, he hopes to work with computers,
eventually becoming a computer consultant.

IX.   SUBSTANCE ABUSE HISTORY:

Inmate Sundberg acknowledges abusing alcohol, stating, "I used alcohol to
medicate my depression." He acknowledges that this was a significant problem.
He also acknowledged the experimental use of drugs, including marijuana and
cocaine, although he felt he was never addicted. He does attend Alcoholics
Anonymous.

X.   PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Sundberg was hospitalized following his commitment offense when,
following the shooting of the victim, he shot himself in the head, and so he was
suicidal at that time. As a result of that injury, he has a seizure disorder, and
currently takes the medication Dilantin for that disorder.

Inmate Sundberg also takes the medication Zoloft for depression, as well as
Trazadone and Benadryl. He is compliant with these medications, and maintains
symptom control of his depression.

XI.   PLANS IF GRANTED RELEASE:

When he paroles, inmate Sundberg hopes to live with his mother. However, his
alternative plans if his mother's health does not permit, he plans to live with one
of his sisters. Other plans include employment in the computer industry, plans for

SUNDBERG        D-79282        CTF-CENTRAL        09/17/04        gmj

SUNDBERG, ROGER
CDC NUMBER: D-79282
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

outpatient counseling, which he is currently researching, and involvement in community meditation and Alcoholics Anonymous meetings.

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Sundberg appeared his staged age. He was appropriately dressed and groomed. He was coherent, cooperative, calm and alert. His speech, flow of thought and affect were all within the normal range and appropriate to the content of speech. His intellectual functioning was estimated to be in the above average range. There was no evidence of a thought disorder. Currently, his symptoms of depression are well controlled, in particular by medications, but also by self-help group participation. He is in the CCCMS program here at CTF, and has been for several years. His judgment appeared to sound. He showed good insight into his commitment offense.

### CURRENT DIAGNOSTIC IMPRESSIONS (DSM-IV):

AXIS I:     1)  Major depressive disorder, improved.
            2)  Alcohol abuse, in institutional remission.
            3)  Marijuana abuse, in institutional remission.
AXIS II:    No contributory personality disorder.
AXIS V:     Global assessment of functioning (GAF) = 80.

Inmate Sundberg's prognosis is positive for being able to maintain his current mental state in the community upon parole.

### XIII.    REVIEW OF LIFE CRIME:

Inmate Sundberg essentially agrees with the description in his central file of the commitment offense. He stated that he was extremely stressed at the time of the offense, and that should those conditions ever exist again, he would move out of the area rather than stay near someone who was threatening him and his wife, as the victim did. He stated he now understands that he thought of the victim as less than a human being, and he now realizes that was a mistake.

### XIV.    ASSESSMENT OF DANGEROUSNESS:

A.    In consideration of several factors, including his lack of previous criminal history or violent criminal history, his lack of CDC-115 violations or violent CDC-115 violations, as well as his greater maturity, his violence potential within a controlled setting is estimated to be significantly below average relative to this level II inmate population.

SUNDBERG        D-79282        CTF-CENTRAL        09/17/04        gmj

SUNDBERG, ROGER
CDC NUMBER: D-79282
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

**B.**    If released to the community his violence potential is estimated to be no more than the average citizen in the community.

**C.**    The most significant risk factor for this inmate which would be a precursor to violence would be finding himself in circumstances of extreme stress. It is believed that he has learned strategies for dealing with that stress in the future, and I do not expect that he would ever commit another serious crime like that again.

**XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:**

**A.**    Inmate Sundberg is competent and responsible for his behavior. He has the capacity to abide by institutional standards, and has done so during his incarceration period.

**B.**    Inmate Sundberg does suffer from a psychiatric disorder which is well controlled with medications. I believe he could benefit from psychiatric treatment following his parole.

**C.**    As inmate Sundberg has acknowledged some abuse of alcohol and drugs, I would recommend upon parole:

1)    Abstinence from all illegal drugs and/or alcohol.

2)    Monitoring for substance abuse.

3)    Mandatory attendance at self-help groups, such as Alcoholics Anonymous or Narcotics Anonymous.

S. Stack, Ph.D.
Licensed Psychologist
Correctional Training Facility, Soledad

E. Zika, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

SS/gmj

D: 09/20/04
T: 09/22/04

*D:\Word Files\BPT - 2004\SUNDBERG, ROGER   D-79282   10-04   STACK.doc*

SUNDBERG        D-79282        CTF-CENTRAL        09/17/04        gmj

# EXHIBIT "E"

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
JULY 2000 LIFER CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 23, 2000

This is the fourth psychological evaluation for the Board of
Prison Terms on inmate Roger Sundberg, CDC# D-79282. This
report is the product of a personal interview, conducted on
05/23/00, as well as a review of his Central file and unit
health record. I have known this individual previously from
his involvement in the CCCMS program here at CTF.

PSYCHOSOCIAL ASSESSMENT

I.    IDENTIFYING INFORMATION:

Inmate Sundberg is a 42-year-old, separated, Caucasian
male. His date of birth is 07/31/57. He stated he
does not have any religious affiliation. There were no
unusual physical characteristics noted and he denied
any history of nicknames or aliases.

II.   DEVELOPMENTAL HISTORY:

He denied any history of birth defects or abnormalities
of developmental milestones, a history of cruelty to
animals, any significant childhood medical history, or
a childhood history of physical or sexual abuse as
either a perpetrator or a victim. He stated that,
although he never started any large fires, on one or
two occasions he did set refuse in trash cans on fire.

III.  EDUCATIONAL HISTORY:

Educationally, inmate Sundberg has a high school
degree, as well an AA degree. He stated that he has
spent over ten thousand hours doing data processing
during his incarceration period and has significant
computer experience.

IV.   FAMILY HISTORY:

His father died over 15 years ago. His mother is still
alive at age 84. He keeps in contact with her through

SUNDBERG      D-79282      CTF-CENTRAL      05/25/00      gmj

SUNDBERG, ROGER
CDC NUMBER:  D-79282
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

letters.  He has six siblings whom he also maintains
contact with.  He denied that any of his family members
have ever had any significant criminal problems.  He
feels that depression runs in his family and several
members have been afflicted with that disorder.  He
also has two siblings who have either have or had
substance abuse problems.  He stated he has a good
relationship with all of his family members.

V.    PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Sundberg stated that he is a heterosexual male.
He denied any history of sexual aggression.

VI.   MARITAL HISTORY:

Inmate Sundberg is currently married, but separated
from his wife, and has minimal contact with her.  This
is his first marriage.  He has two sons from this
marriage whom he stays in contact with.

VII.  MILITARY HISTORY:

Inmate Sundberg denied any history of military service.

VIII. EMPLOYMENT AND INCOME HISTORY:

In the past, he has been employed at several jobs in
the community.  His most significant job was as a
telephone operator, which he did for approximately ten
years.  When he paroles, he hopes to work with
computers, eventually becoming a computer consultant.

IX.   SUBSTANCE ABUSE HISTORY:

Inmate Sundberg acknowledges abusing alcohol, stating,
"I used alcohol to self-medicate for depression."  He
acknowledges that this was a significant problem.  He
also acknowledged the experimental use of drugs,
including marijuana and cocaine, although he felt he
was never an addict.  He does attend Alcoholics
Anonymous.

X.    PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Sundberg was hospitalized following his
commitment offense when, following the shooting of the

SUNDBERG      D-79282      CTF-CENTRAL      05/25/00      gmj

SUNDBERG, ROGER
CDC NUMBER:  D-79282
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

victim, he shot himself in the head, and so he was
suicidal at that time.  As a result of that injury, he
has a seizure disorder, and currently takes the
medication Dilantin for that disorder.  He also takes
the medication Prozac for his depressive disorder.  He
stated he has not had any seizures for several years.

XI.   PLANS IF GRANTED RELEASE:

When he paroles, he hopes to live with his mother.
Given the information he provided to me, it would
appear his parole plans are viable and his prognosis
for community living is very positive.

### CLINICAL ASSESSMENT

XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Sundberg appeared his stated age.  He was
appropriately dressed and groomed.  He was coherent,
cooperative, calm and alert.  His speech, flow of
thought and affect were all within the normal range.
His intellectual functioning was estimated to be in the
above average range.  There was no evidence of a
thought disorder.  Currently, his symptoms of
depression are well controlled, in particular by
medications.  He is in the CCCMS program here at CTF
and has been for several years.  His judgment appeared
to be sound.  He showed good insight into his
commitment offense.

CURRENT DIAGNOSTIC IMPRESSIONS:

AXIS I:     1)  Major Depressive Disorder, in good
                remission.
            2)  Alcohol Abuse, in institutional
                remission.
            3)  Marijuana Abuse, in institutional
                remission.
AXIS II:    No Contributory Personality Disorder.
AXIS V:     GAF = 75.

His prognosis is positive for being able to maintain
his current mental state in the community upon parole.

SUNDBERG       D-79282       **CTF-CENTRAL**       05/25/00       gmj

SUNDBERG, ROGER
CDC NUMBER:  D-79282
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

XIII. REVIEW OF LIFE CRIME:

    Inmate Sundberg essentially agreed with the description
in his Central file of the commitment offense.  He
stated that he quite stressed at that time, and that
should those conditions ever exist again, he would have
moved out of the area rather than stay around someone
who was threatening him and his wife, as the victim
did.  He stated he now understands that at that time he
thought of the victim as less than a human being, and
he now realizes that was a mistake.

XIV. ASSESSMENT OF DANGEROUSNESS:

    A.  In consideration of several factors, including his
        lack of any criminal history or violent criminal
        history, his lack of any CDC-115 violations or
        violent CDC-115 violations, as well as his greater
        maturity, his violence potential within a
        controlled setting is estimated to be significantly
        below average relative to this Level II inmate
        population.

    B.  If released to the community, his violence
        potential is estimated to be no more than the
        average citizen in the community.

    C.  The most significant risk factor for this inmate
        which would be a precursor to violence would be
        finding himself in circumstances of great stress.
        I believe he has learned strategies for dealing
        with that stress in the future, and I do not expect
        that he would ever commit another serious crime
        like this again.

XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

    A.  This inmate is competent and responsible for his
        behavior.  He has the capacity to abide by
        institutional standards and has done so during his
        incarceration period.

    B.  Inmate Sundberg does suffer from a psychiatric
        disorder which is well controlled with medications
        at this time.  I believe he could benefit from
        psychiatric treatment following his parole.

SUNDBERG     D-79282     CTF-CENTRAL     05/25/00    .gmj

SUNDBERG, ROGER
CDC NUMBER:  D-79282
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

C.  As this man has acknowledged some abuse of alcohol
    and drugs, I would recommend, upon parole:

    1)  Abstinence from all illegal drugs and alcohol.

    2)  Monitoring.

    3)  Mandatory attendance at self-help groups such
        as Narcotics Anonymous or Alcoholics Anonymous.

STEVEN J. TERRINI, Ph.D.
Senior Supervising Psychologist
Correctional Training Facility, Soledad

SJT/gmj

d:  05/23/00
t:  05/25/00

# EXHIBIT  "F"

INSTITUTIONAL STAFF RECOMMENDATION SUMMARY

SOURCES OF REPORT:  Probation Officer's Report dated 2/24/88, C-File and personal interview.

CONFIDENTIAL INFORMATION:  None noted as of 3/17/88.

HOLDS/DETAINERS:  None noted as of 3/17/88.

MEDICAL/DENTAL:  Full duty no camp.  Seizure disorder.   DENTAL CLASS: II

PSYCHIATRIC/PSYCHOLOGICAL:  Referral indicated due to nature of offense and and psychiatric condition. Dr. T. Freeman, Sr. Psychologist    3/10/88

WORK SKILLS: ¨Claims clerical, and switchboard operator.

NARCOTICS/DRUGS/ALCOHOL: Claims prior abuse of amphetamines, cocaine, lysergic acid, and phencyclidine.  He states he used "speed" approximately two months prior to the offense.  Drinks alcohol to excess.

ESCAPE HISTORY:  None per POR and inmate denies.

ARSON HISTORY:  None per POR and inmate denies.

SEX RELATED OFFENSES:  None per POR and inmate denies.

ACADEMIC/VOCATIONAL:  GPL: 12.7       Shipley Hartford IQ: 105

CASEWORK FOLLOW-UP:  Obtain and review CII and FBI arrest reports to update arrest history.

EVALUATION:  Sandberg was committed to CDC for seventeen years to life for murder second.  No prior arrest history noted.

During the interview he readily admitted committing the instant offense, claiming there had been on-going conflict with the victim and the day of the offense, he had been drinking alcohol and decided to confront the victim while in possession of a weapon.  He subsequently shot the victim several times and attempted to commit suicide by shooting himself in the head.

He indicates that while incarcerated, he desires to further his education and obtain a job skill in the computer field.

Since reception, he has not been a custody problem to date and is not viewed as a serious management problem at this time.

RE-ENTRY PLANS:  N/A


SANDBERG          D79282          RCC/CIM          3/18/88        bkg

CLASSIFICATION SCORE: 66  ·  CUSTODY LEVEL: IV

INSTITUTION RECOMMENDATION: CCI-IV/CMS-III

REASON FOR OUT OF CLASS RECOMMENDATION: Subject is not viewed as a serious management problem at this time, override to Level III appears to offer adequate security and housing needs.

CORRECTIONAL COUNSELOR I: J.I. Roberts  3/17/88

SUPERVISOR'S RECOMMENDATION: RxCCI-IV. NO PRIOR ARREST HISTORY NOTED


3-21-88                    Y.A. CANEDO CCII              3-23-88   cfd


SANDBERG          D79282          RCC/CIM          3/18/88        bkg

# EXHIBIT   "G"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
OCTOBER 2005 CALENDAR

SUNDBERG, ROGER                                        D-79282

## I.    COMMITMENT FACTORS:

A.    **Life Crime:** PC 187, Murder 2nd with Use of a Weapon per PC 12022.5(A) from
Los Angeles County Case #A474007. Received by CDC on 3/7/88 with a
sentence of 17 years to Life and an MEPD of 8/4/98. Victim; Steven Paul
Summers, age 40, weapon used: handgun.

