UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ROGER SUNDBERG,

    Petitioner,

v.

BEN CURRY, warden,

    Respondent.

No. C 08-2709 SI (pr)

**ORDER DENYING HABEAS PETITION**

## INTRODUCTION

Roger Sundberg, an inmate at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Sundberg was convicted upon a guilty plea in Los Angeles County Superior Court of second degree murder with an enhancement for use of a firearm in the offense. He was sentenced on February 24, 1988 to 17 years to life in prison. His habeas petition does not challenge his conviction but instead challenges a June 7, 2006 decision by the Board of Parole Hearings ("BPH") that had found him suitable for parole. The 2006 hearing was Sundberg's fifth parole hearing, and was conducted at a time when he was more than 18 calendar years into his life sentence.

The BPH identified the circumstances of the commitment offense as the primary reason for the determination that Sundberg was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. Petition, Exh. 3 (reporter's transcript of June 7, 2006 BPH hearing (hereinafter "RT")) at 106-07. The BPH also noted that, in the next year, Sundberg needed to take care of certain deficiencies in his parole plans; he needed to figure out where he would be able to attend AA meetings, what he would do for transportation, and how he would address his needs for mental health medications and therapy in light of his documented major depression. RT 108-111. The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Sundberg sought relief in the California courts. He filed a habeas petition in the Los Angeles County Superior Court, where it was denied in a reasoned order. Petition, Exh. R. The California Court of Appeal denied his habeas petition in a 3-sentence order. Petition, Exh. S. The California Supreme Court summarily denied his habeas petition. Petition, Exh. T.

Sundberg then filed his federal petition for a writ of habeas corpus. The court found cognizable due process claims for insufficient evidence to support the decision and breach of the plea agreement. Respondent filed an answer and Sundberg filed a traverse. The matter is now ready for a decision.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action concerns the execution of the sentence of a prisoner housed in a prison in Monterey County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state

judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.  <u>Due Process Requires That Some Evidence Support a Parole Denial</u>

A California prisoner with a sentence of a term of life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for

disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the BPH. Sass, 461 F.3d at 1128 (quoting Superintendent v. Hill, 472 U.S. at 455-56). The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'" Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457). The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d). Sass, 461 F.3d at 1129. As a matter of state law, the decision must also satisfy the "some evidence" standard of review. See In re Lawrence, 44 Cal. 4th 1181, 1191 (Cal. 2008) (state court "standard of review properly is characterized as whether 'some evidence' supports the conclusion that the inmate is unsuitable for parole because he or she currently is dangerous"); In re Rosenkrantz, 29 Cal. 4th 616, 676-77 (Cal. 2002), cert. denied, 538 U.S. 980 (2003).

     A critical issue in parole denial cases concerns the parole authority's use of evidence about the commitment offense that led to the conviction. Three Ninth Circuit cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on this point: Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), Sass, 461 F.3d 1123, and Irons v. Carey, 505 F.3d 846 (9th Cir. 2007).[1] Biggs explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs, 334 F.3d at 916-17. Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before

---

[1] En banc review is now pending in a fourth case regarding the some evidence standard, Hayward v. Marshall, 512 F.3d 536 (9th Cir.), reh'g en banc granted, 527 F.3d 797 (9th Cir. 2008). The order granting en banc review states that the panel opinion is of no precedential value.

incarceration, but cautioned that "[o]ver time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id. at 916. Next came Sass, which criticized the Biggs statements as improper and beyond the scope of the dispute before the court: "Under AEDPA it is not our function to speculate about how future parole hearings could proceed." Sass, 461 F.3d at 1129. Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. See id. (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). Sass also put to rest any idea from Biggs that the commitment crime and pre-offense behavior only support the initial denial of parole. Irons determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence. Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." Irons, 505 F.3d at 853.[2]  Interpreting this statement from Irons to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that Sass identified in Biggs: it is not the holding of the case. The dicta in Biggs and Irons are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process. Neither logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a 15-to-life sentence.