1.    **Summary of Crime:** The victim was estranged from his wife, Pamela
Summers and during their marital difficulties, his wife became involved
with the prisoner. At first it was just a matter of talking over her problems
but as time went on, they became romantically involved. The victim was
physically abusive to her, so when they separated, she had a restraining
order placed against him. During the separation, the victim had no place
to stay so the victim's wife allowed him to stay in the garage at her
residence. While the victim was staying in the garage, he still had the
freedom to go in and out of the house as well as in the garage and this
irritated the prisoner. On the night of the crime, Sundberg saw the victim
moving about the garage and back and forth into the house. The prisoner's
house was located next to the victim's residence. The prisoner's rage
escalated to a point where he took a pistol inside his house and went to the
driveway next door and shot the victim four times. The victim went inside
his wife's house and staggered toward the bedroom. The prisoner
followed him with the pistol and occasionally struck the victim. At this
point, the victim's son, who was in the house, grabbed a plastic baseball
bat and tried to stop Sundberg from killing his father. The son was unable
to stop the prisoner. Sundberg kept on following the victim into the
bathroom where the victim fell into the bathtub. At this point they argued
some more and Sundberg shot the victim twice in the head. The victim's
son observed the killing. The prisoner then left the victim's house. Before
the police arrived to arrest him, he tried to shoot himself in the head.

2.    **Prisoner's Version:** For about a year there was an ongoing conflict
between my wife Robin and I, and Steve Summers (the victim). His wife
Pam and my wife became friends not long after we moved across from her.
She was often at our house, sometimes with her son, especially so when

SUNDBERG, ROGER        D79282                CTF-SOLEDAD        OCT/2005

she was afraid of Steve. He was a dealer and heavy user of cocaine and amphetamines. When he used too much and when he came down he became very angry and abusive, primarily towards Pam. She told me that this went as far as his tying her up and torturing her, which he acknowledged and then laughed about. He began threatening my wife and me for interfering; we were supportive of Pam and protective of her and her son Jimmy. This became increasingly stressful. Eventually our friendship with Pam developed to include a physical relationship.

My job was stressful, my wife and I were having financial problems and began having a marital crisis over her resumption of a previous affair that I was jealous of. I became severely depressed and suicidal. Pam got a restraining order to keep Steve away, but he sometimes came back and would leave only when the police were called or he was threatened with their being called.

My wife and I were drinking and arguing about her affair and I became utterly despondent; feeling that the marriage my life was based upon was over and therefore my life along with it as well. Walking past my open front door, I saw Steve and became enraged that this continuing threat and stress, which I thought was finally gone, was back again. I got my pistol and extra ammunition and went over to the garage he was in. He ran at me, I shot at him, and we fought. I literally saw red after he punched me in the head a few times. I backed up and reloaded. He ran into the house and into the bathroom and I followed. We fought more and I shot more, and at some point, I shut the door. He looked to me like he died. I think I reloaded at this point, and then I shot myself in the head and blacked out. Bone fragments were later removed from my brain by surgery at USC Medical Center.

3.  **Aggravating/Mitigating Circumstances:**

   a.  **Aggravating Factors:**
      1. Prisoner had opportunity to cease but continued with crime.
      2. Use of Weapon.

   b.  **Mitigating Factors:**

      1. Prisoner has no history of criminal behavior.

B.  **Multiple Crime(s):**  None.

   1.  **Summary of Crime:**  None.

SUNDBERG, ROGER        D79282              CTF-SOLEDAD         **OCT/2005**

LIFE PRISONER EVALUATI◌ EPORT
PAROLE CONSIDERATION ◌ ◌RING
OCTOBER 2005 CALENDAR

      2.    **Prisoner's Version:** None.


## II.    PRECONVICTION FACTORS:

    A.    **Juvenile Record:** None.

    B.    **Adult Convictions:** None.

    C.    **Personal Factors:** The defendant was born in Minnesota and was brought to California by his parents in 1962, when he was five years old. He is the youngest of seven siblings. The record shows that there is no other criminality in the family. The prisoner graduated in 1975 from Long Beach Polytechnic High School and attended college courses at Long Beach City College and Cal State Long Beach for two years. He got married to Robin Lee Sundberg and has two children as follows: Nathan Christopher Sundberg and Neil Forrest Sundberg. Inmate Sundberg was employed by AT&T for nine years as a long distance telephone operator with a gross month income of $1700.00. Since this crime occurred, his wife had to move to Morro Bay to live with her parents because she has no income and no resources to support herself and her children. The prisoner experimented with cocaine, LSD and PCP when he was younger. The last time he used "Speed" was a couple of months before the crime occurred. Inmate Sundberg was drinking beer every day and he believed it became a problem. He had drank two 16 ounce cans of beer before the crime occurred. He claimed that he had an emotional problem and that his family in general had problems with depression including his mother and two sisters.


## III.    POSTCONVICTION FACTORS:

    A.    **Special Programming/Accommodations:** None.

    B.    **Custody History:** Since his last board hearing, Sundberg has remained at the Correctional Training Facility under Medium A custody with 19 placement points. He has continued his full time assignment working as a computer tech, in the Computer Refurbishing Program. Work supervisor's reports for this period reflect exceptional grades across the board. Supervisor's comments include, "great worker, always on time. His pleasant attitude and generous nature have been a very positive and motivating influence in this program." Also noted was a laudatory chrono dated 5/10/04, detailing his commendable efforts as an Education Office Clerk from August 1993 to September 1993.

    C.    **Therapy and Self-Help Activities:** Sundberg is continuing his studies through Coastline Community College, working towards a degree in possibly, Computer Science. Also noted in the C-File were chronos for completion of the 12 week

SUNDBERG, ROGER       D79282          CTF-SOLEDAD       **OCT/2005**

Anger Management Course (9/15/04) and ongoing participation in CTF's Alcoholic's Anonymous group through the first quarter of 2005 (3/15/05). Sundberg also states that he is continuing his Buddhist Meditations Studies and his Depression management group therapy programs and will try to have updated letters in time for his board hearing.

**D.**   **Disciplinary History:**

CDC 115's

None.

CDC 128A's

05/02/98        CTF             Non compliance with grooming standards.

**E.**   **Other:**  Sundberg was seen by the Board of Prison Terms on 10/28/04 and was denied parole for one year.  In addition the board recommended that Sundberg stay disciplinary free and participate in any self help therapy that may be offered by CDC.  He has complied with these recommendations.

**IV.**   **FUTURE PLANS:**

**A.**   **Residence:**  Sundberg would like to parole to his mother's house, Ms. Helen Sundberg at 271 Molino Ave #10, Long Beach, CA 90803, telephone number (562) 438-7533.

**B.**   **Employment:**  Sundberg has an Associates Degree in general studies, plus he has completed the Vocational Data Processing Program at CTF.  In addition he has several years of experience working as a certified electronic technician in both a teaching and employment (custodial) capacity.  Also noted in the Central File were numerous classes from Hartnell College in the electronics field and though he does not have a specific job offer, Sundberg is confident that he would be able to provide for his needs if granted a parole date.

**C.**   **Assessment:**  Sundberg has been disciplinary free from reception, has taken advantage of available self help therapy/educational opportunities and enjoys substantial support from family and friends.

**V.**   **USINS STATUS:**  Sundberg is a United States Citizen.

SUNDBERG, ROGER           D79282                      CTF-SOLEDAD        **OCT/2005**

LIFE PRISONER EVALUATI⌣ ⌣EPORT                                                                    5
PAROLE CONSIDERATION ⌐⌐ARING
OCTOBER 2005 CALENDAR

**VI.** **SUMMARY:**

    **A.**    Prior to release the prisoner could benefit from maintaining his disciplinary free behavior and participating in any self help therapy that may be offered by CDC.

    **B.**    This report is based upon an interview with the prisoner on 6/10/05 lasting approximately one hour(s) and a review of the Central File lasting approximately three hours.

    **C.**    Prisoner was afforded an opportunity to examine his Central File on 6/10/05 which he did per the CDC 128B of the same date.

    **D.**    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

SUNDBERG, ROGER      D79282            CTF-SOLEDAD      **OCT/2005**

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
OCTOBER 2005 CALENDAR

6

_____  7. 14. 05
G. Williams                         Date
Correctional Counselor I


_____  7/19/05
R. Leach                            Date
Correctional Counselor II


_____  7/14/05
R. Pope                            Date
Facility Captain


_____  7/27/05
D. S. Levorse                      Date
Classification and Parole Representative


SUNDBERG, ROGER          D79282               CTF-SOLEDAD          OCT/2005

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
                ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
| YEAR | BPT | PBR | REASONS |
|------|-----|-----|---------|
| 10/04 to Present | | | **PLACEMENT**: Remained at the Correctional Training Facility (CTF).<br>**CUSTODY**: Remains at Medium A.<br>**VOC. TRAINING**: None noted.<br>**ACADEMICS**: Enrolled in Coastline Community College working towards a degree in Computer Science.<br>**WORK RECORD**: Continued full time assignment working as a Computer Tech. Work supervisor's reports for this period reflect exceptional grades across the board.<br>**GROUP ACTIVITIES**: Completed 12 week Anger Management class (9/15/04), as well as continued attendance at Alcoholic's Anonymous through the first quarter 2005 (3/15/05).<br>**PSYCH. TREATMENT**: None noted.<br>**PRISON BEHAVIOR**: Sundberg has been disciplinary free from the beginning<br>**OTHER**: None. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE<br>7·14·05 |
|---|---|---|
| SUNDBERG | D79282 | CTF-SOLEDAD | OCT/2005 |

BPT 1004 (REV 7/86)                              Page _1_

BOAR OF PRIS- N TERMS              STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐   DOCUMENTATION HEARING

☒   PAROLE CONSIDERATION HEARING          **ADDENDUM**

☐   PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
       ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 7/14/05 to 4/19/06 (Present) | | | **PLACEMENT:** CTF. **CUSTODY:** Medium A. **VOC. TRAINING:** None. **ACADEMICS:** Enrolled in Coastline Community College working towards a degree in computer science. **WORK RECORD:** Continues as a Computer Technician. Work Supervisors performance reports remain excellent. **GROUP ACTIVITIES:** Continues to participate in AA programs, CDC 128B's dated 10/4/05, 1/3/06 and 4/5/06. **PSYCH. TREATMENT:** None. **PRISON BEHAVIOR:** Clear. **OTHER:** Continues to have excellent behavior patterns. |

CORRECTIONAL COUNSELOR'S SIGNATURE          DATE   4/21/0G

SUNDBERG         D79282         CTF-SOLEDAD

COPY TO INMATE ON
May 4, 2006

BPT 1004 (REV 7/86)

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                    **ADDENDUM**

_____    4/21/06
M. Morton                          Date
Correctional Counselor I


_____    4/21/06
R. Leach                           Date
Correctional Counselor II


_____    4-25-06
R. Pope                            Date
Facility Captain


_____    4.27.06
D.S. Levorse                       Date
Classification and Parole Representative


SUNDBERG                    D79283              CTF-SOLEDAD


CDC 1004 (REV 7/86)

# EXHIBIT    "H"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JUNE 2003 CALENDAR


SUNDBERG, ROGER                                        D-79282


I.    **COMMITMENT FACTORS:**

A.    **Life Crime:** Count 1; Murder 2nd with Use of Firearm, Case No. LA A474007,
Sentence: 17 years to life. MEPD: 9/6/98, Victim: Steven Paul Summers, age:
unknown. Date received by CDC 3-7-88. Source of information: POR.

1.    **Summary of Crime:** The victim was estranged from his wife, Pamela
Summers and during their marital difficulties, his wife became involved
with the prisoner. At first it was just a matter of talking over her problems
but as time went on, they became romantically involved. The victim was
physically abusive to her, so when they separated, she had a restraining
order placed against him. During the separation, the victim had no place
to stay so the victim's wife allowed him to stay in the garage at her
residence. While the victim was staying in the garage, he still had the
freedom to go in and out of the house as well as in the garage and this
irritated the prisoner. On the night of the crime Sundberg saw the victim
moving about the garage and back and forth into the house. The prisoner's
house was located next to the victim's residence. The prisoner's rage
escalated to a point where he took a pistol inside his house and went to the
driveway next door and shot the victim four times. The victim went inside
his wife's house and staggered toward the bedroom. The prisoner
followed him with the pistol and occasionally struck the victim. At this
point, the victim's son, who was in the house, grabbed a plastic baseball
bat and tried to stop Sundberg from killing his father. The son was unable
to stop the prisoner. Sundberg kept on following the victim into the
bathroom where the victim fell into the bathtub. At this point they argued
some more and subsequently again shot the victim twice in the head. The
victim's son observed the killing. The prisoner then left the victim's
house. Before the police arrived to arrest him, he tried to shoot himself in
the head.

2.    **Prisoner's Version:** Sunberg, stated that prior to the commitment
offense, there had been an ongoing conflict between him and the victim
for close to a year. The victim was his next door neighbor, a heavy
cocaine and methamphetamine user. The victim was a heavy user of

cocaine and then he stopped using it and came down from it, "The victim became abusive and violent towards his own wife, my wife and me. The victim's wife was a close friend to me and my wife. She always came to see us for protection and support." Sundberg said at that time, he himself and his wife had marital problems and one of them was jealousy along with financial problems. Over that long period, there was tension built because the victim had constantly threatened him, his wife, as well as the victim's wife.

When the victim and his wife separated, the victim's wife had a restraining order against him, but then the victim came back to stay in the garage and "His wife did not inform me that she allowed him to stay in the garage." He stated that he himself was drinking that evening. "Because of the stress that had been building up with my own marital problems, I went out into a rage and just blew up."