        The upshot of these three cases is that the BPH can look at immutable events, such as the

---

[2]Interestingly, Irons was referring the actual number of years the inmate had been in prison and not the fictional number of years based on reductions for time credits. In Irons, the inmate had been in custody 16 years on his 17-to-life sentence, having been convicted in 1985 and challenging a 2001 parole decision.

nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons). Sass did not dispute the principle that, other things being equal, a crime committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to Biggs and Irons. Superintendent v. Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.[3]

What little guidance has come from the Supreme Court suggests that judicial review should be extremely deferential to the original decision-maker in the parole context. In addition to the very low evidentiary standard that Superintendent v. Hill imposes, other Supreme Court comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision. See Greenholtz, 442 U.S. at 13. "No ideal, error-free way to make parole-release decisions has been developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of decisionmakers in predicting future behavior. Our system of federalism encourages this state experimentation." Id.; see also id. at 8.

Past criminal conduct is not some arbitrary factor like eye color that has nothing to do

---

[3]The California Supreme Court recently weighed in on the use of the commitment crime to deny parole in the companion cases of In re Lawrence, 44 Cal. 4th 1181 (Cal. 2008), and In re Shaputis, 44 Cal. 4th 1241 (Cal. 2008). The court explained that where "evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' inevitably supporting the ultimate decision that the inmate remains a threat to public safety." Lawrence, 44 Cal. 4th at 1191 (emphasis in source). Applying that rule, the court determined that there was not some evidence to deny parole in Lawrence but that there was some evidence to deny parole in Shaputis.

with present dangerousness. Recidivism concerns are genuine. See Ewing v. California, 538 U.S. 11, 26 (2003) (O'Connor J.) (noting a report stating that over 60% of violent offenders were arrested again within three years of their release). California's parole scheme does not offend due process by allowing the BPH to predict that an inmate presents a present danger based on a crime he committed many years ago.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. One must look to state law to answer the question, "'some evidence' of what?"

B.  State Law Standards For Parole For Murderers In California

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree murder conviction yields a minimum term of 25 years to life and a second degree murder conviction yields a term of 15 years to life imprisonment. See In re Dannenberg, 34 Cal. 4th 1061, 1078 (Cal.), cert. denied, 126 S. Ct. 92 (2005); Cal. Penal Code § 190. The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPH panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the panel "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal. Penal Code

§ 3041(b). California law adds a layer of review by giving the Governor the power to review the BPH decision and to affirm, modify or reverse the decision but only on the basis of the same factors the parole authority is required to consider. See Cal. Penal Code § 3041.2; Cal. Const. art. V, § 8(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[4] The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. Some prisoners estimate their time to serve based only on the matrix. However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires him first to be found suitable for parole. The statutory scheme places individual suitability for parole

---

[4] The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior. 15 Cal. Code Regs. § 2402(c). The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior. 15 Cal. Code Regs. § 2402(d).

8

above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg, 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he panel shall set a base term for each life prisoner who is found suitable for parole").

The "Penal Code and corresponding regulations establish that the fundamental consideration in parole decisions is public safety . . . [T]he core determination of 'public safety under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness." Lawrence, 44 Cal. 4th at 1205 (emphasis in source).[5]

C. Some Evidence Supports The BPH's Decision

1. The BPH's Decision And State Court Review

The BPH identified the circumstances of the murder as the primary reason for its determination that Sundberg was not suitable for parole. The Life Prisoner Evaluation Report summarized the facts of the murder:

> The victim was estranged from his wife, Pamela Summers and during their marital difficulties, his wife became involved with the prisoner. At first it was just a matter of talking over her problems but as time went on, they became romantically involved. The victim was physically abusive to her, so when they separated, she had a restraining order placed against him. During the separation, the victim had no place to stay so the victim's wife allowed him to stay in the garage at her residence. While the victim was staying in the garage, he still had the freedom to go in and out of the house as well as in the garage and this irritated the prisoner. On the night of the crime, Sundberg saw the victim moving about the garage and back and forth into the house. The prisoner's house was located next to the victim's residence. The prisoner's rage escalated to a point where he took a pistol inside his house and went to the driveway next door and shot the victim four times. The victim went inside his wife's house and staggered toward the bedroom. The prisoner followed him with the pistol and occasionally struck the victim. At this point, the victim's [11-year old] son, who was in the house, grabbed a plastic baseball bat and