3. **Aggravating/Mitigating Circumstances:**

   a. **Aggravating Factors:**

- During the commission of the crime the inmate had the opportunity to cease but continued with the crime.

- Circumstances of the crime created potential for serious injury to others.

   b. **Mitigating Factors:** The prisoner has minimal or no history of criminal behavior.

B. **Multiple Crime(s):** None.

   1. **Summary of Crime:** None.

   2. **Prisoner's Version:** None.


II. **PRECONVICTION FACTORS:**

A. **Juvenile Record:** None.

B. **Adult Convictions:** None.

C. **Personal Factors:** The defendant was <u>born in Minnesota and</u> was brought to California by his parents in 1962, when he was five years old. He is the youngest

SUNDBERG, ROGER     D-79282        CTF-SOLEDAD        JUN/2003

of seven siblings. The record shows that there is no other criminality in the family. The prisoner graduated in 1975 from Long Beach Polytechnic High School and attended college courses at Long Beach City College and Cal State Long Beach for two years. He got married to Robin Lee Sundberg and has two children as follows: Nathan Christopher Sundberg and Neil Forrest Sundberg. Inmate Sundberg was employed by AT&T for nine years as a long distance telephone operator with a gross month income of $1700.00. Since this crime occurred, his wife had to move to Morro Bay to live with her parents because she has no income and no resources to support herself and her children. The prisoner was using cocaine, LSD and PCP when he was younger. The last time he used "Speed" was a couple of months before the crime occurred. Inmate Sundberg was drinking beer ever day and he believed it became a problem. He had drank two 16 ounce cans of beer before the crime occurred. He claimed that he had an emotional problem and that his family in general had problems with depression including his mother and two sisters.

## III.   POSTCONVICTION FACTORS:

**A.**   **Special Programming/Accommodations:** None.

**B.**   **Custody History:** Documents from the previous hearing have been considered and that information remains valid. During the period of time since the last hearing, Sundberg has remained at CTF. His custody remains MED A and zero points. He continued to be assigned as a Instructor's Aide in the Vocational Data Processing Program until 5/26/01 at which time he started as a clerk for the Education Department. On 1/30/03, he started as a Teacher's Aide for the Vocational Computer Repair Program. Noted: He has received excellent work reports from his supervisors over this time frame.

**C.**   **Therapy and Self-Help Activities:** CDC-128B's dated 4/5/01, 7/10/01, 10/2/01, 1/11/02 and 4/11/02 for attending A.A.

**D.**   **Disciplinary History:** Sundberg has remained disciplinary-free.

**E.**   **Other:** The panel recommendations from the prior Board hearing was denied parole for 2 years, remain disciplinary-free and participate in self-help. Sundberg has accomplished the above recommendations.

## IV.   FUTURE PLANS:

SUNDBERG, ROGER          D-79282                    CTF-SOLEDAD              JUN/2003

A. **Residence:** Sundberg plans to live in the county of commitment and reside with his mother. His mother is Helen Sundberg, 271 Molivo Avenue #10, Long Beach, CA 90803, Tel: (310) 438-7533.

B. **Employment:** Subject said he doesn't have any firm job offers, although he will try to obtain employment in the computer field.

C. **Assessment:** Sundberg has a great deal of knowledge in Computer Programming and should be able to find a job in this field.

## V. USINS STATUS: N/A.

## VI. SUMMARY:

A. Considering the commitment offense, prior record and prison adjustment, this writer believes the prisoner would probably pose a low degree of threat to the public if released from prison at this time. Sundberg, while incarcerated has performed an exceptional program, with his work record as well as his disciplinary record. He has participated in A.A. and many other self-help programs over the years. He states he currently is participating in a meditation group and a depression group and he asked his instructor for documentation. Sundberg has changed over time and it's my opinion that his risk to society has been reduced.

B. Prior to release the prisoner could benefit from continuing to perform the program he is currently participating in, with no further recommendations.

C. This report is based upon an interview with the prisoner on 2/27/03 lasting approximately 1 hour and numerous contacts with him since he was received in CTF in 1988.

D. Sundberg was afforded an opportunity to examine his Central File on 2/27/03. He spent 30 minutes reviewing it.

E. No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

SUNDBERG, ROGER          D-79282               CTF-SOLEDAD          JUN/2003

_M. Motz_                6/10/03

M. Morton               Date
Correctional Counselor I


_R. Leach_              6/10/3

R. Leach                Date
Correctional Counselor II


_R. Lopez_              6-10-03

R. Lopez                Date
Facility Captain


_Levorse CPR_          6.11.03

D. S. Levorse           Date
Classification and Parole Representative


SUNDBERG, ROGER        D-79282          CTF-SOLEDAD        JUN/2003

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

INSTRUCTIONS

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/25/01 to 5/26/02 | | | **PLACEMENT:** CTF.<br>**CUSTODY:** MED A.<br>**VOCATIONAL TRAINING:** None noted.<br>**ACADEMICS:** None noted.<br>**WORK RECORD:.** Sundberg worked as an Instructor's Aide in the Vocationally Data processing Program till 7/01, then he started as a clerk for the Educational Program. He received excellent grades for both jobs.<br>**GROUP ACTIVITIES:** CDC-128B's dated 4/7/01, 7/10/01, 10/2/01, 10/2/01. 1/11/02 and 4/11/02 and 4/11/02 for participating in AA.<br>**PSYCH. TREATMENT:** None noted.<br>**PRISON BEHAVIOR:** Remained disciplinary-free this period.<br>**OTHER:** N/A. |

DATE  6/10/03

SUNDBERG, ROGER       D-79282              CTF-SOLEDAD           JUNE/2003

BPT 1004 (REV 7/86)                         Page _1_

BOARD OF PRISON TERMS                                                                          STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/27/02 to 2/28/03 (Present) | | | **PLACEMENT:** CTF. <br> **CUSTODY:** MED A. <br> **VOCATIONAL TRAINING:** None noted. <br> **ACADEMICS:** None noted. <br> **WORK RECORD:** Continue to work as a clerk for the education program, until 1/30/03. He then started to work as a Teacher's Aide for the Vocational Computer Repair Program where he is at presently. <br> **GROUP ACTIVITIES:** None noted. <br> **PSYCH. TREATMENT:** None noted. <br> **PRISON BEHAVIOR:** Remained disciplinary-free this period. <br> **OTHER:** Sundberg states he participates in a mediation group and a depression group. He has ask both instructors for chronos but at present not in file. |

ORDER:
- ☐ BPT date advanced by _____ months.
- ☐ PBR date advanced by _____ months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

SUNDBERG, ROGER          D-79282                    CTF-SOLEDAD              JUN/2003

BOARD OF PRISON TERMS                                                                          STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                            Page _2_

BOARD OF PRISON TERMS                                                                     STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING                **ADDENDUM**

☐  PROGRESS HEARING

INSTRUCTIONS
   TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
   TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
                  ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 5/00 to 5/01 | | | **PLACEMENT**: Sundberg remained at the Correctional Training Facility (CTF). |
| | | | **CUSTODY**:  His custody remained at Medium A. |
| | | | **CLASSIFICATION SCORE**:  His classification score remained at zero points. |
| | | | **ACADEMIC**:  None noted. |
| | | | **WORK**:  Noted under "Vocation". |
| | | | **VOCATION**:  Sundberg was assigned to Vocational Data Processing-Instructor's Aide.  He received three Education Progress Reports dated 7-5-00, 10-3-00, and 1-2-01 reflecting "satisfactory" ratings. |
| | | | **GROUP ACTIVITIES**:  Sundberg received four chronos dated 5-24-00, 10-25-00, 1-4-01, and 4-5-01 for his participation in Alcoholics Anonymous.  He received three chronos dated 5-24-00, 10-25-00, and 1-4-01 for his position as a Vice Chairman of Alcoholics Anonymous. |
| | | | **PSYCH TREATMENT**:  Sundberg met the inclusion criteria for Clinical Case Management level of care. |
| | | | **PRISON BEHAVIOR**:  Sundberg remained disciplinary-free during this period. |

CORRECTIONAL COUNSELOR'S SIGNATURE                                    DATE  5/25/01

SUNDBERG, ROGER          D79282                    CTF                    JUL/2000

BPT 1004 (REV 7/86)                              1

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                **ADDENDUM**
JUL/2000


_M. Aguirre_
M. Aguirre
Correctional Counselor I


_G. Severino (4)_
G. Severino
Correctional Counselor II


_R. Pope (4)_
R. Pope
Facility Captain


_S.L. Hill (for)_
S.L. Hill
Classification and Parole Representative(A)


SUNDBERG, ROGER            D79282                CTF                JUL/2000

# EXHIBIT    "I"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JULY 2004 CALENDAR

SUNDBERG, ROGER DEANE                                    D-79282

## I.    COMMITMENT FACTORS:

A.    **Life Crime:**  PC187, Murder 2nd degree with PC12022.5, Use of Weapon in commission of a felony, to wit a pistol.  Los Angeles County Superior Court Case #A-474007.  Term: 15 years to life for PC187.  2 years for PC 12022.5 to run consecutive.  MEPD: 8/4/98.  Victim: Steven Paul Summers.  Age:  Unknown.

   1.    **Summary of Crime:**   All relevant documents from the previous hearing.

   2.    **Prisoner's Version:**    Remains the same as stated in the previous hearing.

   3.    **Aggravating/Mitigating:**

      a.    **Aggravating Factors:**  Remains the same as stated in the previous hearing.

      b.    **Mitigating Factors:**  Remains the same as stated in the previous hearing.

B.    **Multiple Crime(s):**  N/A

   1.    **Summary of Crime:**  N/A

   2.    **Prisoner's Version:**  N/A

## II.   PRECONVICTION FACTORS:

A.    **Juvenile Record:**  Documents from the previous hearing have been considered and that information remains the same.

B.    **Adult Convictions:**  Documents from the previous hearing have been considered and that information remains the same.

SUNDBERG, ROGER D       D-79282              CTF-SOLEDAD          JULY 2004

C.    **Personal Factors:** Documents from the previous hearing have been considered and that information remains valid.

## III.    POSTCONVICTION FACTORS:

A.    **Special Programming/Accommodations:** None.

B.    **Custody History:** Documents from the previous hearing(s) have been considered and that information remains valid. Since his last Board of Prison Terms (BPT) hearing on 7/31/03 in which his parole was denied for one (1) year, inmate Sundberg has remained at the Correctional Training Facility (CTF), in the general population (GP). He has retained his custody at Medium A with a Preliminary/behavior classification score of 0 and a Mandatory Minimum Placement score of 19 (the change is due to the revised classification scoring system effective effective 10/15/02).

C.    **Therapy and Self-Help Activities:** Refer to the Postconviction Progress Report for details.

D.    **Disciplinary History:** Disciplinary free since 1998.

E.    **Other:** N/A

## IV.    FUTURE PLANS:

A.    **Residence:** Inmate Sundberg intends to reside with his mother, Helen Sundberg and sister, Lou Sundberg at 271 Molino Avenue #10, Long Beach, California, 90803 with telephone number 310-438-7533, if and when he is paroled.

B.    **Employment:** Inmate Sundberg plans to acquire employment in the Data Processing and Computer Repair industry although he will accept any type of employment in the interim, if and when he is paroled.

C.    **Assessment:** Refer to Section VI, Summary.

## V.    USINS STATUS:    Inmate Sundberg is a United States citizen born on 7/31/57 in Minnesota.

## VI.    SUMMARY

A.    Considering the commitment offense, prior record, and prison adjustment,

SUNDGERG, ROGER D        D 79282                    CTF-SOLEDAD            JULY 2004

LIFE PRISONER EVALU    REPORT                                            3
SUBSEQUENT PAROLE CONSIDERATION HEARING
JULY 2004 CALENDAR

the writer believes the prisoner would probably pose a low degree of threat to the
public at this time, if released from prison. Inmate Sundberg has been
incarcerated for over 16 years, he has matured and shown marked progress
towards maintaining an overall positive attitude. He has been disciplinary free
since 6/98. Additionally, he has acquired an employable trade through CTF's
Vocational Data Processing program. Also, he has an Associate's Degree in
General Education. Finally, he has achievable and realistic parole plans.

B.    Prior to release, the prisoner could benefit from:
      1.  Remain disciplinary free;
      2.  Continue to participate in self-help programs, when available.

C.    This report is based on 4 hours of Central file research, an interview with inmate
      Sundberg and incidental contact with the prisoner during this period of review.

D.    Inmate Sundberg reviewed his Central file per Olson on 4/23/04.

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole
      Proceedings Remedial Plan (ARP) for effective communication.