---

[5]The California Supreme Court's determination in Lawrence that state law requires the parole authority to determine whether the inmate is unsuitable for parole because he currently is dangerous is binding in this federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988). However, Lawrence does not govern this court's analysis in every respect. This court is not bound by the discussion in Lawrence (see footnote 4, supra) as to the evaluation of the commitment offense in determining whether the parole applicant currently is dangerous. As to that point, Lawrence is persuasive authority, while the Ninth Circuit's holdings in Sass, Biggs, and Irons are binding authority. Also, Lawrence's determination that "some evidence" is the proper standard of judicial review, 44 Cal. 4th at 1211-12, does not bind this court because it is a state court decision and, in any event, was not determining the standard required by the federal constitution.

> tried to stop Sundberg from killing his father. The son was unable to stop the prisoner. Sundberg kept on following the victim into the bathroom where the victim fell into the bathtub. At this point they argued some more and Sundberg shot the victim twice in the head. The victim's son observed the killing. The prisoner then left the victim's house. Before the police arrived to arrest him, he tried to shoot himself in the head.

Petition, Exh. G, Life Prisoner Evaluation Report, p. 1.

The BPH's decision stated that the murder "was carried out in an especially cruel and callous manner. A boy watched his father die. It was indicated that you shot, or fired 14 times. Fortunately 11 missed. The gun was reloaded twice. The offense was carried out in a manner which demonstrates exceptionally callous disregard for human suffering, and – and to be truthful, the motive was very trivial for the actions." RT 107.

The BPH also had concerns about certain parts of Sundberg's parole plans. The BPH asked him to arrange for alternative housing in case his plan to live with his mother did not materialize. The BPH also asked him to make greater efforts to try to line up employment. Sundberg had taken some steps to seek employment before his last parole hearing, but had met with almost no success. The BPH recognized that he had very marketable skills in computer-related work -- as Sundberg had been trained in data processing and had been trained and worked as a computer technician – but encouraged him to explore employment opportunities that might exist. A commissioner said, "you don't have to have a job to parole, you have to have made an attempt," and therefore Sundberg was advised to document his efforts to find a job. RT 112. The BPH also noted that, because of his seizures for which he took anti-seizure medications, he might not be able to drive and needed to explore transportation options in his intended place of parole. The BPH also suggested he find out information about where AA meetings would take place, because he had been in AA throughout his imprisonment and would be in AA when he left prison. (Sundberg had not consumed alcohol while in prison, but had abused it before his incarceration and even said he used it to self-medicate to deal with his depression. See Petition, Exh. C (9/17/04 psychological evaluation), p. 2.) Although the foregoing are routine problems that an inmate often faces, the BPH also was concerned about mental health needs for this particular inmate.

The BPH told Sundberg he needed to make arrangements to obtain his mental health

10

medications and mental health care after prison. RT 110-111. These particular concerns are serious ones, and have ample support in the record. After Sundberg had killed his neighbor, he shot himself in the head; the bullet wound to his head led to mild seizures for which he still took medication. Id. Additionally, Sundberg had been diagnosed with major depression, for which he took medications and for which he was in some sort of therapy apparently for the entire 18 years he had been in prison. See id. at 2-3. The psychological evaluation was overall very positive but did note that the "most significant risk factor for this inmate which would be a precursor to violence would be finding himself in circumstances of extreme stress." Id. at 4. The psychologist stated that Sundberg suffers "from a psychiatric disorder which is well controlled with medications. I believe he could benefit from psychiatric treatment following his parole." Id. The psychologist also noted that, since Sundberg had acknowledged some abuse of alcohol and drugs, he would recommend abstinence from drugs and alcohol, monitoring for substance abuse, and mandatory attendance at self-help groups, such as AA or NA. Id. Sundberg stated at the hearing that he had not received treatment for depression before his incarceration, and that he had a family history of depression. Ominously, he saw depression in his future that might make him suicidal but he thought he could avoid harming anyone because he had learned coping skills. See RT 103-104.