SUNDGERG, ROGER D    D 79282              CTF-SOLEDAD          JULY 2004

LIFE PRISONER EVALL     REPORT
SUBSEQUENT PAROLE ι    ̃IDERATION HEARING
JULY 2004 CALENDAR

_____  7-1 5-04
F.I. DeGuzman                              Date
Correctional Counselor I


_____  7-15-04
R. Leach                                   Date
Correctional Counselor II


_____  7-21-04
R. Pope                                    Date
Facility Captain


_____  7-22-04
D. S. Leverse                             Date
Classification and Parole Representative


SUNDBERG, ROGER D       D 79282          CTF-SOLEDAD          JULY 2004

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

- ☐  DOCUMENTATION HEARING
- ☒  PAROLE CONSIDERATION HEARING
- ☐  PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 3/1/03 to 2/29/04 | | | **PLACEMENT**:  Remains housed at CTF, in the GP. **CUSTODY**:  Remains at Medium A. **ACADEMIC**:  Remains assigned as a Teacher's Aide until 8/6/03, receiving satisfactory assessment per the Education Progress Report (CDC128-E) dated 6/26/03. Also, inmate Sundberg is currently enrolled in an Independent Study Program through Coastline Community College for the semester ending December 22, 2004. **WORK**:  Assigned on 9/18/03 to Waste Control. **VOCATION**:  None noted this period. **GROUP ACTIVITIES**:  Laudatory chrono for participation in the Alcoholics Anonymous (AA) program for the 3rd quarter ending 9/03 and 4th quarter ending 12/03 per CDC128-B dated 11/3/03 and 12/18/03. **PSYCH TREATMENT**:  Regular participant in the weekly Group Therapy (Depression Management) per CDC128-C dated 3/4/03. **PRISON BEHAVIOR**:  Disciplinary free this period. **OTHER**:  N/A. |

CORRECTIONAL COUNSELOR'S SIGNATURE

F. I. DeGUZMAN

DATE

4/30/04

SUNDBERG,                    ROGER DEANE                    D79282                    JULY, 2004

BOARD OF PRISON TERMS                                                                                          STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 3/1/04 to 4/30/04 (Present) | | | **PLACEMENT**:  Remains housed at CTF, in the GP. **CUSTODY**:   Remains at Medium A. **ACADEMIC**:   Remains enrolled in an Independent Study Program through Coastline Community College for the semester ending December 22, 2004. **WORK**:   Remains assigned to Waste Control until 4/6/04. **VOCATION**:   Assigned as a Compuer Technician in the Vocational Computer Repair program on 4/6/04. **GROUP ACTIVITIES**:   Laudatory chrono for participation in the AA program for 1st quarter ending 3/04. **PSYCH TREATMENT**:   None noted this period. **PRISON BEHAVIOR**:   Disciplinary free this period. **OTHER**: N/A. |

ORDER:

☐   BPT date advanced by           months.           ☐   BPT date affirmed without change.
☐   PBR date advanced by           months.           ☐   PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐       Previously imposed  conditions affirmed.
☐       Add or modify

☐       Schedule for Progress Hearing on appropriate institutional calendar

SUNDBERG,                ROGER DEANE              D79282                    JULY, 2004

BPT 1004 (REV 7/86)                           Page _2_

# EXHIBIT "J"

BOARD OF PRISON TERMS                                                                                STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☐  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

**INSTRUCTIONS**
  TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
  TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
                 ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6/1/94 to 6/1/95 | | | Sundberg was received at RCC-CIM for processing on 3/7/88 from L.A. County Jail subsequent to his conviction for Murder 2nd. He received a sentence of 15 years to life plus 2 years enhancement for use of a weapon. Remained at CTF-Central during this period under Medium A custody in the general population. He is on A1A status having continued his assignment at Vocational Data Processing. On 6/1/94 Sundberg graduated from Hartnell College (Cum Laude) with an Associate of Arts Degree in General Education. He also received during this period 30 vocational certification units in Vocational Data Processing. He received a Laudatory Chrono dated 4/28/95 for his support and participation in the Children's Walk-A-Thon on April 21, 1995. He is disciplinary free during this period. |
| 6/1/95 to Present | | | Remained at CTF-Central under Medium A custody in the general population. Continued his job assignment in Vocational Data Processing. Received 20 vocational certification units in Vocational Data Processing. Remained an active member of AA since 1989. Disciplinary free during this period. |

CORRECTIONAL COUNSELOR SIGNATURE                                                                DATE
   CCPR                                                                                          5-15-97

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| SUNDBERG, R. | D79282 | CTF | 7/97 | |

BPT 1004 (REV 7/86)                              PAGE 1 of  1

# EXHIBIT "K"

BOARD OF PRISON TERMS                                              STATE OF CALIFORNIA
**LIFE PRISONER DECISION FACE SHEET**

### PERIOD OF CONFINEMENT

*(RECORDS OFFICER USE ONLY)*

|  | YR | MO | DAY |
|---|---|---|---|
| Adjusted Period of Confinement........................................................................ |  |  |  |
| Date Life Term Begins.................................................................................... | +88 | 03 | 07 |
| At Large Time............................................................................................... | + |  |  |
| PAROLE DATE.............................................................................................. | = |  |  |

### MISCELLANEOUS

*Parole denied two (2) years.*

Panel recommendations and requests:
| | |
|---|---|
| ____ Become | ✔ Remain disciplinary free. |
| ____ Work towards reducing his/her custody level. | |
| ____ Upgrade ____ vocationally ____ educationally | |
| ✔ Participate in ✔ self-help (and) ____ therapy. | |
| ____ Transfer to ____ Cat. X ____ Cat. T. | |

PENAL CODE SECTION 3042 NOTICES ☒ SENT     (Date) **04/20/01**

COMMITMENT OFFENSE

| P187 W/12022.5 | MURDER 2ND W/USE OF HANDGUN |
|---|---|
| (Code Section) | (Title) |
| A474007 | **01** |
| (Case Number) | (Count Number) |

| Date Received by CDC 03/07/88 | Date Life Term Begins 03/07/88 | Controlling MEPD 08/04/98 |
|---|---|---|
| Type of Hearing ☐ INITIAL   ☒ SUBSEQUENT (Hearing No.) **#1** | | If Subsequent Hearing, Date of Last Hearing 07/24/97 |

Department Representative
**JOY KELLAM TYLER, C & PR**

| Counsel for Prisoner **JEFF CHAMPLIN** | Address |
|---|---|
| District Attorney Representative **KAHANA, TAL** | County LOS ANGELES |

### PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) *Sharon Lawin* | Date 06/06/01 |
|---|---|
| Concurring (Name) | Date |
| Concurring (Name) | Date |

| NAME **SUNDBERG, ROGER** | CDC NUMBER **D79282** | INSTITUTION **CTF** | CALENDAR 07/00 | HEARING DATE 06/06/01 |
|---|---|---|---|---|

BPT 1001 (Rev. 1/91)

63

| | |
|---|---|
| 1 | CALIFORNIA BOARD OF PRISON TERMS |
| 2 | D E C I S I O N |
| 3 | **PRESIDING COMMISSIONER LAWIN:** We're back on |
| 4 | record and all parties have returned to the hearing |
| 5 | room in the hearing for Roger Sundberg. The Panel |
| 6 | reviewed all the information received from the |
| 7 | public and relied on the following circumstances in |
| 8 | concluding that the prisoner is not suitable for |
| 9 | parole and would pose an unreasonable risk of danger |
| 10 | to society or a threat to public safety, if released |
| 11 | from prison. The commitment offense was carried out |
| 12 | in an especially cruel and callous manner. It was |
| 13 | the shooting death of Steven Summers, who was the |
| 14 | inmate's next door neighbor. The inmate became |
| 15 | enraged over, apparently a number of different |
| 16 | issues that were happening in his life at the time. |
| 17 | He went next door to Mr. Summers' residence and |
| 18 | proceeded to scuffle with him, to enter into a |
| 19 | confrontation with him in the garage. They then |
| 20 | moved. The inmate followed the victim into the |
| 21 | residence, ultimately to the bathroom of the home, |
| 22 | where the inmate shot him again, several times. And |
| 23 | this offense was carried out in an especially -- in |
| 24 | an exceptionally callous disregard for human |
| 25 | suffering. The -- as I indicated, the inmate not |
| 26 | only shot him in the early stages of the |
| 27 | ROGER SUNDBERG   D-79282   DECISION   PAGE 1 6/6/01 |

64

1    confrontation but then shot him again after the

2    victim had apparently fallen into the bathtub.

3    And this also involved the victim's young son,

4    attempting to stop the inmate from killing his

5    father and undoubtedly caused severe trauma to

6    this young boy.  And the prisoner has not

7    sufficiently participated in beneficial self-help

8    programs.  In terms of parole plans, the inmate

9    does have realistic parole plans for residence.

10   He has good family support.  He also has

11   marketable skills in computer or data processing.

12   He's quite knowledgeable in this area, however, he

13   does not yet have acceptable employment plans.  We

14   do know that he has been attempting to secure

15   employment, or interviews, and thus far has been

16   unsuccessful.  The hearing Panel notes that

17   responses to PC 3042 notices indicate opposition

18   to a finding of parole suitability, specifically

19   from the District Attorney's Office, as well as

20   from the Los Angeles County Sheriff's Department.

21   The inmate's counselor, D. Wadleigh, that's W-A-D-

22   L-E-I-G-H, believes he would pose an unpredictable

23   degree of threat to the public at this time.  And

24   the Panel finds that the prisoner needs continued

25   therapy in order to face, discuss, understand and

26   cope with stress in a nondestructive manner.  And

27   ROGER SUNDBERG   D-79282  DECISION  PAGE 2 6/6/01

1  until further progress is made, he continues to be
2  unpredictable and a threat to others.
3  Nevertheless, he has much to be commended for and
4  the fact that he has been disciplinary-free.  It
5  is pretty astonishing to find an inmate who has no
6  115s and Mr. Sundberg has no 115s.  He has only
7  one 128(a) counseling chrono and that is for
8  grooming.  He also has upgraded educationally by
9  acquiring his AA at some point, has his vocation
10  in Data Processing, has some time in Voc.
11  Drafting.  He also has participated for a great
12  number of years in AA.  In the past, he has
13  participated also in Life Skills, Anger
14  Management, Stress Management and a program called
15  Conducts Helping Adults called CHANGE, and he has
16  become an instructor in the Infectious Disease
17  Program.  He has received a number of laudatory
18  letters from his instructors and/or coworkers
19  regarding his work.  However, these positive
20  aspects of his behavior do not yet outweigh the
21  factors of unsuitability.  This is a two-year
22  denial.  In a separate decision, the hearing Panel
23  finds it is not reasonable to expect that parole
24  would be granted at a hearing during the next two
25  years.  The specific reasons for this finding are
26  as follows:  The murder of Steven Summers was
27  ROGER SUNDBERG   D-79282   DECISION   PAGE 3 6/6/01

1    carried out in an especially cruel manner.  The

2    inmate went to the residence of Mr. Summers, who

3    was his next door neighbor, proceeded to shoot him

4    and got into a scuffle or a physical altercation

5    that -- that continued into the house.  Mr.

6    Sundberg followed Mr. Summers into the house and

7    shot him again several times after he had gone

8    into the bathroom of the home.  This was partially

9    witnessed by the young son of the victim and he

10   attempted to intercede at some point and was

11   unsuccessful.  And this offense was clearly

12   carried out in a manner which demonstrates a

13   callous disregard for human suffering.  And the

14   motive for the crime is very trivial, in that the

15   inmate took it upon himself to apparently punish

16   this man for wrongs that the inmate believed that

17   he had carried out.  The inmate was enraged over a

18   number of issues.  Some were related to Mr.

19   Summers and others not.  The prisoner has a

20   history of misconduct which included use of drugs,

21   amphetamines, cocaine, LSD, and PCP, although it

22   seems that primarily he was involved in the

23   separate abuse of alcohol.  And the prisoner has

24   not completed the necessary programming which is

25   essential for his adjustment and needs additional

26   time to gain such programming.  Specifically, in

27   ROGER SUNDBERG   D-79282   DECISION   PAGE 4 6/6/01

67

1    my opinion, Mr. Sundberg, you have come a long way

2    and I hope that there will be something available

3    for you in terms of self-help and therapy in the

4    next two years that will help you progress even

5    further.  I see, just in the transcripts from the

6    last hearing and today's hearing, a tremendous

7    amount of growth.  And I hope that you'll be able

8    to maintain that and partake of any programs that

9    will assist you in further looking into your

10    participation in this life crime, the positive

11    factors for your participation and continue to

12    provide you with personal growth.  The Board

13    recommends during the next two years that you

14    remain disciplinary-free, and based on your

15    record, I have no doubt that that will be the

16    case.  And participate in whatever self-help or

17    therapy that becomes available to you.  And other

18    than that, you're doing a great program.  It's

19    just a horrendous crime, as you well know, and we

20    wish you good luck.  Commissioner Welch?

21           **COMMISSIONER WELCH:**  Good luck to you, Sir.

22           **PRESIDING COMMISSIONER LAWIN:**  Commissioner

23    Harmon?

24           **DEPUTY COMMISSIONER HARMON:**  Nothing

25    further.  Good luck to you.

26           **PRESIDING COMMISSIONER LAWIN:**  Mr.

27    ROGER SUNDBERG    D-79282   DECISION   PAGE 5 6/6/01

68

1    Sundberg, that concludes the hearing.   This is

2    your copy of the tentative decision and the time

3    is 12:30.

4                          --o0o--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    PAROLE DENIED TWO YEARS

26    EFFECTIVE DATE OF THIS DECISION____ JUN 2 9 2001 _____

27    ROGER SUNDBERG    D-79282   DECISION   PAGE 6 6/6/01

69

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, KARIN R. LEWIS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 through 68, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ROGER SUNDBERG, CDC No. D-79282, on JUNE 6th, 2001, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated June 24th, 2001, at Sacramento County, California.