Other than these concerns, the BPH was very favorably impressed with this inmate. He had been disciplinary-free for his entire incarceration, had been industrious and helpful in computer-related matters, had excellent work reviews, had been taking college-level courses with a purpose, and had participated in numerous self-help and therapy programs, had taken a leadership role in some of these groups, had tutored other inmates, and was considered to have a positive attitude. One commissioner observed that he had seen few inmates like Sundberg "who have done just about everything that they can possibly do with the hopes of bettering themselves." RT 114.

The Los Angeles County Superior Court upheld the decision in a reasoned order. The court identified the "some evidence" standard for judicial review of the parole decision. See Petition, Exh. R, p. 1. After reviewing the evidence related to the crime, the court explained:

> The Court finds that there is some evidence to support the Board's findings that the Petitioner's commitment offense demonstrated an exceptionally callous disregard for human suffering and that his motive was very trivial in relation to the offense. Cal. Code Regs., tit. 15, § 2402, subds. (c)(1)(D) and (c)(1)(E). After shooting the victim once in the garage, the Petitioner continued to pursue him, hit him with the gun and his fists, and then shot him again several times. This demonstrated an exceptionally callous disregard for the victim's suffering, as it was more violent than is ordinarily shown in the commission of murder in the second degree. [Citation.] Additionally, the Petitioner's motive was very trivial because, although the victim had previously threatened him and his wife and had previously been abusive to Pamela, he did not pose a threat to anyone and did not provoke the Petitioner in any way at the time of the offense. The Petitioner became enraged merely by the sight of the victim moving between the garage and the house. This was a very trivial motive for chasing him and shooting him multiple times.

Petition, Exh. R, ¶. 1-2. The court also noted that the BPH's consideration of some deficiencies in Sundberg's parole plan was permissible under the regulation. "While these factors may not justify a finding of unsuitability, the Board may consider them." Id. at 2. The court also stated that the BPH had some evidence to support its determination that Sundberg would pose an unreasonable threat to public safety because of the nature of his commitment offense, notwithstanding all of Sundberg's progress and accomplishments in prison. Id.

### 2. Analysis Of Federal Claim

The Los Angeles County Superior Court correctly identified the "some evidence" standard as the applicable standard for judicial review, as evidenced by its citation to In re Rosenkrantz, 29 Cal. 4th 616 (Cal. 2002), which had cited and adopted the Superintendent v. Hill some evidence standard as the proper standard for judicial review of evidentiary sufficiency for administrative cases. See Rosenkrantz, 29 Cal. 4th at 665-67. Because the Los Angeles County Superior Court's decision is the last reasoned decision, that is the decision to which § 2254(d) applies. See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006). The state court did not unreasonably apply Superintendent v. Hill.

The BPH had considered circumstances and factors proper under California law. A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). The BPH's ultimate conclusion was cast in terms of the requirement of California law, i.e., that

Sundberg "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." RT 106; see Lawrence, 44 Cal. 4th at 1191.