*Karin R. Lewis*

Karin R. Lewis
Transcriber
**CAPITOL ELECTRONIC
REPORTING**

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

**LIFE PRISONER: PAROLE CONSIDERATION**
**PROPOSED DECISION  (BPT §2041)**

I.  [✓] PAROLE DENIED  *Two (2) Years*

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II.  [ ]  PAROLE GRANTED

A. Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

| Case No. | Count No. | Offense |
|----------|-----------|---------|

B. Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

C. Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

| Case No. | Count No. | Offense | _____ mos. |
|----------|-----------|---------|------------------|

| Case No. | Count No. | Offense | _____ mos. |
|----------|-----------|---------|------------------|

| Case No. | Count No. | Offense | _____ mos. |
|----------|-----------|---------|------------------|

D. Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .= _____ Months

E. Postconviction Credit From _____ To _____ — _____ Months
                                    (Date)           (Date)

F. Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

III.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

**PANEL HEARING CASE**

| Name | Date |
|------|------|
| *Sharon Lawin* | 06/ |
| Name  *Robert Ham* | Date  06/06/0 |
| Name  *B. Wile* | Date |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|------|-----------|-------------|--------------|
| SUNDBERG, ROGER | D79282 | CTF-SOLEDAD | 06-04-01 |

Distribution: White—C. File
Canary—BPT
Pink—Prisoner

BPT 1005 (Rev. 8/1/81)

BOARD OF PRISON                                                    STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☐ INITIAL HEARING          ☒ SUBSEQUENT HEARING

| PRISONER'S NAME | CDC NUMBER |
|---|---|
| **SUNBERG, ROGER** | **D79282** |

| DATE OF HEARING | LOCATION |
|---|---|
| **WEDNESDAY, JUNE 6, 2001 AT 9:30 AM** | **CORRECTIONAL TRAINING FACILITY - SOLEDAD** |

## LEGAL STATUS

| DATE RECEIVED | DATE LIFE TERM STARTS (IF DIFFERENT) | COUNTY |
|---|---|---|
| 03/07/88 | 03/07/88 | LOS ANGELES |

| OFFENSE | CASE NUMBER |
|---|---|
| MURDER 2ND W/USE OF HANDGUN | A474007 |

| COUNT NUMBER(S) | PENAL CODE SECTIONS(S) VIOLATED |
|---|---|
| 01 | P187 2ND W/12022.5 |

| TERMS | MEPD |
|---|---|
| 15 TO LIFE PLUS 2 YRS | 08/04/98 |

## OTHER COMMITMENT OFFENSES *OR STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | _____ | _____ | _____ | _____ | _____ |
| ☐ | _____ | _____ | _____ | _____ | _____ |
| ☐ | _____ | _____ | _____ | _____ | _____ |

## PRESENT AT HEARING

| PANEL MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| *LAWIN* | *HARMON* | *WELCH* |

OTHERS PRESENT

☐ PRISONER (IF ABSENT, WHY) _____

☒ ATTORNEY     *J. CHAMPLIN* _____

☒ DEPUTY D. A.  *T. KAHANA* _____  COUNTY OF   *LA* _____

☐ OTHERS: _____

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATED BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____ , PAGES _____ THROUGH _____

☒ THE STATEMENT OF FACT IS

    ☒ QUOTED FROM THE BOARD REPORT, DATED *July 1997* ,PAGE(S) *1*

    ☐ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) _____

    ☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

BPT  1000 (Rev 8/90)

# EXHIBIT  "L"

PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
PAROLE CONSIDERATION HEARING
JULY 1997 CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
APRIL 29, 1997

This is the third psychological evaluation for the Board of
Prison Terms on inmate Roger Sundberg.  This report is the
product of a personal interview, conducted on 04/29/97, as
well as a review of his Central file and unit health record.
I have known this inmate, as I am his correctional case
manager for his CCCMS program.

Inmate Sundberg was convicted of second degree murder for an
incident in 1987.  He described the circumstances
surrounding the crime as a time when he was very depressed
and despondent over his relationship with his wife and his
involvement with another woman and her husband, the victim.

This inmate has not had any CDC-115 or CDC-128 violations.

He has attended Alcoholics Anonymous since 1988 and admits
that he had some problems in the past with alcohol and
other drugs.  He has attended Dr. Bakeman's "Life Skills"
group in the past.  He is currently in the CCCMS program and
is taking antidepressant medications.  His depression is
currently very stable and he appears to be functioning quite
well in the general population.  Educationally, he completed
high school and has also achieved an AA degree.  He is also
currently functioning as a teacher's aide in the education
program.  Vocationally, he has experience with data
processing.  If paroled, his plans include living with his
mother, trying to find a computer-related job, attending
school to further his education, and hopefully eventually to
live near his children.

MENTAL STATUS EXAMINATION:  Inmate Sundberg is a 39-year-
old, white male who of average build who appeared his stated
age.  He was appropriately dressed and groomed.  He was
cooperative, calm and alert.  His speech, flow of thought
and affect were all normal.  There is no evidence of a
thought disorder.  He showed good insight into his
commitment offense and his judgment is estimated to be good.

SUNDBERG      D-79282      CTF-NORTH      04/28/97      gj

SUNDBERG, ROGER
CDC NUMBER:  D-79282
PAGE TWO

DIAGNOSTIC IMPRESSIONS:

AXIS I:      1)  Major depression, recurrent, in remission.
             2)  Alcohol abuse.
             3)  Marijuana abuse.
AXIS II:    Impulsive traits, improved.
AXIS III:   Seizure disorder.

CONCLUSIONS AND RECOMMENDATIONS:

1)  This man is competent and responsible for his behavior.
He has the capacity to abide by institutional standards and
has done so during his incarceration.

2)  Regarding violence potential, given his lack of criminal
history and his lack of CDC violations, as well as his
greater maturity, his violence potential is estimated to be
below average relative to this inmate population.

3)  Regarding substance abuse, self-help group attendance,
as well as drug screening, should be mandatory conditions of
parole.

4)  This inmate could benefit from parole outpatient clinic
treatment, as well as medications after parole.  He will
continue on the CCCMS program during his incarceration
period.


STEVEN J. TERRINI, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad

SJT/gj

d:  04/29/97
t:  04/30/97




SUNDBERG      D-79282      CTF-NORTH      04/28/97      gj

# EXHIBIT    "M"

BOARD OF PRISON TERMS                                                    STATE OF CALIFC

# LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

*(RECORDS OFFICER USE ONLY)*

| | YR | MO | |
|---|---|---|---|
| Adjusted Period of Confinement ............................................................... | | | |
| Date Life Term Begins ............................................................................. + | 88 | 08 | |
| At Large Time ......................................................................................... + | | | |
| PAROLE DATE ....................................................................................... = | | | |

## MISCELLANEOUS

*3 YR. DENIAL*

Panel recommendations and requests:
_____ Become ___✓___ Remain disciplinary free.
_____ Work towards reducing his/her custody level.
__✓__ Upgrade __✓__ vocationally _____ educationa
__✓__ Participate in __✓__ self-help (and) __✓__ the
_____ Transfer to _____ Cat. X _____ Cat. T.

PENAL CODE SECTION 3042 NOTICES    ☒ SENT    (Date) 06-02-97

COMMITMENT OFFENSE

| PC 187 w/12022.5 | MURDER 2ND w/use F'Arm |
|---|---|
| (Code Section) | (Title) |
| A474007 | 01 |
| (Case Number) | (Count Number) |

| Date Received by CDC | Date Life Term Begins | Controlling MEPD |
|---|---|---|
| 03-07-88 | 08-04-88 | 08-04-98 |

| Type of Hearing ☒ INITIAL ☐ SUBSEQUENT (Hearing No.) _____ | If Subsequent Hearing, Date of Last Hearing |
|---|---|

Department Representative

| Counsel for Prisoner   CLAY LAUCELLA | Address |
|---|---|
| District Attorney Representative | County   L.A. |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | Date |
|---|---|
| Concurring (Name) | Date 24/ |
| Concurring (Name)   M. Quaterrama | Date /9.7 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DAT |
|---|---|---|---|---|
| SUNDBERG, ROGER | D-79282 | CTF-Soledad | 07/97 | 07/24/97 |

BPT 1001 (REV. 1/91)                                        PERMANENT ADI

48

1      CALIFORNIA BOARD OF PRISON TERMS

2                    D E C I S I O N

3          PRESIDING COMMISSIONER ORTEGA:   Okay.   The

4      panel has reviewed all the information received from

5      the public and relied on the following circumstances

6      in concluding that the prisoner is not suitable for

7      parole and would pose an unreasonable risk of danger

8      to society and a threat to public safety if released

9      from prison.   Number one was the commitment offense.

10     The offense was carried out in an especially cruel and

11     callous manner, it was carried out in a manner which

12     exhibits a callous disregard for the life and

13     suffering of another, and the offense was carried out

14     in a dispassionate and calculated manner.   These

15     conclusions were drawn from the statement of facts

16     wherein the prisoner, in a bit of rage, went next door

17     to his neighbor's home and shot him a minimum of 14

18     times, and then turned the gun on himself, and then

19     broke into a neighbor's residence, at which time he

20     was ultimately then arrested and taken to the hospital

21     as well.   Institutional behavior, the prisoner has

22     failed to develop a marketable skill that could be put

23     to use upon release.   It's my understanding we haven't

24     seen the vocational certificate, is that correct, from

25     -- I fail to see anything in the C-file or fail to see

26     anything in the report.

27     ROGER SUNDBERG, D-79282    DECISION PAGE 1    7/24/97

49

ATTORNEY LAUCELLA:  I remember seeing it.

PRESIDING COMMISSIONER ORTEGA:  So, we have to get that in the file.

INMATE SUNDBERG:  May I interject?

PRESIDING COMMISSIONER ORTEGA:  Do you have the chronos for that?

INMATE SUNDBERG:  It's referred to in one of the chronos from my supervisors.

PRESIDING COMMISSIONER ORTEGA:  Okay.  Well, we have to see the actual document.  We have to see that, so you might want to look for that and make sure it gets in there.  And also, he has not participated in sufficient beneficial self-help and/or therapy programming.

Now, the psychiatric factors, the psychiatric report that was dated 4/28/97, authored by Dr. Terrini, is not totally supportive of release at this time.  The panel makes the following findings.  The prisoner needs therapy in order to face, discuss, understand and cope with stress in a non-destructive manner, and until progress is made the prisoner continues to be unpredictable and a threat to others.  Also, the prisoner's gains are recent and he must demonstrate an ability to maintain gains over an extended period of time.  Nevertheless, the prisoner should be commended for gaining his AA degree and for

ROGER SUNDBERG, D-79282   DECISION PAGE 2    7/24/97

1    remaining disciplinary free his entire time while he's

2    been in the institution.  However, these positive

3    aspects of his behavior do not outweigh the factors of

4    unsuitability.

5         Mr. Sundberg, this is going to be a three year

6    denial.  The panel finds that it's not reasonable to

7    expect that parole would be granted at a hearing

8    during the next three years, and the specific reasons

9    for these findings are as follows.  The prisoner

10   committed the offense in an especially cruel and

11   callous manner, we're not going to go through that

12   again, you know exactly how that happened, and as a

13   result a longer period observation and evaluation is

14   required before the Board should set a parole date.

15   And also, the prisoner has not completed the necessary

16   programming essential to his adjustment, and needs

17   additional time to gain such programming.  And

18   particularly what we're talking about is more therapy,

19   more one on one therapy, if possible, to understand

20   and to cope with the problems of stress that this

21   crime has committed.  The panel is going to recommend

22   that the prisoner remain disciplinary free, that he

23   continue to upgrade vocationally and educationally,

24   and that he participate in self-help and therapy

25   programming as it becomes available, and continue to

26   work with those issues.

27   **ROGER SUNDBERG, D-79282    DECISION PAGE 3    7/24/97**

· 51

1      That's the official decision, it was a

2   unanimous decision by the Board.  We feel that you've

3   come a long way, you've done well in the institution,

4   however, there's still some issues and concerns that

5   you're going to have to deal with, and that's going to

6   be done probably better by an educated clinician that

7   can help you cope and understand those stresses and

8   those problems that manifested in the shooting.

9         Anything that you'd like to add, Mr. Gillis?

10         COMMISSIONER GILLIS:  No.  Good luck.

11         PRESIDING COMMISSIONER ORTEGA:  Anything, Mr.

12   Guaderrama?

13         COMMISSIONER GUADERRAMA:  No.

14         PRESIDING COMMISSIONER ORTEGA:  At this time

15   then we're going to end the hearing.  The time now is

16   approximately 11:24 a.m.  The best to you.

17

18

19                        --o0o--

20

21

22

23

24

25   PAROLE DENIED THREE YEARS

26   EFFECTIVE DATE OF THIS DECISION_____SEP 1 2 1997_____

27   ROGER SUNDBERG, D-79282    DECISION PAGE 4    7/24/97

52

## DECLARATION OF TRANSCRIBER

I, MARYANN LOVERRO, a duly designated transcriber, PETERS SHORTHAND REPORTING SERVICES, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 - 51, and which recording was duly recorded at CALIFORNIA TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING OF ROGER SUNDBERG, CDC No. D-79282, on July 24, 1997, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated September 2, 1997, at Sacramento, California.

MARYANN LOVERRO
TRANSCRIBER

BOARD OF PRISON TERMS                                                                    STATE OF CALIFOR

## LIFE PRISONER: PAROLE CONSIDERATION
## PROPOSED DECISION  (BPT §2041)

I.  [✓]  PAROLE DENIED  *3 YRS.*

If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

---

II.  [ ]  PAROLE GRANTED

A.  Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

Case No. _____   Count No. _____   Offense _____

B.  Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

C.  Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

Case No. _____   Count No. _____   Offense _____   _____ mos.

Case No. _____   Count No. _____   Offense _____   _____ mos.

Case No. _____   Count No. _____   Offense _____   _____ mos.