Notwithstanding all the positive factors for Sundberg, the BPH believed the criminal offense committed in 1988 that led to Sundberg's imprisonment was so bad that it still had enough weight to show that he posed an unreasonable risk of danger to society if released from prison in 2006. The BPH did not act arbitrarily or capriciously or without some evidentiary support in determining that the circumstances of the crime committed showed that Sundberg currently presented an unreasonable risk of danger to society if released, some 18 years into his 17-to-life sentence. As the state court explained, Sundberg became enraged at the mere sight of the victim, at a time when the victim was not posing a threat to anyone or doing anything to provoke Sundberg. Sundberg pursued the victim through the residence while shooting at him 14 times during the course of which he reloaded his weapon and pushed aside the victim's 11-year old son who tried to protect his father. This murder was, as the state court observed, more violent than the usual second degree murder. Additionally, the BPH properly considered parole plans in evaluating Sundberg. Most notably, the absence of a plan to address Sundberg's significant mental health needs upon release -- especially when he attributed the murder in large part to stress -- gave added support to the conclusion that his release would pose an unreasonable risk of danger to society. Bearing in mind that the court's chore is to consider not whether some evidence supports the reasons, but whether some evidence supports the conclusion that Sundberg's release unreasonably endangers public safety, this court concludes that the Los Angeles County Superior Court's rejection of Sundberg's insufficient evidence claim was not contrary to or an unreasonable application of the Superintendent v. Hill some evidence standard. Sundberg is not entitled to the writ on this claim.

D. Breach Of Plea Agreement Claim

Sundberg claims that the BPH's denial of parole resulted in a breach of the plea agreement. He reasons that, when he pled guilty and was sentenced, "the court noted the mitigating factors of his crime. Neither the court nor the prosecution raised aggravating factors,

13

leading Petitioner to reasonably understand that, barring misconduct on his part, his uniform term would be set according to the matrix for second degree murder, at his first parole hearing as required by the Penal Code sections then became part of his plea contract, when it was accepted by the court and he was sentenced." Petition, p. 36. In his traverse, Sundberg argues that the BPH's decision requires him to serve a term beyond the matrix for second degree murder, which deprives "him of the only benefit he could have received from his plea agreement to a lesser offense: a reduced term of imprisonment." Traverse, p. 13.

The Los Angeles County Superior Court denied the breach-of-plea-agreement claim. That court construed Sundberg's claim to be a "contention that the District Attorney's opposition to his parole violated the terms of his plea agreement. The Petitioner agreed to a bargain that subjected him to a life sentence. An indeterminate sentence is, in legal effect, a sentence for the maximum term unless the parole authority acts to fix a shorter term. (Citations.) The District Attorney must be given an opportunity to oppose parole under Penal Code § 3402." Petition, Exh. R, ¶. 3-4.[6]

"Plea agreements are contractual in nature and are measured by contract law standards." Brown v. Poole, 337 F.3d 1155, 1159 (9th Cir. 2003) (quoting United States v. De la Fuente, 8 F.3d 1333, 1337 (9th Cir. 1993)). Although a criminal defendant has a due process right to enforce the terms of a plea agreement, see Santobello v. New York, 404 U.S. 257, 261-62 (1971), there is no evidence that Sundberg's subjective expectations about how parole would be decided were part of the plea agreement. The court notes that Sundberg did not submit his plea colloquy, but only the transcript of the sentencing proceeding, which was upon a negotiated disposition. See Petition, Exh. B. At sentencing, the court made no findings of aggravating and mitigating circumstances, but simply observed that, regardless of any mitigating circumstances "that very assuredly can be asserted on behalf of the defendant," the law allowed no discretion in the sentence and the sentence had to be 17 years to life in prison. See id. at 3. Any aggravating factors, like any mitigating factors, wouldn't have made a difference: Sundberg had

---

[6]This court does not apply §2254(d) to the superior court's reasoned decision because that court did not decide the issue presented to this court.

14

to receive that 17-to-life sentence for second degree murder with a firearm. The sentencing transcript does not mention how parole consideration would occur. Sundberg provides no evidence that there was any promise that he would be released at any particular time absent further criminal activity or misbehavior. The possibility of parole does not mean a guarantee of parole; under state law (as it existed when he was sentenced and as it exists now), the inmate must be found suitable before his term and release date are set. He did receive a lesser sentence, in that a first degree murder conviction would have resulted in a life sentence with a minimum of 25 years instead of a minimum of 15 years. Sundberg has received the parole considerations to which he was entitled under his sentence. Sundberg's claim that his plea agreement was breached in violation of his right to due process fails.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED: March 8, 2010

                                        SUSAN ILLSTON
                                  United States District Judge