D.  Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .= _____ Months

E.  Postconviction Credit From _____ To _____  − _____ Months
                                    (Date)              (Date)

F.  Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

---

III.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

| PANEL HEARING CASE | |
|---|---|
| Name _[signature]_ | Date 7/ |
| Name _[signature]_ | Date 24/ |
| Name _[signature]_ | Date 97 |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|---|
| SUNDBERG, ROGER | D-79282 | CTF-Soledad | 07-24-97 |

Distribution: White
Canar
Pink

BPT 1005 (Rev. 8/1/81)

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

[X] INITIAL HEARING          [ ] SUBSEQUENT HEARING

| PRISONER'S NAME  SUNDBERG, ROGER | CDC NUMBER  D-79282 |
|---|---|
| DATE OF HEARING  07-24-97 | LOCATION  CTF-Soledad |

## LEGAL STATUS

| DATE RECEIVED  03-07-88 | DATE LIFE TERM STARTS (IF DIFFERENT)  08-04-88 | COUNTY  L.A. |
|---|---|---|

OFFENSE
 Murder 2nd w/use f'arm                                          CASE NUMBER  A474007

COUNT NUMBER(S)
 01                                        PENAL CODE SECTION(S) VIOLATED  PC 187 w/12022.5

TERMS
 15-Life + 2 years                         MEPD  08-04-98

## OTHER COMMITMENT OFFENSES *OR STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| [ ] | | | | | |
| [ ] | | | | | |
| [ ] | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER  ORTEGA | PANEL MEMBER  Gillis | PANEL MEMBER  GUADERRAMA |
|---|---|---|

OTHERS PRESENT

[ ] PRISONER  (IF ABSENT, WHY?) _____

[✓] ATTORNEY  CLAY LAUCELLA _____

[✓] DEPUTY D. A.  DIANE VEZZANI _____  COUNTY OF  L. A. _____

[ ] OTHERS: _____

## STATEMENT OF FACTS

[ ] THE HEARING PANEL INCORPORATES BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____ , PAGES _____ THROUGH _____

[✓] THE STATEMENT OF FACT IS

    [ ] QUOTED FROM THE BOARD REPORT, DATED _____ , PAGE(S) _____

    [✓] QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S)  2 & 3

    [ ] QUOTED FROM THE COURT OPINION, PAGE(S) _____

BPT  1000   (Rev. 8/90)

# EXHIBIT "N"

BOARD OF PRISON TERMS                                                      STATE OF CALIFORNIA
LIFE PRISONER DECISION FACE SHEET

## PERIOD OF CONFINEMENT

### (RECORDS OFFICER USE ONLY)

|                                  | YR     | MO  | DAY  |
|----------------------------------|--------|-----|------|
| Adjusted Period of Confinement.. |        |     |      |
| Date Life Term Begins ....       | +1988  | 08  | 04   |
| At Large Time......              | +      |     |      |
| PAROLE DATE                      | =      |     |      |

## MISCELLANEOUS

*1 year Denial*

*Please prepare new psych report prior to next hearing*

Panel recommendations and requests:
_____ Become ✓ Remain disciplinary free.
_____ Work towards reducing his/her custody level.
_____ Upgrade _____ vocationally _____ educationally
_____ Participate in ✓ self-help (and) , therapy.
_____ Transfer to _____ Cat. X _____ Cat. T.

PENAL CODE SECTION 3042 NOTICES   ☒ SENT   (Date) 06-13-2003

## COMMITMENT OFFENSE

| PC 187 W/12022.5 | MURDER 2ND W/USE F'ARM |
|------------------|------------------------|
| (Code Section)   | (Title)                |
| A474007          | 01                     |
| (Case Number)    | (Count Number)         |

| Date Received by CDC<br>03-07-1988 | Date Life Term Begins<br>08-04-1988 | Controlling MEPD<br>08-04-1998 |
|---|---|---|
| Type of Hearing<br>☐ INITIAL   ☒ SUBSEQUENT (Hearing No.) #2 | If Subsequent Hearing, Date of Last Hearing | |

Department Representative
D.S. LEVORSE, C&PR

| Counsel for Prisoner<br>CANDICE CHRISTENSEN | Address | |
| District Attorney Representative<br>*Scott Carbaugh* | County<br>LOS ANGELES | |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | Date 7/ |
| Concurring (Name) | Date 7/31/ |
| Concurring (Name) | Date 7/31/03 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|------|-----------|-------------|----------|--------------|
| SUNDBERG, ROGER | D79282 | CTF | | JULY 31, 2003 |

BPT 1001 (Rev. 1/91)

42

1          CALIFORNIA BOARD OF PRISON TERMS

2                  D E C I S I O N

3       PRESIDING COMMISSIONER MOORE:    All right.   Let

4    the record show that all interested parties have

5    returned to the room in Roger Sundberg, CDC number D

6    as in David 79282.   The Panel reviewed all

7    information received from the public and relied on

8    the following circumstances in concluding that the

9    prisoner is not suitable for parole and would pose

10   an unreasonable risk of danger to society or a

11   threat to public safety if released from prison at

12   this time.   Mr. Sundberg, this is going to be a

13   one-year denial this time.   The paramount reason

14   would be the time and the gravity of the committing

15   offense.   The offense was carried out in an

16   especially vicious and brutal manner.   The offense

17   itself was the shooting of Steven Summers, who was

18   the next door neighbor.   The prisoner became enraged

19   over apparently a number of different issues that

20   were happening in his life at the time.   He went

21   next door to Mr. Summers' residence and proceeded to

22   scuffle with Mr. Summers, to enter into a

23   confrontation with the victim in the garage.   They

24   then moved.   The prisoner followed the victim into

25   the residence, ultimately to the bathroom of the

26   home where the prisoner shot the victim again

27   **ROGER SUNDBERG  D-79282  DECISION PAGE 1   7/31/03**

43

1    several times.  This offense was carried out in an

2    especially insensitive disregard for human

3    suffering.  As I indicated, the prisoner not only

4    shot the victim early in this confrontation, he then

5    pursued him as he went into the -- had fallen into

6    the bathroom or into the bathtub area.  He proceeded

7    to shoot him.  His young son was attempting to stop

8    the prisoner from killing his father, and

9    undoubtedly caused some severe trauma to this young

10   boy.  Nevertheless, the conclusions are drawn from

11   the Statement of Facts wherein the prisoner went in

12   a rage where the victim was residing next door.  He

13   shot the victim a minimum of 14 times, then turned

14   the gun on himself while at the neighbor's

15   residence.  And then was ultimately apprehended and

16   taken to a hospital for treatment as well.  The

17   institutional behavior, the prisoner's not

18   sufficiently participated in beneficial self-help

19   and therapy at this time.  There are no disciplinary

20   behaviors.  He's been disciplinary-free.  The

21   psychosocial report was adequate.  Parole plans were

22   adequate.  3042 Notices, the hearing Panel notes

23   responses to 3042 Notices indicate opposition to a

24   finding of suitability, specifically the District

25   Attorney's Office of Los Angeles County with a

26   representative present in opposition today, as well

27   **ROGER SUNDBERG  D-79282  DECISION PAGE 2   7/31/03**

44

1    as a letter received from the sheriff of Los Angeles

2    County, Sheriff Bacca.  A letter received from the

3    captain of the homicide bureau, Frank Merriman,

4    which was the law enforcement agency which

5    investigated this particular case.  He was in

6    opposition.  His letter was received July 14th, of

7    '03.  Remarks, the prisoner should be commended.

8    He's done remarkably well during his entire

9    incarceration, staying out of trouble, 115s, 128s,

10   there was one for grooming.  He's participated in AA

11   and vice chair, and currently secretary I believe.

12   He was participating in mediation -- not mediation,

13   meditation, excuse me, and depression groups.  He's

14   gone to weekly sessions with Dr. Gamard.  He was on

15   the waiting listing for conflict resolution.  He's

16   completed data processing vocation.  He's had

17   positive work reports.  He was a teacher's aide in

18   data processing, as well as teacher's aide in

19   computer repair.  He's upgraded himself, got an AA

20   degree from Hartnell College, as well as some

21   numerous -- almost enough for a BA.  However, these

22   positive aspects of his behavior don't affect his

23   unsuitability at this point.  And as I said,

24   Mr. Sundberg, this is a one-year denial.  And

25   recommendations to you are to continue to remain

26   disciplinary-free.  And if it's available to you

27   **ROGER SUNDBERG  D-79282  DECISION PAGE 3   7/31/03**

45

1    continue to participate in beneficial self-help and

2    therapy programming that will enable you to better

3    understand the causative factors of why you lost it

4    and just saw red when you caused the demise of your

5    neighbor Mr. Summers.  Commissioner, any comments to

6    the prisoner?

7        **DEPUTY COMMISSIONER BACHLOR:**  I do have one

8    comment I'd make to you is you may want to research

9    some depression groups out in the community in the

10   Los Angeles area.  I think it is going to be

11   important for you to have those available to you as

12   soon as you come out.  So I would recommend that you

13   do that and be ready to talk about that next time.

14       **INMATE SUNDBERG:**  Are you familiar with what

15   resources in the area of the parole department is?

16       **DEPUTY COMMISSIONER BACHLOR:**  No, no.  I would

17   not count on parole, sir, at all, no.

18       **INMATE SUNDBERG:**  I know they do have --

19       **DEPUTY COMMISSIONER BACHLOR:**  You'd be assigned

20   to parole outpatient clinic very likely because of

21   your triple CMS status.  That means you go to see a

22   psychiatrist or psychologist maybe once a month.

23   It's a very brief meeting usually.  I would not

24   count on that at all.

25       **INMATE SUNDBERG:**  Thank you.

26       **DEPUTY COMMISSIONER BACHLOR:**  All right.

27   **ROGER SUNDBERG  D-79282  DECISION PAGE 4   7/31/03**

46

1          **INMATE SUNDBERG:**  I appreciate your time.

2          **DEPUTY COMMISSIONER BACHLOR:**  And I believe,

3     Sir, we will be requesting a new psych report for

4     next time.

5          **PRESIDING COMMISSIONER MOORE:**  Sure.

6          **DEPUTY COMMISSIONER BACHLOR:**  At counselor's

7     request.

8          **ATTORNEY CHRISTENSEN:**  Thank you.

9          **DEPUTY COMMISSIONER BACHLOR:**  All right.  I wish

10    you good luck, sir.

11         **INMATE SUNDBERG:**  Thank you.

12         **ATTORNEY CHRISTENSEN:**  Thank you.

13         **PRESIDING COMMISSIONER MOORE:**  And with that we

14    would conclude the hearing, as well as ask you to

15    cooperate with clinicians.  Thank you, sir.

16                          --oOo--

17

18

19

20

21

22

23

24

25    PAROLE DENIED ONE YEAR

26    FINAL DATE OF DECISION_____OCT 2 9 2003_____

27    ROGER SUNDBERG  D-79282  DECISION PAGE 5   7/31/03

47

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER


I, CONNIE MASTIN, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 46, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ROGER SUNDBERG, CDC No. D-79282, on JULY 31, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated AUGUST 15, 2003, at Sacramento County, California.


Connie Mastin
Transcriber
**CAPITOL ELECTRONIC REPORTING**

LIFE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION  (BPT §2041)

I.  [X]  PAROLE DENIED                                    *1 year Denial*

   If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

---

II.  [ ]  PAROLE GRANTED

   A.  Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

   | Case No. | Count No. | Offense |
   |---|---|---|

   B.  Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

   C.  Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

   | Case No. | Count No. | Offense | _____ mos. |
   |---|---|---|---|

   | Case No. | Count No. | Offense | _____ mos. |
   |---|---|---|---|

   | Case No. | Count No. | Offense | _____ mos. |
   |---|---|---|---|

   D.  Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .= _____ Months

   E.  Postconviction Credit From _____ To _____ − _____ Months
                                        (Date)              (Date)

   F.  Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

   The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

   You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or post-ponement of your parole date.

---

II.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

| PANEL HEARING CASE | | |
|---|---|---|
| Name | | Date 7/ |
| Name | | Date /31/ |
| Name | | Date /03 |

| CDC NUMBER | INSTITUTION | HEARING DATE |
|---|---|---|

Distribution: White—C. File
Canary—BPT
Pink—Prisoner

PT 1005 (Rev. 8/1/81)

BOARD OF PRISON TERMS                          STATE OF CALIFORNIA

## SETTING A LIFE PRISONER TERM - PAROLE DENIED

### 11. NOTE TO CDC STAFF:  RECOMMENDATIONS AND REQUESTS

☒ 3. the panel's belief that the prisoner's current mental health is an important issue.  In the new full evaluation, the panel requests that the clinician specifically address the following:

☒ a. the prisoner's violence potential in the free community;

☒ b. the significance of alcohol/drugs as it relates to the commitment offense and an estimate of the prisoner's ability to refrain from use/abuse of same when released;

☐ c. the prisoner's psycho-sexual problems;

☐ d. the extent to which the prisoner has explored the commitment offense and come to terms with the underlying causes;

☐ e. the need for further therapy programs while incarcerated.

☒ f. other: *the extent to which he has learned skills to cope with disappointment and rejection. P states the rejection from his wife was a major factor in the Com Offense.*

☐ 4. the panel's belief that the prisoner has deteriorated psychologically and there appears to be a need for treatment.  The panel bases this conclusion upon

_____

_____

_____

☐ B. (Other requests to CDC staff): _____

_____

Sundberg, Roger          D 79282

BPT 1000(a) (Rev. 12/98)                          11

BARD OF PRISON                                                                STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☐ INITIAL HEARING            ☒ SUBSEQUENT HEARING

| PRISONER'S NAME<br>SUNDBERG, ROGER | CDC NUMBER<br>D79282 |
|---|---|
| DATE OF HEARING<br>THURSDAY, JULY 31, 2003 @ 11:00 a.m. | LOCATION<br>CORRECTIONAL TRAINING FACILITY - SOLEDAD |

## LEGAL STATUS

| DATE RECEIVED<br>03-07-1988 | DATE LIFE TERM STARTS (IF DIFFERENT)<br>08-04-1988 | COUNTY<br>LOS ANGELES |
|---|---|---|
| OFFENSE<br>MURDER 2ND W/USE F'ARM | | CASE NUMBER<br>A474007 |
| COUNT NUMBER(S)<br>01 | | PENAL CODE SECTIONS(S) VIOLATED<br>PC 187 W/12022.5 |
| TERMS<br>15 TO LIFE PLUS 2 YEARS | | MEPD<br>08-04-1998 |

## OTHER COMMITMENT OFFENSES OR STAYED COUNTS

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | _____ | _____ | _____ | _____ | _____ |
| ☐ | _____ | _____ | _____ | _____ | _____ |
| ☐ | _____ | _____ | _____ | _____ | _____ |

## PRESENT AT HEARING

| PANEL MEMBER<br>*Moore* | PANEL MEMBER<br>*Bachlar* | PANEL MEMBER |
|---|---|---|

OTHERS PRESENT

☐ PRISONER (IF ABSENT, WHY)

☒ ATTORNEY    CANDICE CHRISTENSEN

☐ DEPUTY D.A.    *Scott Carbaugh*    COUNTY OF    *Los Angeles*

☐ OTHERS: _____

## STATEMENT OF FACTS

☑ THE HEARING PANEL INCORPORATED BY REFERENCE FROM THE DECISION OF THE HEARING HELD
   ON *6/6/01* , PAGES *6* THROUGH *7*

☐ THE STATEMENT OF FACT IS

   ☐ QUOTED FROM THE BOARD REPORT, DATED _____ PAGE(S) _____

   ☐ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) _____

   ☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

BPT    1000 (Rev 8/90)

# EXHIBIT    "O"

| | Records Use Only |
|---|---|
| [ ] PAROLE GRANTED - (YES) | |
| CDC:  Do not release prisoner before | Parole Release Date |
| Governor's review | YR    MO    DAY |
| [X] PAROLE DENIED - (NO)  1 yea (one) | Attach Prison Calculation Sheet |

[ ] AGREED UNSUITABLE (Attach 1001A Form) FOR:_____YEAR(S)

[ ] HEARING POSTPONED/REASON:_____

### PANEL RECOMMENDATIONS AND REQUESTS

**The Board Recommends:**

[ ] No more 115's or 128A's    [X] Stay discipline free

[ ] Work to reduce custody level    [ ] Learn a trade*      [ ] Earn positive chronos

[X] Get self-help*            [ ] Get therapy*       [ ] Get a GED*

[ ] Recommend transfer to_____

[ ] Other_____

    *These programs are recommended if they are offered at your prison and you are eligible/able to participate.

| **Penal Code 3042 Notices** | [ X ] Sent   Date: *9/2/04* |
|---|---|

| Commitment Offense(s) | *P187* | *MURDER 2ND* |
|---|---|---|
| | Code(s) | Crime(s) |
| | *A474007* | *1* |
| | Case #(s) | Count #(s) |

| Date Inmate Came to CDC *3/7/88* | Date Life Term Began | Minimum Eligible Parole Date *8/4/98* |
|---|---|---|
| [ ] Initial Hearing | [ X ] Subsequent (Hearing No.) 3 | Date of Last Hearing |

| CDC Representative | |
|---|---|
| Attorney for Prisoner *MARY ANN THEDIFF* | Address |
| D.A. Representative *Tonia Sousa* | County |

This form  and the Board's decision at the end of the hearing is only proposed and NOT FINAL. It will not become final until it is reviewed.

| Chair | Date |
|---|---|
| Panel Member | Date |
| Panel Member | Date |

NAME *SUNDBERG, ROGER*     CDC # *D79282*     PRISON *CTF*     CALENDAR *10/04*     DATE

**BPT 1001** (REV. 08/03)

61

```
 1              CALIFORNIA BOARD OF PRISON TERMS

 2                        D E C I S I O N

 3          DEPUTY COMMISSIONER SMITH:  We're on the

 4     record.  Everyone previously identified is back in

 5     the hearing room.

 6          PRESIDING COMMISSIONER RISEN:  Okay.  The

 7     time is 4:00 p.m.  The Panel reviewed all

 8     information received from the public and relied on

 9     the following circumstances in concluding that the

10     prisoner is not suitable for parole and would pose

11     an unreasonable risk of danger to society or a

12     threat to public safety if released from prison.

13     It's a one-year denial.  The offense was carried

14     out in an especially violent and brutal manner.

15     These conclusions are drawn from the Statement of

16     Facts wherein the prisoner shot and killed the

17     victim, Paul, Steven Paul Summers.  The victim was

18     estranged from his wife.  The prisoner developed a

19     romantic relationship with her.  While the wife was

20     separated from the victim, she obtained a -- What

21     do you call them?

22          DEPUTY COMMISSIONER SMITH:  Restraining

23     order.

24          PRESIDING COMMISSIONER RISEN:  Restraining

25     order, right, but she did allow him to move back

26     into the garage and use the house.  On this

27     ROGER SUNDBERG   D-79282   DECISION PAGE 1  10/28/04
```

1    particular occasion, the prisoner saw the victim in

2    the backyard and became enraged.  He picked up his

3    pistol and some extra bullets, went next door to

4    the garage where he shot the victim, where he fired

5    the gun five times.  I don't know how many times he

6    hit the victim.  The victim then headed for the

7    house.  The prisoner continued to follow him,

8    followed him into the house, reloading his gun with

9    five more bullets.  The victim went into the

10   bathroom.  They fought in the bathroom.  This

11   prisoner then shot the victim again and reloaded

12   the gun and shot again.  There were a total of 13

13   rounds fired.  The gun only holds five, so it took

14   two reloads.  The victim was shot in the head, the

15   chest, the forearm, and the wrist.  The victim's

16   11-year-old son witnessed this incident.  After the

17   incident, the prisoner placed the gun to his head

18   and fired one round, but it was not fatal.  He just

19   suffered injuries.  The prisoner has no prior

20   criminal history as a juvenile or adult.  His

21   institutional behavior is satisfactory.  He has

22   been programming.  The psychiatric evaluation was

23   supportive.  Regarding parole plans, the prisoner

24   has a place to reside with his mother, and we have

25   a letter from her.  He does not have a job offer

26   and does not have a letter of support for the job

27   **ROGER SUNDBERG    D-79282  DECISION PAGE 2  10/28/04**

63

1    offer as a result of no job offer. The Hearing

2    Panel notes that in response to the 3042 Notices

3    the District Attorney's Office of Los Angeles

4    County participated in the hearing and was opposed

5    to parole. We received a letter from the Los

6    Angeles County Sheriff's Office, and they were

7    opposed to parole also. The prisoner should be

8    commended for receiving no 115s while incarcerated,

9    although he has received one 128(a), has completed

10    the data processing vocation. He's taking a course

11    from Coastline College in mass communications. He

12    completed a 13-week Impact workshop, completed a

13    12-week Anger Management workshop. He has

14    participated in AA and group therapy for depression

15    management. He has received laudatory chronos for

16    his participation in the previous program, and he

17    also participates in the Buddhist meditation

18    program. However, these positive aspects of the

19    prisoner's behavior do not outweigh the factors of

20    unsuitability. The Panel recommends that he remain

21    disciplinary-free, participate in whatever self-

22    help becomes available, and that concludes the

23    reading of the decision. Any comment?

24         **DEPUTY COMMISSIONER SMITH:** Yeah. Mr.

25    Sundberg, you or anyone else, this isn't required

26    to speak to the life crime, but if you choose to do

27    **ROGER SUNDBERG    D-79282    DECISION PAGE 3    10/28/04**

64

1    so, whether it's this Panel or any Panel, we expect

2    that whatever we're told is going to be the full

3    truth of the matter.  It wasn't until the recess

4    that I learned that in fact 13 shots had been fired

5    which means when I was asking you about reloading

6    the first time, you explained that, you addressed

7    it, but the fact of the matter was that you

8    reloaded twice, but you didn't bother to tell me

9    that.  You're taking a position, and it's

10   referenced in the letter from the instructor that

11   you're happy to answer any questions specifically

12   that you're asked, but you're not going to

13   volunteer anything, and part of becoming in control

14   of your commitment offense and representing and

15   presenting yourself before a Panel is for you to be

16   willing and able to discuss openly what the

17   commitment offense was not simply answer whatever

18   questions may be coming and let it go at that,

19   because it doesn't give us a clear story, perhaps

20   it doesn't give you the clear story.  Thank you,

21   Chair.

22          **INMATE SUNDBERG:**  May I respond?

23          **PRESIDING COMMISSIONER RISEN:**  No.  That's

24   just a statement.  It's 4:05 p.m.  We'll conclude

25   the hearing at this time.  Thank you.

26                    --oOo--

27   **ROGER SUNDBERG   D-79282  DECISION PAGE 4  10/28/04**

69

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED ONE YEAR

24   THIS DECISION WILL BE FINAL ON:_____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   ROGER SUNDBERG   D-79282   DECISION PAGE 5   10/28/04

66

## CERTIFICATE AND

### DECLARATION OF TRANSCRIBER

I, KRISTIN LEDBETTER, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 65, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of ROGER SUNDBERG, CDC No. D-79282, on OCTOBER 28, 2004, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated NOVEMBER 9, 2004, at Sacramento County, California.

Kristin Ledbetter
Transcriber
**CAPITOL ELECTRONIC REPORTING**

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION:
**DENY PAROLE**

[X] PAROLE DENIED FOR:        ( 1 )  2    3    4    5    **YEARS**

Place the prisoner on the _10 - 2005_ calendar for his next subsequent hearing.

If this decision is final, you WILL NOT get paroled. The Board will send you a copy of the decision. It will indicate the reasons you did not get paroled. If this decision is not final, the Board will set up another hearing. You can read the laws about your hearing. You can find the laws at California Code of Regulations, Title 15, section 2041.

## RECOMMENDATIONS

**The Board Recommends:**
[  ] No more 115's or 128A's              [  ] Learn a trade*
[  ] Work to reduce custody level          [  ] Get therapy*
[X] Get self-help*                          [  ] Earn positive chronos
[X] Stay discipline free                    [  ] Get a GED*

[  ] Recommend transfer to _____
[  ] Other _____

_____
_____
_____

* These programs are recommended if they are offered at your prison and you are eligible/able to participate.

## HEARING PANEL

Name _____        Date _____

Name _____        Date _____

Name _____        Date _____

| NAME | CDC# | PRISON | DATE |
|------|------|--------|------|
| SUNDBERG | D 79282 | CTF | 10-28-04 |

**BPT 1005(b)**
**(REV 04/04)**

Distribution: White-C File
Canary-BPT
Pink-Prisoner

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

| ☐ INITIAL HEARING | ☒ SUBSEQUENT HEARING |
|---|---|

| PRISONER'S NAME<br>*SUNDBERG, ROGER* | CDC NUMBER<br>*D79282* |
|---|---|
| DATE OF HEARING<br>*THURSDAY, OCTOBER 28, 2004 @ 1:30 PM* | LOCATION<br>*CORRECTIONAL TRAINING FACILITY - SOLEDAD* |

## LEGAL STATUS

| DATE RECEIVED<br>*3/7/88* | DATE LIFE TERM STARTS (IF DIFFERENT) | COUNTY<br>*LA* |
|---|---|---|
| OFFENSE<br>*MURDER 2ND* | | CASE NUMBER<br>*A474007* |
| COUNT NUMBER(S)<br>*01* | PENAL CODE SECTIONS(S) VIOLATED<br>*P187* | |
| TERMS<br>*17 TO LIFE* | MEPD<br>*8/4/98* | |

## OTHER COMMITMENT OFFENSES *OR STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | | | | | |
| ☐ | | | | | |
| ☐ | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER<br>*Filsen* | PANEL MEMBER<br>*D Smith* | PANEL MEMBER<br>— |
|---|---|---|

**OTHERS PRESENT**

☒ PRISONER (IF ABSENT, WHY)  *Present*

☒ ATTORNEY  *MARY ANN TARDIFF*

☒ DEPUTY D. A.  *TONY SOUSA*  COUNTY OF  *LA*

☐ OTHERS:  *—*

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATED BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____ , PAGES _____ THROUGH _____

☒ THE STATEMENT OF FACT IS

    ☐ QUOTED FROM THE BOARD REPORT, DATED _____ ,PAGE(S) _____

    ☒ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S)  *2 & 3*

    ☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

BPT    1000 (Rev 8/90)

# EXHIBIT  P

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
SEPTEMBER 1991 ISL CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
JULY 19, 1991

This is the first psychiatric evaluation for the Board of Prison Terms on
inmate Sundberg. This report is the product of a 30 minute interview, as
well as a review of his Central file and medical record.

His crime consisted of the shooting death of a neighbor following a long
history of difficulties between this neighbor and himself. Inmate Sundberg
has had a good record while incarcerated, with no CDC 115s. He had a
problem with alcohol abuse and marijuana prior to his incarceration. He
now attends Alcoholics Anonymous. He has had over one year of college and
is still taking classes. He is studying data processing and programming
with computers. Vocationally, he is working now as a vocational data
processing clerk. For nine years prior to his incarceration, he worked as
a telephone operator. His future plans include trying to transfer to Utah
to be near his children, since his brother has been appointed the foster
parent for the children. Inmate Sundberg's wife was in prison for drug
abuse and is now out. He plans to work with computers when he paroles and
live near his children. He expressed regret for his Life crime.

MENTAL STATUS EXAMINATION: Inmate Sundberg is a well developed, well
nourished male of medium build who appeared to be his stated age of 34. He
was appropriately dressed and groomed, and seemed reasonably relaxed and
cooperative during the interview. His speech was of normal intensity,
rate, inflection and quantity. His affect was normal and seemed
appropriate to the content of his thought. He has had a long standing
problem with depression. His flow of thought was normal with no
hallucinations nor delusions noted. He seemed to be fully oriented with
normal intellectual functioning. His attention and concentration were
good. His insight and judgment appear to be improving.

PSYCHIATRIC DIAGNOSES:  (DSM-III-R)

AXIS I:     300.40 - Dysthymia.
            305.00 - Alcohol abuse, in institutional remission.
            305.20 - Cannabis abuse, in institutional remission.
AXIS II:    V71.09 - No diagnosis.


SUNDBERG        D-79282         CTF-CENTRAL        07/24/91        gj

SUNDBERG
D-79282
Page  2


AXIS III:   No diagnosis.
AXIS IV:    Psychosocial stress - two (incarceration).
AXIS V:     Global assessment of functioning:  current 90, past year 90.

PSYCHIATRIC CONCLUSIONS:  His diagnosed psychopathology appears to be
indirectly related to his offense.  It was a contributing, but not a
determining, factor.  Both the chronic depression and alcohol abuse may
have contributed to some of his problems with his neighbor and his
neighbor's family.  He does not have a psychiatric condition which would
benefit from mental health treatment following his release, other than
perhaps continuing treatment for his depression.  He does appear to be
showing improvement in his behavior and states that he is feeling much
better.  If released, he should be able to maintain these gains, provided
he continues for a time to see a therapist and avoids alcohol and illicit
drugs.

SUGGESTED ACTIONS:  If he is to be continued in his present program, he
should be encouraged to continue his participation in Alcoholics Anonymous
and his further education in computers and computer programming.  If he is
considered for parole, his level of dangerousness should be less than for
the average inmate.  Conditions for parole should include no alcohol nor
illicit drugs.

RECOMMENDATION TO CLASSIFICATION COMMITTEE:  Until released, he should:
1)  Continue to attend Alcoholics Anonymous.  2)  Continue his education in
the computer field.


*Bruce Bakeman Ph.D.*
BRUCE M. BAKEMAN, Ph.D.
Staff Psychologist
Correctional Training Facility, Soledad




SUNDBERG          D-79282          CTF-CENTRAL          07/24/91          gj

# EXHIBIT  Q

PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
DOCUMENTATION HEARING
1994 ISL CALENDAR

CORRECTIONAL TRAINING FACILITY, SOLEDAD
MAY 16, 1994

This is the second mental health evaluation for the Board of
Prison Terms on inmate Roger Sundberg, DOB: 07/31/57. He was
seen for a 90 minute interview, including a review of his Central
file and Medical record. This was the only contact with this
inmate for the purpose of this evaluation.

Since his last evaluation in 1991 by Dr. Bakeman, he has
completed Dr. Bakeman's Lifeskills group. He states that he
benefitted from the Lifeskills group by learning how to think
about making choices and to look at himself. He currently
receives anti-depressant medication from the CTF psychiatrists.
He is also receiving Dilantin for a history of seizures. The
seizures were caused by a self-inflicted gunshot wound to the
head. He has a history of substance abuse, including alcohol and
marijuana, prior to incarceration. He also has a history of
self-injury, including a past overdose and a self-inflicted
gunshot wound immediately after a homicide.

The interview with the inmate was consistent with the
documentation in the medical record. His depression is currently
in remission. He reports having no seizures in the past year.

The inmate reports that he discussed his visitation with his
children during one of his treatment sessions with Dr. Farr. The
inmate now has a different strategy for discussing his commitment
with his children, which should address the concerns described by
the Department of Social Services in their letter of 1993. The
inmate now knows that he will communicate with his children in a
manner which is not hopeless, but will also make no false
promises.

When asked about the causative factors for the offense, he
explained that he was despondent over the difficulties with his
open marriage and his wife's affair. He also was experiencing
conflict with the victim, whose wife was having an affair with
the inmate. The inmate has gained some self-understanding about
the dynamics of his behavior and believes that the violence
towards the victim was partly a displacement of the anger the
inmate had towards his own wife, as well as a sense of
protectiveness, due to the threats made by the victim. He

SUNDBERG        D-79282        CTF-CENTRAL        05/17/94        rr

SUNDBERG
D-79282
PAGE 2

appears to be sincere about his rehabilitation and is benefitting from the psychiatric medication, which he is currently receiving. His social identification appears to be positive at this time, as evidenced by a lack of disciplinary action. He is currently emotionally stable and is making good progress in his self-understanding.

PSYCHIATRIC DIAGNOSIS:

    AXIS I:         Major depression, recurrent, in remission.
                    Alcohol abuse, in remission.
                    Cannabis abuse, in remission.

    AXIS II:        Impulsive traits, improved.

    AXIS III:       Seizure disorder.

    The above diagnosis is a reflection of substance abuse and emotional depression resulting in the homicide.

PSYCHIATRIC CONCLUSIONS:  The above psychopathology was directly related to the offense.  While incarcerated, he psychiatrically improved moderately due to the improved emotional stability.  He could benefit from further insight about his relationship conflicts and emotional needs that led to the offense.

In a less controlled setting, he is likely to maintain his gains provided he receives adequate psychiatric treatment and maintains his sobriety.

SUGGESTED ACTION:  It is recommended that he continue with his present rehabilitation program.  He should continue to receive psychiatric medication.  He could benefit from extensive psychotherapy if that became available to him.  He has already benefitted considerably from his treatment sessions with Dr. Farr.

PAROLE AND RELEASE:  If this inmate were to be paroled or released, his potential for violence in the past was considered to have been average and at present is estimated to be decreased.

SUNDBERG       D-79282       CTF-CENTRAL     05/17/94       rr

SUNDBERG
D-79282
PAGE 3


Conditions of parole would include random drug screening,
attendance at Alcoholics Anonymous meetings, evaluation for
treatment with Antabuse unless medically contraindicated, parole
outpatient mental health treatment – both psychiatric medications
and individual psychotherapy. He currently benefits from being
incarcerated in proximity to his children. This is beneficial to
him and it is recommended to be continued.


RONALD H. KITT, Ph.D.
Clinical Psychologist
Correctional Training Facility, Soledad


SUNDBERG        D-79282        CTF–CENTRAL        05/17/94        rr

# EXHIBIT  R

| **SUPERIOR COURT OF CALIFORNIA**<br>**COUNTY OF LOS ANGELES** | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | **FILED**<br>LOS ANGELES SUPERIOR COURT<br><br>NOV 2 0 2007<br><br>BY _J. Aldana_<br>DEPUTY |
| PLAINTIFF/PETITIONER:<br><br>ROGER SUNDBERG | |

| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004698 |
|---|---|

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time          ☑ Order re: Writ of Habeas Corpus Denied
☐ Order to Show Cause           ☐ Order
☐ Order for Informal Response   ☐ Order re:
☐ Order for Supplemental Pleading   ☐ Copy of Petition for Writ of Habeas Corpus for the
                                     Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

November 20, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Alexandre Aldana_, Clerk
    Alexandre J. Aldana

Roger Sundberg
D-79282
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Cynthia Lumely

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | OCTOBER 29, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

| | | (Parties and Counsel checked if present) | |
|---|---|---|---|
| | BH004698 | | |
| | In re, | | |
| | ROGER SUNDBERG, | Counsel for Petitioner: | |
| | Petitioner, | | |
| | | Counsel for Respondent: | |
| | On Habeas Corpus | | |

Nature of Proceeding: ORDER RE: PETITION FOR WRIT OF HABEAS CORPUS

The Court has read and considered the Petition for Writ of Habeas Corpus filed on June 1, 2007 by the Petitioner. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the determination that the Petitioner presents an unreasonable risk of danger to society and is, therefore, not suitable for release on parole. See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667.

The Petitioner was received in the Department of Corrections on March 7, 1988 after a conviction for murder in the second degree with a firearm. He was sentenced to 17 years to life. His minimum parole eligibility date was August 4, 1998.

The record reflects that the Petitioner was having trouble with his wife and was having an affair with his neighbor, Pamela Somers. Pamela and her husband, Steve Somers, were separated and because of previous physical abuse, Pamela obtained a restraining order against Steve. However, Pamela permitted Steve to live in the garage of her house. The Petitioner claims that in addition to physically harming Pamela on several occasions, Steve would also make threats against him and his wife. On May 7, 1987, the Petitioner was extremely depressed because of his marital problems and financial concerns. He saw Steve Somers going in and out of Pamela's house and became enraged. He grabbed a gun and some extra ammunition from his house and went to confront Steve. The two argued and the Petitioner claims Steve hit him in the head. The Petitioner fired several shots at

1

<table>
<tr><td>Minutes Entered</td></tr>
<tr><td>10/29/07</td></tr>
<tr><td>County Clerk</td></tr>
</table>

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | OCTOBER 29, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

|  | (Parties and Counsel checked if present) | |
|---|---|---|
| BH004698<br>In re,<br>ROGER SUNDBERG,<br> Petitioner, <br>On Habeas Corpus | Counsel for Petitioner:<br><br>Counsel for Respondent: | |

Steve, hitting him once in the chest. Steve then tried to fight the Petitioner off and ran into Pamela's house. The Petitioner followed Steve into the house and chased him into a bathroom. Steve and Pamela's eleven year-old son attempted to prevent the Petitioner from further harming Steve by hitting him with a plastic bat. The Petitioner closed the bathroom door, blocking the boy, and then fired several more shots at Steve, hitting him 3 more times and killing him. The Petitioner then shot himself in the head, in an apparent suicide attempt, but was taken to the hospital and survived.

The Board found the Petitioner unsuitable for parole after a parole consideration hearing held on June 7, 2006. The Petitioner was denied parole for one year. The Board concluded that the Petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision primarily on his commitment offense.

The Court finds that there is some evidence to support the Board's findings that the Petitioner's commitment offense demonstrated an exceptionally callous disregard for human suffering and that his motive was very trivial in relation to the offense. Cal. Code Regs., tit. 15, §2402, subds. (c)(1)(D) and (c)(1)(E). After shooting the victim once in the garage, the Petitioner continued to pursue him, hit him with the gun and his fists, and then shot him again several times. This demonstrated an exceptionally callous disregard for the victim's suffering, as it was more violent than is ordinarily shown in the commission of murder in the second degree. See *In re Scott* (2004) 119 Cal.App.4[th] 871, 891. Additionally, the Petitioner's motive was very trivial because, although the victim had previously threatened him and his wife and had previously been abusive to Pamela, he did not pose a threat to anyone and did not provoke the Petitioner in any way at the time of the offense. The

2

| Minutes Entered |
|---|
| 10/29/07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DEPT 100

| Date: | OCTOBER 29, 2007 | | | |
|-------|------------------|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

<table>
<tr><td colspan="3" align="center">(Parties and Counsel checked if present)</td></tr>
<tr><td>BH004698<br>In re,<br>ROGER SUNDBERG,<br>          Petitioner,<br>On Habeas Corpus</td><td>Counsel for Petitioner:<br><br>Counsel for Respondent:</td><td></td></tr>
</table>

Petitioner became enraged merely by the sight of the victim moving between the garage and house. This was a very trivial motive for chasing him and shooting him multiple times.

The Board also considered the Petitioner's lack of specific parole plans with regard to possible Alcoholics Anonymous meetings, transportation, and alternate housing in the event his mother falls ill. While these factors may not justify a finding of unsuitability, the Board may consider them. Cal. Code Regs., tit. 15, §2402(b).

The Board also considered the Petitioner's post-conviction gains, including earning his Associates Degree with honors; receiving excellent work reports; completing vocational data processing and certification as an electronics technician; serving as a tutor; participating in Anger Management, Depression Group, Meditation Group, Self-Esteem Group, and several other self-help and educational programs; and his participation in Alcoholics Anonymous for almost his entire time in prison. However, they still concluded that the Petitioner would pose an unreasonable threat to public safety. Penal Code §3041(b). The Court finds that there is some evidence to support this determination because of the nature of the commitment offense. As indicated in *Rosenkrantz, supra,* 29 Cal..4th 616, 677, it is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence that demonstrates suitability for parole, as long as there is some evidence to support the finding of unsuitability. See also, *In re Jacobson,* (2007) -- Cal.App.4th --, 65 Cal.Rptr.3d 222, 229; and *In re Hyde* (2007) -- Cal.App.4th --, 65 Cal.Rptr.3d 162, 172.

Finally, the court rejects the Petitioner's contention that the District Attorney's opposition to his parole violated the terms of his plea agreement. The Petitioner agreed to a bargain that subjected him to a life

3

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | OCTOBER 29, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | A. ALDANA | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH004698
In re,
ROGER SUNDBERG,
           Petitioner,
On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

sentence. An indeterminate sentence is, in legal effect, a sentence for the maximum term unless the parole authority acts to fix a shorter term. See In re Dannenberg (2005) 34 Cal.4th 1061, 1097-1098; In re Honesto (2005) 130 Cal. App. 4th 81, 92-93. The District Attorney must be given an opportunity to oppose parole under Penal Code §3402.

Accordingly, the petition is denied.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Roger Sundberg
D-79282
Correctional Training Facility
P.O. Box 689
Soledad, California 93960-0689

Department of Justice- State of California
Office of the Attorney General
110 West A Street, Suite 1100
San Diego, California 92101
Attn: Ms. Cynthia Lumely

4

| Minutes Entered |
|---|
| 10/29/07 |
| County Clerk |

# EXHIBIT  S

Roger D. Sundberg
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689


Case Number B205118
Division 5

In re ROGER D. SUNDBERG on Habeas Corpus.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

COURT OF APPEAL SECOND DIST.

F I L E D

FEB 1 1 2008

JOSEPH A. LANE    Clerk

Deputy Clerk

| | |
|---|---|
| In re | B205118 |
| ROGER D. SUNDBERG | (Super. Ct. No. BH004698) |
| on | (Steven R. Van Sicklen, Judge) |
| Habeas Corpus. | **O R D E R** |

THE COURT:

The court has read and considered the petition for writ of habeas corpus, filed January 22, 2008. The petition is denied. The record submitted reflects that there is some evidence to support the challenged decision. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 664-667.)

_____    _____    _____
TURNER, P.J.         ARMSTRONG, J.        KRIEGLER, J.

# EXHIBIT  T

Court of Appeal, Second Appellate District, Div. 5 - No. B205118
**S161182**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re ROGER D. SUNDBERG on Habeas Corpus

The petition for review is denied.

George, C.J., was absent and did not participate.

SUPREME COURT
FILED

APR 2 3 2008

Frederick K. Ohlrich Clerk

_____
Deputy

**WERDEGAR**
_____
Acting Chief Justice

LEGAL MAIL

LEGAL MAIL

Roger D. Sundberg
CTF-C   B-116L
P.O. Box 689
Soledad, CA  93960

United States District Court
Northern District of California
Box 36060
San Francisco, CA  94102-3483

Pro Se

RECEIVED

MAY 2 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTH DIST. OF CALIFORNIA

LEGAL